Michael W. Graf (SBN 136172)
Law Offices
227 Behrens Street
El Cerrito, California 94530
Telephone: (510) 525-1208
mwgraf@aol.com

Peter M.K. Frost, *applicant pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Telephone: 541-359-3238
frost@westernlaw.org

Attorneys for Plaintiffs Central Sierra Environmental
Resource Center and Sierra Forest Legacy

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CENTRAL SIERRA ENVIRONMENTAL RESOURCE CENTER; SIERRA FOREST LEGACY, <br><br> Plaintiffs, <br><br> v. <br><br> JEANNE M. HIGGINS, STANISLAUS NATIONAL FOREST, U.S. FOREST SERVICE, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Introduction.

1.       Plaintiffs Central Sierra Environmental Resource Center and Sierra Forest Legacy hereby respectfully file this suit against Defendants Jeanne M. Higgins, Stanislaus National Forest and the U.S. Forest Service ("Forest Service"), challenging their actions authorizing cattle grazing in sensitive forest habitats and wetland areas and along forest streams on three livestock grazing allotments in the Stanislaus National Forest, because their actions violate the Clean Water Act, California's Porter Cologne Act, the National Environmental Policy Act ("NEPA"), and the National Forest Management Act ("NFMA").

2.       The Forest Service has authorized cattle grazing on the Bell Meadow, Eagle Meadow, and Herring Creek ("BEH") allotments in a manner that contaminates streams in the public forest and in a manner that significantly degrades sensitive natural resources, including meadows, fens and stream and lake environments, violating standards applicable to grazing activities. The Forest Service has continued to authorize grazing without the required waste discharge permit or waiver. Further, the Forest Service has continued to authorize grazing that has caused and will continue to cause repeated violations of water quality standards for fecal coliform in streams in the allotments. The Forest Service has authorized grazing without any required completed NEPA process analyzing its effects.

3.       Plaintiffs bring this action to require the Forest Service to comply with federal and state laws and to ensure that any continued grazing protects and restores sensitive habitat areas and streams in the Stanislaus National Forest.

Jurisdiction.

4.       Final agency action exists that is subject to judicial review under the Administrative Procedure Act ("APA"). 5 U.S.C. § 702. Plaintiffs have exhausted any administrative remedies available to them. 36 C.F.R. part 215.18(c). This Court has jurisdiction pursuant to 28 U.S.C. §

1331. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court may grant declaratory relief and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. §§ 705 and 706.

5. Venue is proper in this Court pursuant 28 U.S.C. § 1391(e) because the events or omissions giving rise to the claims occurred in this district, the Stanislaus National Forest is in this district, the livestock allotments are in this district, and Plaintiffs and Defendants reside in this district. Fresno is the appropriate division within this district for this suit. LR 120(d).

Parties.

6. Plaintiff Central Sierra Environmental Resource Center ("CSERC") works to protect water, wildlife, and wild places across the Northern Yosemite region. CSERC has over 750 members who actively recreate, work, seek spiritual renewal, volunteer, do rehabilitation projects, undertake research, fish, hike, bird-watch, hunt, and otherwise make use of lands within the boundaries of the Stanislaus National Forest and specifically on lands within the project boundaries. CSERC's staff scientists and executive director have been deeply involved for more than 25 years in efforts to protect and restore at-risk plant and wildlife populations of the affected project area. CSERC staff has intensively engaged in local and regional grazing management planning both within and outside the project area. CSERC has participated in and provided detailed comments on the Stanislaus National Forest's approvals for range management within the grazing allotments challenged in this case.

7. Sierra Forest Legacy ("Legacy") is a regional environmental coalition with 81 partner groups. Legacy is focused on the conservation, enhancement and protection of old growth forests, wildlands, at-risk species, protection of the region's rivers and streams, and the ecological processes that shape the forest ecosystem of the Sierra Nevada. Legacy is a leader in bringing together scientists and diverse interests on a wide range of forest issues including fire ecology,

fuels management, protection of at-risk wildlife species, and socio-economic values associated with public forest management. Legacy has a high level of expertise dealing with species such as the Yosemite Toad and Sierra Nevada Yellow-Legged Frog.

8. Plaintiffs' members live, work, and/or recreate in or near the Stanislaus National Forest, including the allotments that are the subject of this case. Plaintiffs' members use and visit, on a continuing and ongoing basis, the resources in and surrounding the allotments for recreational, scientific, aesthetic, educational, wildlife and botanical preservation, conservation and other purposes such as camping, swimming, hiking, fishing, bird-watching, other wildlife observation, instruction, study, photography and general enjoyment of the beauty of the wildlife, land, and other resources in the area. Members intend to return to and to continue using and enjoying these resources in the future.

9. In order to safeguard these interests and to carry out their respective missions, Plaintiffs and their members have been, and continue to be, actively involved in planning and resource use issues involving range management activities in the Stanislaus National Forest. Plaintiffs have participated in administrative proceedings and reviews of the BEH Rangeland Allotments Project since its inception. Plaintiffs provided timely comments on a Draft Environmental Impact Statement ("DEIS") prepared for the Project and filed formal objections to the BEH Rangeland Allotments Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD").

10. The Forest Service's actions in this case have harmed and injured, and continue to harm and injure, the interests of Plaintiffs and their members by causing significant harmful effects upon the forest and meadow habitats and on water quality in forest streams contained within the BEH Rangeland Allotments Project area.  Significant negative impacts are caused by cattle adversely affecting the plant and wildlife species that depend upon that habitat and by cattle contributing pathogenic bacteria to unsafe levels of contamination of water.  Additionally, the

Forest Service's actions deny Plaintiffs' members their right to have public laws implemented and enforced. Plaintiffs' injuries would be redressed by the relief they seek. Plaintiffs have no adequate remedy at law. The actual and prospective harm to Plaintiffs' members has been caused by the Forest Service. The Court has authority to redress the actual and prospective harm Plaintiffs' members have suffered and will suffer.

11.     Defendant Jeanne M. Higgins is the Forest Supervisor for the Stanislaus National Forest. Ms. Higgins is sued in her official capacity.  Ms. Higgins is responsible to ensure that the national forest she supervises complies with all applicable laws.

12.     Defendant Stanislaus National Forest is a unit of the National Forest System. The Stanislaus National Forest and its staff are required to comply with federal law.

13.     Defendant United States Forest Service is an agency within the United States Department of Agriculture.  The Forest Service is responsible for ensuring that livestock grazing activities occurring on Forest Service are consistent with all applicable laws.

Facts.

14.     The Forest Service has issued permits authorizing cattle grazing on the BEH allotments on the Summit Ranger District in the Stanislaus National Forest in Tuolumne County.

15.     The Bell Meadow Allotment is bounded on the west by Dodge Ridge; on the north by the South Fork of the Stanislaus River; on the east by Bear Lake, Grouse Lake, Lake Valley and Chain Lakes; and, on the south by Bell Mountain. The location is generally described as Townships 3 and 4 North and Ranges 18 and 19 East. The Allotment ranges in elevation from about 6,350 to 9,150 feet. Annual precipitation averages 50 to 60 inches. The Bell Meadow Allotment encompasses about 13,240 acres, all of which are National Forest System lands.

16.     The Eagle Meadow Allotment is bounded on the northwest by Highway 108 and the Middle Fork Stanislaus River; on the north by Double Dome; on the east by Haypress Lake; on the

southeast by Lower Relief Valley; and, on the south by Eagle Pass and the Emigrant Wilderness. The location is generally described as Townships 5 and 6 North and Ranges 19 and 20 East. The Allotment ranges in elevation from about 6,400 to 9,900 feet. Annual precipitation averages 50 to 65 inches. The Eagle Meadow Allotment currently encompasses about 20,700 acres, and under the recent project proposal, would have expanded to 25,092 acres, about 870 acres of which are private lands, with the remainder being National Forest System lands.

17.     The Herring Creek Allotment is bounded on the west by Highway 108 and Leland Creek; on the north by Bull Run and Eagle Peak; on the east by Horse and Cow Meadow and McCormick Pocket; and on the south by the Emigrant Wilderness. The location is generally described as Townships 4 and 5 North and Ranges 18 and 19 East. The Allotment ranges in elevation from about 5700 to 9500 feet. Annual precipitation averages 50 to 60 inches. The Herring Creek Allotment encompasses about 18,150 acres, all of which are National Forest System lands.

18.     In 1995, Congress enacted the Rescissions Act. The Rescissions Act requires the Forest Service to set a schedule for assessing the environmental impacts of grazing permits under NEPA. Section 504(a) of the Act requires the Forest Service to: 1) determine which grazing allotments need NEPA analysis and documentation in order to support the continuation of permitted grazing activity; 2) develop a schedule for each NFS unit for the completion of the NEPA analysis and documentation on those allotments where NEPA analysis is needed; and 3) adhere to the schedule. Section 504(b) of the Act states that "grazing permits which expire or are waived before the NEPA analysis and decision pursuant to the schedule… shall be issued on the same terms and conditions and for the full term of the waived or expired permits. Upon completion of the scheduled NEPA analysis and decision for the allotment, the terms and conditions of existing grazing permits may be modified or re-issued, if necessary to conform to such NEPA analysis."

19. To comply with the Rescissions Act of 1996, in 1996, the Forest Service published a NEPA Allotment Schedule. That schedule displayed information for allotments in need of NEPA Analysis during a 15-year span, from 1996 to 2010. The 1996 National Allotment NEPA Schedule identified 6,886 allotments (out of a total of approximately 9,400 allotments).

20. In 2004, Congress enacted the Interior Appropriations Act. P.L. 108-108. Section 325 of the Interior Appropriations Act provides that "notwithstanding Section 504 of the Rescissions Act (109 Stat. 212), the Secretaries in their sole discretion determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the Secretaries for this purpose."

21. In 2008, the Forest Service updated the 1996 schedule to account for local adjustments relative to priority of allotments and timing due to funding issues and changing environmental significance. The new 2008 NEPA Allotment Schedule displayed a total of 3,897 allotments needing NEPA analysis.

22. In 2010, the Forest Service directed the Regional Foresters to provide updates or prepare NEPA analyses for allotments that needed them. The 2011 NEPA Allotment Schedule displayed a total of 3,605 allotments requiring NEPA analysis. Subsequently, the Forest Service created a compliance schedule addressing the 12-year period from 2014 to 2025.  The 2014 NEPA Allotment Schedule displays a total of 3,782 allotments needing NEPA analysis, and includes four 3-year cycles ending in 2016, 2019, 2022 and 2025.  According to the 2014 NEPA Allotment Schedule, NEPA review for the BEH allotments was to be completed by 2016, within the 2014 to 2016 cycle.

23. Following enactment of the Rescissions Act, representatives of environmental organizations (including some of Plaintiffs) met with Forest Service range officials at the Regional Office level and with representatives of the grazing industry and permittee associations.  The

organizations presented photos of resource conditions within the Stanislaus National Forest as examples of livestock impacts of grave concern that were also evident elsewhere on national forest lands in Region 5.  These discussions and attempts to develop collaborative-based improvements in range management practices lasted for nearly two years of quarterly meetings, but did not result in substantive changes in grazing practices in sensitive areas within the Region or in the Stanislaus National Forest.

24. Following these meetings, the Stanislaus National Forest identified four allotments in upper elevation areas of the Stanislaus Forest as timely and appropriate for allotment management planning to address public concerns and to meet Rescissions Act direction. The allotments were: Bell Meadow-Bear Lake, Long Valley-Eagle Meadow, Herring Creek, and Stanislaus Meadow.

25. The Forest Service first listed the Rangeland Allotments Phase 1 (Phase 1) project in the April 1, 2006 issue of the Stanislaus National Forest Schedule of Proposed Actions ("SOPA"). In December, 2006, the Forest issued an Environmental Assessment ("EA") to analyze whether to re-authorize grazing on the four allotments.  In 2007, the Forest Service issued a Decision Notice and Finding of No Significant Impact to authorize continued grazing on the four allotments.  Three administrative appeals were filed under 36 C.F.R. 215. A primary objection from environmental organizations focused on the Forest Service's failure to develop an EIS that would consider a range of alternatives to the status quo grazing that was then occurring within the affected allotments. In response to the appeals, the Regional Forester reviewed the project record and reversed the decision on October 15, 2007. The Regional Forester cited a lack of cumulative effects analyses in wildlife specialist reports and the failure of the record to support the elimination by the Stanislaus National Forest of additional alternatives suggested by the public for consideration.

26. Following the 2007 appeal decision, the Forest Supervisor determined a need to prepare a new EA in order to make a new decision. The Forest Service first listed the Rangeland Allotment

8
Complaint for Declaratory & Injunctive Relief

Phase 1 (2008) in the April 2008 issue of the Stanislaus National Forest Schedule of Proposed Actions. A revised EA was made available for public comment on June 19, 2009. Environmental organizations raised strong objections to the failure of the EA to consider a reasonable range of alternatives, including management direction that would reduce resource impacts and water quality effects associated with livestock presence within the allotments. In comments submitted in July, 2009, CSERC provided extensive comments and citations of peer-reviewed literature related to fecal coliform and other pathogens contaminating water in streams sampled within grazing allotments within the Stanislaus National Forest.

27. On February 19, 2010, the Forest Supervisor determined that additional analysis was necessary to incorporate new information. The Forest Service decided to prepare an EIS to analyze and disclose environmental impacts related to grazing on the allotments.

28. In the next planning phase, the Forest Service narrowed management planning to the BEH allotments. The Forest Service first listed the BEH Allotment Project in the October 2010 issue of the Stanislaus National Forest Schedule of Proposed Actions. On August 3, 2011 the Forest sent a scoping letter to individuals, permittees, organizations, agencies, and Tribes interested in this project. On August 4, 2011, the Forest Service published a Notice of Intent requesting public comment on the proposal. 76 Fed. Reg. 47,140-41 (Aug. 4, 2011). CSERC and Legacy commented during scoping.

29. In 2012 and 2013, CSERC provided the Forest Service with photos and field measurements at forage utilization sites, meadows, and riparian areas within the BEH allotments. The data showed stream bank degradation and water quality effects associated with livestock being concentrated along streams for prolonged periods. CSERC expressed concern about contamination of streams in recreation areas within the allotments, where direct contact with polluted water by forest visitors poses a significant health issue.

30. On January 31, 2014 the Forest Service published an initial Notice of Availability for a DEIS prepared to assess the impacts of grazing on the BEH allotments. 79 Fed. Reg. 21 (Jan 31, 2014).

31. The DEIS states: "Recent assessments indicate that specific locations within the project area may not be meeting or moving toward desired conditions in a manner that is timely and consistent with Forest Plan objectives, standards and guidelines. Gaps between existing resource conditions and desired conditions indicate a need to change grazing management by updating AMPs.... There is a need to design and implement an adaptive management system that will continue to move resource conditions toward desired conditions in a manner that is timely and consistent with Forest Plan goals and objectives."

32. The DEIS describes the Proposed Action as: "[U]pdate Allotment Management Plans, change Allotment boundaries, and implement design criteria, including resource conservation measures and an adaptive management strategy that would move existing resource conditions toward desired conditions. These actions are needed in order to fulfill P.L. 104-19 Section 504 of the 1995 Rescissions Act, which requires each National Forest to establish and adhere to a schedule for completing NEPA analysis and updating Allotment Management Plans for all rangeland Allotments on National Forest System lands."

33. The DEIS considers four alternatives: 1) proposed action; 2) no project alternative, which would allow no further grazing in the allotments; 3) continue current management; and 4) reduced impact alternative. The DEIS describes Alternative 4 as implementing "resource protection measures immediately where a need for change in management was identified during project analysis. Livestock grazing would be minimized or excluded in areas where certain resource concerns were identified. Permitted livestock numbers for the Bell Meadow, Eagle Meadow, and

Herring Creek Allotments would be reduced by an amount proportionate to the reduction in suitable foraging area caused by exclusion of those areas with resource concerns."

34. CSERC and other interested parties submitted comment letters on the DEIS. In March 2014, a coalition of environmental organizations - including CSERC and Legacy -- submitted detailed comments, photos providing evidence of degraded resource conditions within the BEH allotments area, extensive field monitoring observations, and copies of e-mail correspondence between the Forest Service and Plaintiffs. These comments included declarations by research experts with field experience about resource conditions and affected wildlife species within the BEH allotments area.

35. In March 2014, the Central Valley Regional Water Quality Control Board commented to support Alternative 4 in the DEIS. The Board noted the lack of necessary monitoring by the Forest Service as being inadequate to achieve a successful adaptive management strategy. The Board noted that beneficial uses of water in the project area apply to all upstream tributaries and connected surface waters of the Stanislaus and Tuolumne Rivers.

36. On March 1, 2016, the Forest Service issued the BEH Rangeland Allotments Final EIS and draft ROD. The draft ROD states that the purpose of the project is to continue to authorize livestock grazing in the project area, implement an adaptive management strategy, and ensure compliance with regulations and agency policies. The draft ROD states the following regarding the use of monitoring and adaptive management in the BEH Allotment management strategy: "The Proposed Action implements an Adaptive Management Strategy to achieve defined desired conditions through design criteria, monitoring and constrained flexibility. By monitoring effects and evaluating results, managers can assess resource trends and modify management practices by adjusting the AMP or AOI."

37. In April 2016, CSERC and Legacy filed an objection in response to the FEIS and the draft ROD. On May 13, 2016, Objection Reviewing Officer Barnie Gyant and Stanislaus Forest Supervisor Jeanne Higgins participated in a resolution call with objectors regarding the BEH Rangelands project.  No resolution was achieved. On July 22, 2016, all those filing objections along with other participants met with Stanislaus Forest staff at two meadow locations within the BEH allotments planning area. Forest Supervisor Higgins described reasons why her draft ROD continued to approve the same number of livestock for the same grazing period as the status quo management direction allowed.  Forest Supervisor Higgins encouraged those filing objections to strongly consider accepting improved adaptive management and increased monitoring as the management direction for the three allotments. The field session ended without any resolution of the objections.  On August 29, 2016, Forest Supervisor Higgins withdrew the draft ROD for the BEH Allotments Project.

38. On September 9, 2016, Objection Reviewing Officer Barnie Gyant set aside all objection appeals based on the withdrawal of the draft ROD by Supervisor Higgins.  His letter to objectors noted that his action constitutes the final administrative determination by the Department of Agriculture and is not subject to further administrative review. The same general grazing management direction for the BEH allotments from prior to the start of AMP planning in 2006 continues to be legal direction for livestock management in the upcoming 2017 grazing season.

39. Due to a lack of water quality monitoring data for streams in allotments within the Stanislaus National Forest, CSERC biologist Lindsey Myers coordinated with the State Water Resources Control Board to establish a protocol-consistent program of water quality sampling of forest streams. In cooperation with Water Board staff, Myers developed a Quality Assurance Project Plan ("QAPP") to ensure accurate sampling. Starting in 2009 Myers and other CSERC biologists sampled streams within the BEH allotments following the QAPP. Samples were taken

before livestock arrived, after they arrived, and after they departed.  Surface waters were tested for pathogenic bacteria indicators (i.e., *E. coli*, total coliform bacteria, and fecal coliform bacteria).  On June 7, 2011, the Journal of Water Quality, Exposure, and Health published a paper by Myers and Kane documenting sampling results and verifying that stream contamination levels spiked during periods when livestock were present on the BEH allotments.

40.     In August 2012, the Journal of Environmental Protection published a paper by Myers and Whited that documented livestock-generated effects associated with laboratory tests of water quality in forest streams in three different climatic years within the BEH allotments.  Myers (2012) reported multiple violations of water quality health thresholds within the BEH allotments.  The levels of indicator bacteria quantified by testing done at the independent laboratory revealed water contamination levels in allotment streams that were significantly above thresholds established by the State for recreational bodily contact with water.

41.     CSERC staff was present for each sampling event to ensure specific protocols were followed, and samples were delivered within the 6-hour time limit to an ELAP certified testing laboratory.  Sample sites were selected to represent a range of conditions and allow samples to be delivered to the lab within 6 hours.  A control site was selected and sampled where cattle were excluded from grazing.  In addition to comparing grazed sites with the control site where cattle never graze, samples were taken "before, during and after" livestock presence in streams flowing through grazing areas to examine any fluctuations in fecal indicator bacteria correlated to the arrival and departure of livestock each season.  As part of the QAPP, CSERC staff tested "field blanks" (samples of clean, filtered water) to ensure there were no quality control issues at the lab or with the sampling technique in the field.

42.     The Central Valley Water Quality Control Board Basin Plan has adopted a water quality standard for pathogenic bacterial pollution in waters designed for contact recreation.  Streams

within the BEH allotments are designated for contact recreation. The water quality standard provides that in waters designated for contact recreation (REC-1), the fecal coliform concentration based on a minimum of not less than five samples for any 30-day period shall not exceed a geometric mean of 200CFU/100 ml, nor shall more than ten percent of the total number of samples taken during any 30-day period exceed 400CFU/100 ml.

43.     The results of the 2011 and 2012 studies (as well as subsequent monitoring that continued through the summer and fall of 2016) showed that individual and average concentrations of fecal coliform bacteria in surface waters were below regulatory thresholds at the ungrazed (control) site and at the grazed sites before cattle arrived.  Shortly after cattle were released into the allotments to graze, fecal coliform concentrations in streams were found to be much higher, and in places exceeded the established state standards for recreational contact with water.  The increase in mean concentration of fecal coliform at each grazed site was significant ($p < 0.05$), and there was no significant difference or increase in contamination at the control site.  Total coliform bacteria and *E. coli* concentrations showed the same pattern.  Significant violations of state water quality standards persisted throughout the summer grazing period, with more than 40 documented violations of state water quality standards identified during the 2009 summer grazing season.

44.     In the 2012 Study, evidence documented 161 violations of State standards during three years of sampling of the selected stream segments within the Stanislaus National Forest: "Violations of the Basin Plan Standard were documented each of the three years after cattle were present.  No violations were found before cattle presence or at control sites. Violations of the State water quality standard for fecal coliform concentration in forest water-bodies were frequent after cattle arrival.  For this study, reporting (i.e., five or more samples collected within a 30-day period) periods were only tabulated where a sampling event occurred on the first and/or last day of the last day of the 30-day period.  This conservative method of data analysis documented 41

violations in 2009, 68 violation in 2010, and 52 violations in 2011 of the relevant water quality standard for fecal coliform bacteria contained in the Basin Plan. A more comprehensive analysis (i.e., tabulating all possible 30-day periods by restarting the 30-day calendar each day) would likely produce many more violations."

45. Monitoring conducted by CSERC during field seasons from 2012 through 2016 has shown continued water quality violations contributed to by livestock grazing in streams in the BEH allotments. In the 2016 field season, (summer, early fall), laboratory results from stream monitoring show 37 violations of Central Valley Regional Water Board (Region 5) regulatory standards for fecal coliform (which includes geometric mean of at least 5 samples in a 30-day period or 10% of samples in a 30-day period not exceeding a specific threshold) or 22 violations of the U.S. Environmental Protection Agency's regulatory standards for *E. coli*. Just within the BEH allotments, lab results for 2016 showed 30 violations for fecal coliform and 18 for *E. coli.*

46. Livestock grazing on the BEH allotments has violated and is likely to continue to violate Forest Plan management standards related to streambank and shoreline protection, livestock impacts to special aquatic features, key grass species utilization and levels of riparian hardwood browse.

## CLAIMS FOR RELIEF.

### Count One: Violation of the Federal Clean Water Act

47. Plaintiffs reallege all previous paragraphs.

48. The Forest Service is required to comply with all State requirements respecting the control and abatement of water pollution in the state, including those set forth in California's Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 1 *et seq. See* 33 U.S.C. § 1323. The Forest Service has violated the Porter Cologne Act, which requires either waste discharge permits or a waiver in order to authorize the discharge of pollutants into state waters. *See* Cal. Water Code

§§ 13263; 13269.  California's Nonpoint Source Plan states: "The SWRCB and RWQCB may not delegate their NPS authorities and responsibilities to another agency… Another agency's actions pursuant to an MOU or MAA do not fulfill the RWQCB's obligation to use its administrative tools to address the relevant NPS discharges."  The Forest Service's authorization of grazing and associated water quality contamination within the BEH allotments violates state law requirements, because it authorizes non-point source pollutant discharges without a permit or waiver as required by state law.

49.     The Forest Service has authorized livestock grazing on the BEH allotments that has caused violations of state water quality standards for fecal coliform bacteria in waters designated for contact recreation (REC-1), as set forth in the Central Valley Regional Water Quality Control Board Basin Plan, and is likely to continue to cause such violations. 33 U.S.C. § 1313.

### Count Two: Violation of Forest Plan Standards

50.     Plaintiffs reallege all previous paragraphs.

51.     The Forest Service may authorize livestock grazing in areas of the Stanislaus National Forest if it complies fully with Stanislaus National Forest LRMP (Forest Plan) standards and guidelines, including regional standards contained in the 2004 Sierra Nevada Forest Plan Amendment.  36 C.F.R. §§ 222.2, 222.4.  The Forest Service's continued authorization of grazing on the BEH Allotments violates regional Forest Plan Standard and Guideline No. 50, which requires the Forest Service to "protect hardwood regeneration in grazing allotments" by allowing "livestock browse on no more than 20 percent of annual growth of hardwood seedlings and advanced regeneration" and to "[m]odify grazing plans if hardwood regeneration and recruitment needs are not being met."  The draft ROD for the BEH allotments stated that the necessary adjustments to protect hardwood regeneration and recruitment would be accomplished through an adaptive management program, based on monitoring.  Required monitoring has not occurred

within each of the affected allotments each year, and current management direction lacks any adaptive program.  Further, livestock grazing on the BEH allotments has violated that standard.

52. The Forest Service's continued authorization of grazing on the BEH Allotments also violates regional Standard and Guideline No. 103, which requires the Forest Service to "p]revent disturbance to streambanks and natural lake and pond shorelines caused by [livestock] activities ...from exceeding 20 percent of stream reach or 20 percent of natural lake and pond shorelines." Plaintiffs have submitted photo evidence of streambanks and natural lake and pond shorelines, trampled, chiseled, and pocked by livestock hooves in excess of Standard and Guideline No. 103. The draft ROD for the BEH allotment stated that the necessary adjustments for streambanks and shorelines would be accomplished through a proposed adaptive management program, based on diligent monitoring.  Required monitoring has not occurred, and current management direction lacks any adaptive program.  In contrast, livestock grazing continues in violation of this standard.

53. The Forest Service's continued authorization of grazing on the BEH allotments also violates regional Standard and Guideline No. 117, which requires the Forest Service to ensure that "characteristics of special features are, at a minimum, at Proper Functioning Condition." "Characteristics of special features" means, in part, special aquatic features on the allotments. The draft ROD for the BEH allotment stated that the necessary adjustments to meet desired conditions would be accomplished through a proposed adaptive management program based on diligent monitoring.  Required monitoring has not occurred, and current management direction lacks any any adaptive program. As acknowledged by the Forest Service's own analysis, numerous springs, fens, and wetlands defined as special aquatic features are not in proper functioning condition, and cattle are not excluded from these areas through fencing or alternative methods. In contrast, monitoring conducted by Plaintiffs on the three Allotments over the last 9 years show numerous violations of this standard and frequent resource damage to these vulnerable special habitats.

54. The Forest Service 's continued authorization of grazing on the BEH allotments also violates regional Standard and Guideline No. 118, which requires the Forest Service to "[p]rohibit or mitigate ground-disturbing activities that adversely affect hydrologic processes that maintain water flow, water quality, or water temperature critical to sustaining bog and fen ecosystems and plant species that depend on these ecosystems." Under current permits, allotment management plans and Annual Operating Instructions (AOI's), grazing in the BEH Allotments has violated this standard. The draft ROD for the BEH allotment stated that the necessary adjustments to protect fens would be accomplished through a proposed Adaptive Management program, based on diligent monitoring. While a limited amount of monitoring was done, current management direction lacks any adaptive program and an effective management strategy to actually exclude cattle from at-risk fens. In contrast, monitoring conducted by Plaintiffs on the three Allotments over the last nine years show numerous violations of this standard.

## Count Three: Violation of Rescissions Act

55. Plaintiffs reallege all previous paragraphs.

56. The 1995 Rescissions Act requires the National Forests to develop a schedule for each NFS unit for the completion of the NEPA analysis and documentation on those allotments where NEPA analysis is needed, and thereafter to adhere to that schedule. *See* Rescissions Act of 1995, From PL 104-19, Sections 504(a)-(b). Subsequent Congressional legislation has clarified that the Department of Agriculture Secretary has discretion over the timing set forth in the schedule based on two factors: 1) the environmental significance of the allotments; and 2) funding available to the Secretaries for the purpose of completing NEPA review. In 2014, the Forest Service adopted a new NEPA Allotment Schedule addressing the 12-year period from 2014 to 2025, encompassing a total of 3,782 allotments needing NEPA analysis over four 3-year cycles (2016, 2019, 2022 and

2025).  According to the 2014 NEPA Allotment Schedule, NEPA review for each of the Bell, Eagle and Herring Creek Allotments was to be completed by 2016, within the 2014-2016 cycle.

57.     Forest Supervisor Higgins' decision on August 29, 2016 to withdraw the draft ROD for the BEH Allotments Project violates the schedule set for NEPA compliance by the Secretary of Agriculture.  At the time of the withdrawal, the Forest Service had no other schedule in place for NEPA compliance for these allotments.  Supervisor Higgins herself lacked the authority to unilaterally alter the NEPA schedule for the allotments. Further, the Forest Supervisor's withdrawal did not evaluate or consider the relevant criteria for establishing the order and timing for NEPA review of grazing allotments, namely: 1) the environmental significance of the allotments; and 2) funding available to the Secretaries for the purpose of completing NEPA review.  Here the allotments are environmentally significant and funding was not only available, but was, in fact, utilized to complete the NEPA review process.

## Relief Requested.

1.      Declare that the Forest Service has violated the Clean Water Act because it has failed to comply with state water quality requirements before authorizing livestock grazing on the BEH allotments and, independently, because grazing has violated and is likely to continue to violate state water quality standards for fecal coliform in waters within the allotments. *See* 33 USC § 1323; Cal. Water Code §§ 13263; 13269.

2.      Declare that the Forest Service has violated NFMA by authorizing livestock grazing on the BEH allotments that violates forest plan management standards designed to protect stream and shore banks, riparian plant species, fens and special habitat features.

3.      Declare that the Forest Service's decision to withdraw the draft ROD for the BEH Allotments Project and not adhere to the schedule set for NEPA compliance by the Secretary of Agriculture violates the Rescissions Act and subsequent acts.

4. Order the Forest Service to modify livestock grazing on the BEH allotments to ensure full compliance with all relevant laws;

5. Grant such other relief as the Court deems necessary and proper.

Dated: March 28, 2017.                    Respectfully submitted,

/s/ Michael Graf
Michael Graf (SBN 136172)
Law Offices
227 Behrens St.
El Cerrito CA  94530
Tel: (510) 525-1208
mwgraf@aol.com

/s/ Peter M.K. Frost
Peter M.K. Frost, *applicant pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-359-3238
frost@westernlaw.org

Attorneys for Plaintiffs