**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CENTRAL SIERRA ENVIRONMENTAL RESOURCE CENTER,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **STANISLAUS NATIONAL FOREST,** *et al.*, <br><br> **Defendants.** | **1:17-cv-00441-LJO-SAB** <br><br> **MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTIONS TO DISMISS (ECF Nos. 40 and 41)** |

## I. <u>INTRODUCTION</u>

Plaintiffs Central Sierra Environmental Resource Center ("CSERC") and Sierra Forest Legacy (together, "Plaintiffs") bring this suit against Defendants Jeanne M. Higgins (now former Forest Supervisor for the Stanislaus National Forest), Stanislaus National Forest, and the U.S. Forest Service ("Forest Service") (together, "Federal Defendants"), challenging the cattle grazing program in three livestock allotments in Stanislaus National Forest. Federal Defendants moved to dismiss on the grounds both that the Plaintiffs fail to state a claim upon which relief can be granted and that the Court lacks jurisdiction to hear the claims. ECF No. 41-1 ("Mot."). Defendant- Intervenors, various permittees and the permittees' trade association, also moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 40-1 ("Intervenor Mot."). Plaintiffs opposed both motions in a single opposition. ECF No. 46 ("Opp."). Federal Defendants, ECF No. 52 ("Reply"), and Defendant-Intervenors, ECF No. 51 ("Intervenor Reply"), both filed replies. This matter is now ripe for review and is suitable for disposition without oral argument. *See* Local Rule 230(g).

1

## II. <u>STATUTORY BACKGROUND</u>

**A.**     <u>Clean Water Act</u>

The purpose of the Clean Water Act ("CWA") is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Accordingly, the CWA prohibits "the discharge of any pollutant by any person" into waters of the United States except when discharged in compliance with a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. The CWA "drew a distinct line between point and nonpoint pollution sources." *Oregon Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 (9th Cir. 1987). The CWA defines point sources as "discernible, confined and discrete conveyances," including pipes and ditches. 33 U.S.C. § 1362(14).[1] The CWA does not define nonpoint sources, but they consist of other sources of pollution that do "not result from the 'discharge' or 'addition' of pollutants from a point source."[2] *Oregon Nat. Res. Council*, 834 F.2d at 849 n.9. Nonpoint sources of pollution include runoff from animal grazing and irrigated agriculture. *Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1998) ("*O.N.D.A. v. Dombeck*"). The parties do not dispute that "something as inherently mobile as a cow" represents a nonpoint pollution source. *Id.* at 1099.

The CWA directly regulates pollution from point sources through the issuance of NPDES permits but "provides no direct mechanism to control nonpoint source pollution." *O.N.D.A. v. Dombeck*, 172 F.3d at 1097. Instead, the CWA "uses the 'threat and promise' of federal grants to the states to accomplish this task" through federal grants for state wastewater treatment plans, 33 U.S.C. § 1288(b)(2), and a requirement that states prepare nonpoint source management programs, 33 U.S.C. § 1329. The latter provision, CWA § 319, "does not require states to penalize nonpoint source polluters

---

[1] The full definition is as follows: "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362(14).
[2] The CWA defines "discharge of pollutant" to mean, in relevant part, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

who fail to adopt best management practices; rather it provides for grants to encourage the adoption of such practices." *Nat. Res. Def. Council v. E.P.A.*, 915 F.2d 1314, 1318 (9th Cir. 1990). California's Porter-Cologne Water Quality Control Act ("Porter-Cologne Act") established California's framework for water quality regulation in the state. Cal. Water Code ("CWC") § 13000 *et seq.* The Porter-Cologne Act vested California's State Water Resources Control Board ("State Water Board"), CWC § 13100, and nine regional water boards, CWC § 13200, with power to set standards and procedures to protect water quality, such as the creation and adoption of water quality control plans, CWC § 13240, and control over the information that waste dischargers must file with the regional board, CWC § 13260.

Though the CWA does not itself regulate nonpoint pollution sources, it provides that federal agencies are required to comply with state and local water quality requirements to the same extent as nongovernmental actors. CWA § 313, 33 U.S.C. § 1323. This requirement applies both to point and nonpoint sources. *O.N.D.A. v. Dombeck*, 172 F.3d at 1098 ("Section 1323 plainly applies to nonpoint sources of pollution on federal land.").

**B.**    **National Forest Management Act**

The Forest Service manages the National Forests pursuant to the National Forest Management Act of 1976 ("NFMA"). *See* 16 U.S.C. §§ 1600-1614. The NFMA and its implementing regulations provide for forest planning and management at the forest level and at the individual project level. *See id.*; *see also Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996). At the forest level, the Forest Service is required to develop a Land and Resource Management Plan ("LRMP" or "Forest Plan"), which sets forth a long-term planning document for an entire National Forest that considers a range of economic and environmental factors. *See* 16 U.S.C. § 1604(g)(1)-(3). At the individual project level, site-specific actions, such as resource plans, contracts, and grazing permits, are approved or denied by the Forest Service consistent with the governing LRMP. *See Inland Empire Pub. Lands Council*, 88 F.3d at 757.

"It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan

3

is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). NFMA is clear that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1062 (9th Cir. 2002) ("Specific projects, such as the Grade/Dukes timber sale, must be analyzed by the Forest Service and the analysis must show that each project is consistent with the plan."); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002) ("[A]ll management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the Forest Act."); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377–78 (9th Cir. 1998) (holding that the Forest Service was not in compliance with NFMA where its site-specific project was inconsistent with the forest plan of the entire forest); *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1068 n.4 (9th Cir. 1998) ("16 U.S.C. § 1604(i) plainly imposes a legal obligation on the Forest Service to ensure that timber sales are consistent with the relevant Forest Plan.").

The Forest Service authorizes grazing on allotments through three types of site-specific actions, each of which must be consistent with the applicable Forest Plan. *Buckingham v. Sec'y of U.S. Dep't of Agr.*, 603 F.3d 1073, 1077 (9th Cir. 2010). The first type of action is grazing permits, which are "document[s] authorizing livestock to use National Forest System or other lands under Forest Service control for the purpose of livestock production." 36 C.F.R. § 222.1(b)(5); *see also* 43 U.S.C. §§ 1702(p), 1752(a). Grazing permits ordinarily specify "(1) the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the period of use." *Buckingham*, 603 F.3d at 1077 (quoting *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006) ("*O.N.D.A. v. U.S. Forest Serv.*")). The standard term for grazing permits is ten years. *Id.* (citing 43 U.S.C. § 1752(b); 36 C.F.R. § 222.3(c)(1)). The Forest Service "'is authorized to cancel, modify, or suspend grazing and livestock use permits in whole or in part' if the permittee fails to comply with the requirements of his or her permit, or with governing regulations." *Id.* (quoting 36 C.F.R. § 222.4(a)(4)).

The second type of site-specific action is an "allotment management plan" ("AMP"), which is "a document that specifies the program of action designated to reach a given set of objectives" as to a specific allotment, including "the manner in and extent to which livestock operations will be conducted in order to meet the multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands, involved." *Id.* (citing 36 C.F.R. § 222.1(b)(2)). If no AMP has been completed or if the Forest Service determines that none is necessary, then the grazing permits and leases include "such terms and conditions as [the Forest Service] deems appropriate for management of the permitted or leased lands." 43 U.S.C. § 1752(e).

Finally, the third type of site-specific action is the development of annual operating plans ("AOPs") or instructions ("AOIs"). "Whereas the AMP relates the directives of the applicable [F]orest [P]lan to the individual grazing allotment . . . the AOI annually conveys these more long-term directives into instructions to the permittee for annual operations." *O.N.D.A. v. U.S. Forest Serv.*, 465 F.3d at 980. "Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit . . . ." *Id.* at 980-81. The terms of the AOI are made part of the grazing permit, which then "governs the permit holder's grazing operations for the next year." *Id.* at 980.

**C.    NEPA And The Rescissions Act**

The National Environmental Policy Act ("NEPA") "is our 'basic national charter for protection of the environment.'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (quoting 40 C.F.R. § 1500.1). "Although NEPA does not impose any substantive requirements on federal agencies, it does impose procedural requirements." *N. Idaho Cmty. Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). "Through these procedural requirements, NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger public audience." *Id.* (internal citations and

quotations omitted).

NEPA requires federal agencies to analyze the potential environmental impacts of any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). When an agency takes major federal action, the agency must prepare an Environmental Impact Statement ("EIS") "where there are substantial questions about whether a project may cause significant degradation of the human environment."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

An agency may choose to prepare an environmental assessment ("EA") to determine whether an EIS is needed.  40 C.F.R. §§ 1501.4, 1508.9(b).  An EA is meant to be a "concise public document . . . that serves to," among other things, "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9; *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988).  Based on the EA, the agency "may conclude that the action will not significantly affect the environment and issue a 'Finding of No Significant Impact' ('FONSI') in lieu of an EIS."  *Bob Marshall*, 852 F.2d at 1225 (citing 40 C.F.R. § 1508.13).

In November 1994, the Forest Service first implemented its policy requiring that NEPA analyses be conducted in connection with the reissuance of any grazing permit.  *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 158 (D.D.C. 2002).  Because of the large number of grazing permits issued every year, the Forest Service was unable to complete all the NEPA analyses prior to reissuing the permits.  *Id.*  In response to the threat that many permits would expire and not be reissued because of the lack of a NEPA analysis, Congress enacted the Rescissions Act of 1995, Pub. L. No. 104–19, §§ 501–04, 109 Stat. 194 (1995) ("Rescissions Act"),[3] which set forth a schedule for the Forest Service's completion of NEPA analyses and decisions, and established a temporary exemption from

---

[3] The full name is Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti–Terrorism Initiatives, for Assistance in the Recovery from the Tragedy that Occurred at Oklahoma City, and Rescissions Act, 1995.

NEPA review for those permits that were up for reissuance before the NEPA review for that allotment

had been completed.[4]  *Id.*  Congress has continued to alter the statutory framework in the years since the

passage of the Rescissions Act through appropriations riders.  Section 325 of the 2004 appropriations act

for the Department of the Interior provides:

> That beginning in November 2004, and every year thereafter, the Secretaries of the Interior and Agriculture shall report to Congress the extent to which they are completing analysis required under applicable laws prior to the expiration of grazing permits, and beginning in May 2004, and every two years thereafter, the Secretaries shall provide Congress recommendations for legislative provisions necessary to ensure all permit renewals are completed in a timely manner.  The legislative recommendations provided shall be consistent with the funding levels requested in the Secretaries' budget proposals[.] . . . That notwithstanding section 504 of the Rescissions Act (109 Stat. 212), the Secretaries in their sole discretion determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the Secretaries for this purpose.

Department of the Interior and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108,

November 10, 2003, 117 Stat 1241, § 325.  In 2014 Congress amended the Federal Land Policy and

Management Act to provide that:

> [t]he Secretary concerned, in the sole discretion of the Secretary concerned, shall determine the priority and timing for completing each required environmental analysis with respect to a grazing allotment, permit, or lease based on-- (1) the environmental significance of the grazing allotment, permit, or lease; and (2) the available funding for

---

[4] Section 504 provides:

> a) SCHEDULE FOR NEPA COMPLIANCE.—Each National Forest System unit shall establish and adhere to a schedule for the completion of National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) analysis and decisions on all allotments within the National Forest System unit for which NEPA analysis is needed. The schedule shall provide that not more than 20 percent of the allotments shall undergo NEPA analysis and decisions through fiscal year 1996.

> (b) REISSUANCE PENDING NEPA COMPLIANCE.—Notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision pursuant to the schedule developed by individual Forest Service System units, shall be issued on the same terms and conditions and for the full term of the expired or waived permit. Upon completion of the scheduled NEPA analysis and decision for the allotment, the terms and conditions of existing grazing permits may be modified or re-issued, if necessary to conform to such NEPA analysis.

> (c) EXPIRED PERMITS.—This section shall only apply if a new term grazing permit has not been issued to replace an expired or waived term grazing permit solely because the analysis required by NEPA and other applicable laws has not been completed and also shall include permits that expired or were waived in 1994 and 1995 before the date of enactment of this Act.

PL 104-19 § 504, 109 Stat 194, 212–213 (July 22, 1995).

the environmental analysis.

43 U.S.C. § 1752(i).

**D.     Administrative Procedure Act**

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
>
> (D) without observance of procedure required by law[.]

*Id.* § 706. When assessing claims pursuant to the APA, a reviewing court "must consider whether the challenged agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977). Although a court's inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity," and a court may not substitute its judgment for that of the agency. *Id.* at 415-16.

Courts should defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." As the Ninth Circuit explained in *River Runners for Wilderness v. Martin*:

> In conducting an APA review, the court must determine whether the

agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

593 F.3d 1064, 1070 (9th Cir. 2010).

Reviewing courts must be at their "most deferential" when an agency makes predictions, "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). In particular, an agency's "scientific methodology is owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004).

But "the deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). Deference is not owed if "the agency has completely failed to address some factor consideration of which was essential to making an informed decision," *id.*, and courts are not required to defer to an agency conclusion that runs counter to that of other agencies or other individuals with specialized expertise in a particular technical area. *See, e.g., Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984) (agency decision under the Marine Mammal Protection Act was not supported by substantial evidence because agency ignored data that was product of "many years' effort by trained research personnel").

### III. FACTUAL BACKGROUND

The following facts are drawn from the Second Amended Complaint, ECF No. 33 ("SAC"), and filings in this matter and are accepted as true only for the purpose of this motion to dismiss. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

Plaintiffs CSERC, an organization with over 750 members who make use of land in Stanislaus National Forest, and Sierra Forest Legacy, a regional environmental coalition with 81 partner groups, bring this suit challenging the grazing program on three grazing allotments in Stanislaus National Forest

("Forest"). At issue is cattle grazing on three Forest allotments: Bell Meadow, Eagle Meadow, and Herring Creek allotments (collectively, "BEH allotments"). The three BEH allotments collectively cover approximately 52,000 acres of land, ranging in elevation from 5,700 to 9,900 feet. SAC ¶¶ 15-17. The BEH allotments are on the Summit Ranger District in Stanislaus National Forest in Tuolumne, California.[5] Two of the three allotments consist entirely of Forest land. The Forest Service issues term grazing permits to authorize cattle grazing[6] on the BEH allotments, and grazing would not be permitted on that land in the absence of a permit from the Forest Service. *Id.* ¶ 18. The Forest Service has also issued AOIs to the permittees for the BEH allotments to establish conditions for cattle grazing each year. *Id.*

The Rescissions Act of 1995 requires each National Forest System unit to set and adhere to a schedule for completion of NEPA analysis on all allotments for which such analysis is needed. Pub L. 104-19 § 504, 109 Stat. 194, 212 (1995). In 1996, the Forest Service published a NEPA Allotment Schedule, which identified 6,886 allotments, including the BEH allotments, in need of analysis during a 15-year span from 1996 to 2010. SAC ¶ 20. In 2004, Congress enacted a rider to an appropriations bill providing that notwithstanding Section 504 of the Rescissions Act, secretaries "in their sole discretion" would determine the priority and timing of the NEPA analyses based on environmental significance and available funding. Pub. L. 108-108, 117 Stat 1241, § 325. In 2008, the Forest Service updated the 1996 schedule, issuing a revised schedule with a total of 3,897 allotments requiring NEPA analysis based on environmental priorities and available funding. SAC ¶ 22. In 2011, the Forest Service again issued a revised NEPA Allotment Schedule, this time identifying 3,605 allotments in need of NEPA analysis. In 2014, the Forest Service issued a NEPA compliance schedule covering 2014 to 2025 that indicated NEPA analysis for the BEH allotments was to be complete by 2016. *Id.* ¶ 23.

In late 2006, the Forest Service issued an Environmental Assessment ("EA") analyzing whether

---

[5] The three allotments are located generally on Townships 3 through 6 North and Ranges 18 through 20 East. SAC ¶¶ 15-17.
[6] At least one grazing permit allows horse grazing, though this is not discussed in the SAC. ECF No. 41-11, Fed. Defs.' Ex. H, Eagle Meadow grazing permit, at 1.

to re-authorize grazing on four allotments, including the BEH allotments.  In 2007, the Forest Service

issued a "Finding of No Significant Impact" and authorized continued grazing on the four allotments.

*Id.* ¶ 26.  Following administrative appeals of the decision, the Regional Forester reversed the decision

in October 2007, citing "a lack of cumulative effects analyses in wildlife specialist reports and the

failure of the record to support the Stanislaus National Forest's decision to eliminate from consideration

other alternatives suggested by the public." *Id.*  The Forest Service in June 2009 issued another EA.  *Id.*

¶ 27.  Following a public comment period, the Forest Service decided in February 2010 to prepare an

EIS.  *Id.* ¶ 29.  In January 2014, the Forest Service published a draft EIS and accepted comment letters

from interested parties.  *Id.* ¶¶ 33-34.  In March 2016, the Forest Service issued the BEH Rangeland

Allotments Final EIS and Draft Record of Decision ("ROD").[7]  *Id.* ¶ 36.  The draft ROD proposed

approval of the same number of livestock for the same grazing period as previously permitted under the

status quo but proposed that by "monitoring effects and evaluating results, managers can assess resource

trends and modify management practices by adjusting the AMP or AOI." *Id.* ¶¶ 36-37 (quoting draft

ROD, ECF No. 46-7, at 29).  Plaintiffs filed an objection to the final EIS and draft ROD in April 2016,

and, following discussions between objectors and Forest Supervisor Higgins and other Forest staff

members in May and July, Forest Supervisor Higgins withdrew the draft ROD on August 29, 2016.  *Id.*

¶ 37.  In the withdrawal letter, Forest Supervisor Higgins stated that she was withdrawing the draft ROD

"[i]n order to allow more interactions with stakeholders on the issues."  ECF No. 41-3, Fed. Defs.' Ex.

A-1.  All objection appeals were set aside following the withdrawal of the draft ROD.  SAC ¶ 38.  The

Forest Service has published a new NEPA Allotment Schedule covering the period from 2017 to 2028,

with NEPA review for the BEH allotments to be completed in 2019.  *Id.* ¶ 68

        Plaintiffs filed suit in March 2017.  ECF No. 1. The SAC brings four causes of action.  ECF No.

33.  First, it alleges that the Forest Service has violated the CWA in two ways.  It alleges that the Forest

---

[7] Neither the SAC nor the briefing by the parties explains why the Forest Service issued a final EIS and a draft ROD.

Service has permitted grazing on its land, resulting in the discharge of waste into streams in the BEH allotments without obtaining a state waste discharge permit or seeking a waiver from any state water board.  It also alleges that CSERC's monitoring has found that grazing on BEH allotments has led to violations of the state water quality standards for fecal coliform concentrations.  *Id.* ¶¶ 46-48.  In particular, while the water monitoring found no violations of state water quality standards at control sites and in streams on the BEH allotments prior to the arrival of cattle, it found "[s]ignificant violations . . . throughout the summer grazing period on the BEH allotments."  *Id.* ¶ 46; s*ee also id.* ¶ 47 ("Violations of the Basin Plan Standard were documented each of the three years after cattle were present. No violations were found before cattle presence or at control sites. Violations of the State water quality standard for fecal coliform concentration in forest water-bodies were frequent after cattle arrival."); *id.* ¶ 48 ("In the 2016 field season, (summer, early fall), laboratory results from stream monitoring show 37 violations of Central Valley Regional Water Board regulatory standards for fecal coliform . . . .").  Second, the SAC alleges that the grazing has violated standards in the Stanislaus National Forest Land and Resource Management Plan, in violation of the NFMA.  *Id.* ¶¶ 62-65.  Third, it alleges that the withdrawal of the draft ROD has violated the Rescissions Act by failing to adhere to the schedule for NEPA analysis and failing to evaluate the relevant criteria.  *Id.* ¶¶ 67-68.  Finally, the SAC alleges that the Forest Service has violated the Endangered Species Act through its failure to consult with the U.S. Fish and Wildlife Service to obtain its opinion concerning livestock grazing on the BEH allotments.  *Id.* ¶¶ 70-71.

## IV. <u>LEGAL STANDARD</u>

A defendant may move for dismissal of an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  A motion to dismiss for lack of subject matter jurisdiction will be granted if the complaint, on its face, fails to allege facts sufficient to establish subject matter jurisdiction.  *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).  Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing

party bears the burden of establishing the Court's jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). A jurisdictional attack under Rule 12(b)(1) may be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* "Whether subject matter jurisdiction exists therefore does not depend on resolution of a factual dispute, but rather on the allegations in [the] complaint," which are presumed to be true for purposes of the motion, with all reasonable inferences drawn in favor of the non-moving party. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction," and the district court may review this evidence without converting the motion to dismiss into a motion for summary judgment. *Id.* (internal quotation marks and citation omitted). "[J]urisdiction and the merits of an action are intertwined where a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Id.* "A jurisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *Id.* (internal alterations, quotation marks, and citation omitted). Jurisdictional dismissals are appropriate "where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." *Id.* (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge to the

sufficiency of the allegations set forth in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In determining whether a complaint states a claim upon which relief may be granted, the Court accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Under Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. In other words, the complaint

must describe the alleged misconduct in enough detail to lay the foundation for an identified legal claim. "Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008). To the extent that the pleadings can be cured by the allegation of additional facts, the Court will afford the plaintiff leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

# V. <u>ANALYSIS</u>

## A.   <u>First Claim For Relief: Clean Water Act</u>

### 1.   <u>Jurisdictional Challenges To Clean Water Act Claim/Waiver Of Sovereign Immunity</u>

Federal Defendants argue that the First Claim for relief under the CWA must be dismissed because the United States is immune from a suit of this nature. The United States is "immune from suit in state or federal court except to the extent that Congress has expressly waived such sovereign immunity." *Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1136 (9th Cir. 2013). "A waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Any waiver of sovereign immunity "will be strictly construed, in terms of scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). The waiver must be "clearly discernable from the statutory text in light of traditional interpretive tools. If it is not, then we take the interpretation most favorable to the Government." *F.A.A. v. Cooper*, 566 U.S. 284, 291 (2012). "A court lacks subject matter jurisdiction over a claim against the United States if it has not consented to be sued on that claim," and when the United States has consented to suit, "the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *Balser v. Dep't of Justice, Office of U.S. Tr.*, 327 F.3d 903, 907 (9th Cir. 2003) (internal citation and quotation marks omitted). The burden of demonstrating a waiver of sovereign immunity lies with the plaintiffs. *Holloman v. Watt*, 708 F.2d 1399, 1401 (9th Cir. 1983).

Section 313 of the CWA, entitled "Federal facilities pollution control," provides in pertinent part:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity . . . . The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. . . . [T]he United States shall be liable only for those civil penalties arising under Federal law or imposed by a State or local court to enforce an order or the process of such court.

33 U.S.C. § 1323(a).[8] Courts read this language as a limited waiver of sovereign immunity. *See U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (holding that Section 313 included a clear waiver of sovereign immunity as to coercive fines but did not unambiguously waive sovereign immunity for punitive fines); *Sierra Club v. Lujan*, 972 F.2d 312, 316 (10th Cir. 1992) (holding that Section 313's waiver of sovereign immunity did not extend to punitive civil penalties for past violations of the CWA). The CWA requires states to develop water quality standards, 33 U.S.C. § 1313, and Section 1323 "requires all federal agencies to comply with all state requirements." *Oregon Nat. Res. Council*, 834 F.2d at 848. "Congress intended this section to ensure that federal agencies were required to 'meet all [water pollution] control requirements as if they were private citizens.'" *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1332 (10th Cir. 2007) (quoting S. Rep. No. 92–414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3734).

---

[8] In addition to the waiver of sovereign immunity in the first sentence of Section 313, Plaintiffs contend that the waiver of sovereign immunity applies here for the additional independent reason that every federal agency must "comply with state requirements respecting the control and abatement of water pollution [because the second sentence of] Section 313 also states, 'to the exercise of any Federal . . . authority.'" Opp. at 11. Plaintiffs cite no cases that adopt this interpretation and the Court finds it unnecessary to address this issue of first impression in light of its conclusion that sovereign immunity has been waived by the first sentence of Section 313.

16

Federal Defendants make two interrelated arguments with respect to the waiver of sovereign immunity. First, they read Section 313 only to apply "when the *United States'* activity results in the discharge of pollutants." Mot. at 14 (emphasis added). This, Federal Defendants maintain, would not apply to Plaintiffs' Complaint about BEH permitting, which takes issue with "the grazing activities of third parties—rather than the authorization of grazing—that is purportedly causing violations of state water quality standards." *Id*. at 15. Second, Federal Defendants argue that Section 313 applies "only to the extent the federal properties and facilities function like a '*nongovernmental entity.*'" Reply at 2. In other words, they read the language "to the same extent as any nongovernmental entity" to mean that the waiver extends only to activities that are not governmental functions, excluding administrative actions like issuing the grazing permits the Plaintiffs challenge here.

In support of their argument that Section 313 does not waive sovereign immunity for federally permitted third-party grazing on Forest Service land, Federal Defendants cite two district court cases that held that the waiver was limited to alleged polluting activities undertaken by the federal government. In *Colorado Wild, Inc. v. U.S. Forest Serv*., 122 F. Supp. 2d 1190 (D. Colo. 2000), the plaintiff challenged the Forest Service's approval of a master development plan that would permit the operator of a ski area on Forest Service land to divert water from a tributary, which the plaintiff asserted would result in increased pollutant concentrations in the downstream river. *Id*. at 1191. Noting that Section 313 is titled "Federal facilities pollution control" and stating that cases interpreting Section 313 involved "the operation of federal facilities," the court held that the Forest Service's approval of the plan did not fall within Section 313's waiver of sovereign immunity. *Id*. at 1194. Where "there is neither a federal facility, nor a federal activity resulting in the discharge of pollutants," the court there "fe[lt] that waiving sovereign immunity in this case where the only alleged action involves the approval of a Master Development Plan would improperly enlarge the waiver of sovereign immunity beyond what Section 313 requires." *Id*. at 1194-95 (citing *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (waivers of sovereign immunity are to be strictly construed)). Notably, the court went on to hold that

17

diverting water was not subject to regulation under the CWA or applicable state water standards in any case. *Id*. at 1195.

The Northern District of Ohio reached a similar conclusion about the scope of Section 313 in *City of Olmsted Falls v. E.P.A.*, 233 F. Supp. 2d 890 (N.D. Ohio 2002). The plaintiffs brought suit against city, state, and federal defendants, including the U.S. Department of Transportation, E.P.A, Army Corps of Engineers, and the F.A.A., concerning the expansion of an airport owned and operated by the City of Cleveland, and the federal agencies' decision to issue a "dredge or fill permit" to the City of Cleveland pursuant to Section 404 of the CWA. *Id*. at 893. The court held that Section 313 did not apply to the action at issue in the case, because "[o]n its face, Section 313 acts to waive sovereign immunity only where an arm of the federal government is an alleged polluter"[9] and the statute lacked any indication "that Congress intended to waive sovereign immunity with respect to agency enforcement decisions over third parties." *Id*. at 897. Federal agencies' decision to grant a permit to a city-owned airport to engage in the fill of part of a creek and two of its tributaries involved no federal property and did not implicate Section 313.

Plaintiffs respond that these out-of-circuit district court cases do not control, are distinguishable, or both, and point to the Ninth Circuit's review of "the kinds of claims Plaintiffs assert in this case under Section 313," where it has repeatedly held that the district court had jurisdiction. Opp. at 13. In *Northwest Indian Cemetery Protective Ass'n v. Peterson*, the Ninth Circuit affirmed a district court's finding that implementation of a Forest Service logging and road-construction plan would violate state "water quality standards with which federal agencies must comply" pursuant to Section 313, even though the logging would be conducted by a third party. 795 F.2d 688, 697 (9th Cir. 1986), *rev'd on other grounds, Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988). In *Oregon Natural Resources Council v. U.S. Forest Service*, another case involving third-party logging under a

---

[9] The court also cited *Colorado Wild*, 122 F. Supp. 2d 1190, for this proposition.

timber contract approved by the Forest Service, the Ninth Circuit held that the citizen-suit provision is not the exclusive means by which individuals could enforce the CWA and does not preclude Section 313 challenges to agency action under the APA. 834 F.2d 842, 852 (9th Cir. 1987). The Ninth Circuit remanded the case to the district court to determine whether the third-party logging would violate state water standards.[10] In *Marble Mountain Audubon Soc. v. Rice*, the Ninth Circuit again noted that the Clean Water Act "requires the Forest Service to comply with all state water quality requirements" and that the APA "permits private citizens to sue for alleged state water quality control violations from nonpoint sources." 914 F.2d 179, 182-83 (9th Cir. 1990). It reversed the district court's grant of summary judgment to the Forest Service and remanded the case to the district court to address the merits of the claim that the recovery project plan, including a proposed timber sale, would result in violations of state turbidity standards. *Id*. at 183. Finally, in *Idaho Sporting Congress v. Thomas*, the Ninth Circuit held that "[u]nder the Clean Water Act, all federal agencies must comply with state water quality standards, including a state's antidegradation policy. 33 U.S.C. § 1323(a) [CWA Section 313]. Judicial review of this requirement is available under the Administrative Procedure Act." 137 F.3d 1146, 1153 (9th Cir. 1998), *as amended on denial of reh'g* (May 13, 1998), and *overruled on other grounds by The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008). In addressing that lawsuit's challenge to a proposed timber sale, the Ninth Circuit examined the language of Idaho's antidegradation policy and held that the record lacked sufficient information to determine whether the state water-quality statute had been violated. *Id*.[11]

Federal Defendants contend that the operation of a dam in *National Wildlife Federation* is precisely the sort of operation of a federal facility that Section 313 was intended to cover, unlike the

---

[10] "The CWA requires each state to develop and implement 'water quality' standards to protect and enhance the quality of water within the state. 33 U.S.C. § 1313. The Act also requires all federal agencies to comply with all state requirements. 33 U.S.C. § 1323." *Oregon Nat. Res. Council*, 834 F.2d at 848.
[11] Plaintiffs also cite *National Wildlife Federation v. U.S. Army Corps of Engineers*, 384 F.3d 1163, 1167 (9th Cir. 2004), where the Ninth Circuit noted that pursuant to CWA Section 313, the Army Corps of Engineers was required to "comply with water quality standards promulgated by the State of Washington" in its operation of the four dams at issue in the case, for the general proposition that the federal government's actions are subject to state water-quality standards.

attenuated permitting at issue here.  Reply at 4.  Federal Defendants attempt to distinguish the four logging cases by arguing that each of them concerned logging projects that required the agency to create an EIS under NEPA, the review of which the Ninth Circuit has held to be governed by the APA.  *Id.* According to Federal Defendants, Plaintiffs here challenge neither the sufficiency of an EIS nor the permits themselves but instead challenge the Forest Service's "administration of grazing," Reply at 5, thus rendering the logging cases inapt.  But the fact that independent NEPA claims were also raised in those cases has no bearing on whether the holdings of those cases provide guidance regarding the application of the CWA in this case. Each of the four logging cases involved allegations that federal agencies violated the CWA, made actionable because they were final agency actions arising under Section 706 of the APA.  *Marble Mountain*, 914 F.2d at 183 ("The judicial review provision of [APA], 5 U.S.C. §§ 701-706, permits private citizens to sue for alleged state water quality control violations from nonpoint sources."); *Oregon Nat. Res. Council*, 834 F.2d at 850-52 (holding that plaintiffs may challenge agency action for allegedly violating state water quality standards pursuant to the APA) (citing 5 U.S.C. §§ 701-706); *Northwest Indian*, 795 F.2d at 695 (district court review of an EIS is done pursuant to APA and "agency action may be set aside if it was undertaken without observance of procedures required by law" (citing 5 U.S.C. § 706(2)(d))); *Idaho Sporting Congress*, 137 F.3d at 1149 ("We must determine whether the Forest Service's actions were 'arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citing 5 U.S.C. § 706(2)(A) and case law for proposition that this standard applies to the adequacy of an EIS under NEPA, to NFMA and NEPA actions, and to agency actions under CWA); *National Wildlife Federation*, 384 F.3d at 1179 (reviewing agency action allegedly in violation of CWA § 313 under 5 U.S.C. § 706(2)(A)).  In those cases, the plaintiffs challenged an agency approval for an action to be undertaken by a third party that would result in violations of state water quality standards.  Plaintiffs do the same here.  Though the Ninth Circuit has not squarely addressed the scope of CWA § 313 under the particular circumstances present here (a federal agency permitting grazing by third parties), it has repeatedly entertained challenges to agency

20

actions under CWA § 313 that involve the authorization of third-party action. The approval of a permit may be a core governmental function, as Federal Defendants claim, but it falls within Section 313's waiver of sovereign immunity.[12] *See Hells Canyon Pres. Council v. Haines,* No. CV 05-1057-PK, 2006 WL 2252554, at *4 (D. Or. Aug. 4, 2006) (Under CWA § 313, "Federal agencies must ensure that any authorized activity on federal lands complies with all applicable water quality standards."); *Save Our Cabinets v. United States Dep't of Agric.*, 254 F. Supp. 3d 1241, 1249 (D. Mont. 2017) ("Under the Clean Water Act Section 313, the Forest Service cannot authorize mining operations that do not comply with state and federal water quality regulations.").

Plaintiffs' challenge satisfies both prongs of Section 313, either of which would make the Forest Service subject to and required to comply with all state and local regulations concerning water pollution.[13] The Forest Service "(1) ha[s] jurisdiction over any property," in this case, the BEH allotments in Stanislaus National Forest. It also is "(2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants." 33 U.S.C. § 1323(a). There is no requirement that the government itself be the discharger, only that it undertake an activity that "may result" in the discharge or runoff of pollutants.[14] Issuing a permit to allow cattle grazing is an activity that may result in the

---

[12] Federal Defendants make the related argument that the APA's waiver of sovereign immunity for challenges brought by a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" does not cover Plaintiffs' claims because the APA's waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702, or if "statutes preclude judicial review," *id.* § 701(a)(1). As discussed above, the Court finds that Section 313 of the CWA does waive sovereign immunity in this suit and thus does not preclude judicial review.

[13] Section 313 is titled "Federal facilities pollution control," a fact the court noted in *Colorado Wild.* 122 F. Supp. 2d at 1194. The title or heading of a statute's section is not dispositive, however; the text of the statute controls. *I.N.S. v. St. Cyr*, 533 U.S. 289, 309 (2001); *see also Bhd. of R. R. Trainmen v. Baltimore & O. R. Co*., 331 U.S. 519, 529 (1947) ("the heading of a section cannot limit the plain meaning of the text").

[14] Under Federal Defendants' reading of Section 313, if the Forest Service itself owned cattle and allowed them to graze on the BEH allotments, that action would be challengeable in court because a federal agency was the direct actor and engaged in a nongovernmental function. If the Forest Service decided to permit a third party to graze cattle on the BEH allotments, however, then the same agency decision to permit the same action, on the same land, with the same environmental consequences, would be unreviewable. This result is justifiable only if the waiver of sovereign immunity in Section 313 draws a distinction between governmental and nongovernmental functions, as Federal Defendants argue that it does. As explained in text, however, the reference to "nongovernmental entit[ies]" in Section 313 does not imply that classes of governmental actions are to be treated differently depending on whether they are traditional governmental functions; it instead simply commands that federal entities are to comply with state pollution control requirements just as nongovernmental actors are. 33 U.S.C. § 1323(a). ("[E]ach . . . agency . . . of the Federal Government . . . shall be subject to, and comply with, all . . . State . . . requirements . . . respecting the control and abatement of water pollution in the same

1    discharge or runoff of pollutants, as Plaintiffs allege it did here.

2         Federal Defendants' argument that the waiver in Section 313 was intended only to apply where

3    the government is acting in a nongovernmental capacity is at odds with the plain language of the text,

4    which is worded broadly to cover activities that may result in the discharge or runoff of pollutants

5    without regard for the nature of the activity.  Rather than exempting certain activities because of its

6    status as a government actor, the waiver in Section 313 does the opposite – it ensures that an agency's

7    status as a governmental actor does *not* exempt it from complying with otherwise applicable water

8    regulations.  "Congress intended this section to ensure that federal agencies were required to 'meet all

9    [water pollution] control requirements as if they were private citizens,'" not to exempt them because

10   they are not.  *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1332 (10th Cir. 2007) (quoting S.

11   Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3734) (holding, in challenge brought

12   pursuant to CWA § 313 and the APA, that Forest Service's authorization of livestock on national forest

13   land grazing did not violate Wyoming standards for fecal-coliform concentrations).

14        The Ninth Circuit has not squarely addressed the contours of the waiver of sovereign immunity

15   in Section 313 of the CWA, but it has repeatedly entertained claims alleging that the Forest Service has

16   violated Section 313 by authorizing certain third-party actions.  Federal district courts apply the law;

17   they do not create it.  This Court will not unsettle three decades of Ninth Circuit case law and hold that

18   APA claims based on Section 313 apply only to polluting activities directly undertaken by the federal

19   government.

20        Plaintiffs' claims fall within the waiver of sovereign immunity in CWA § 313.

21        **2.      Substantive Challenges To Clean Water Act Claim**

22        The SAC alleges two violations of state law giving rise to its claim under the CWA.  First,

23   Plaintiffs allege that the Forest Service failed to procure a permit or waiver prior to issuing permits and

24

25   manner, and to the same extent as any nongovernmental entity . . . .").

AOIs to allow grazing on its land.  SAC ¶ 69.  Second, they argue that the Forest Service has authorized grazing that has led to violations of water-quality standards for fecal coliform bacteria in waters designated for contact recreation, in violation of the standards set forth in the Central Valley Regional Water Quality Control Board Basin Plan.  *Id.* ¶ 70.

### a.  Is The Forest Service A "Person Discharging" Or "Proposing To Discharge Waste" Under The Porter-Cologne Act?

Federal Defendants argue that the CWA claim is substantively deficient.  The SAC alleges that the Forest Service's decision to authorize grazing violates California's Porter-Cologne Water Quality Control Act because it allowed nonpoint source pollutant discharges without first obtaining a permit or a waiver, leading to violations of California water quality standards.  Mot. at 17 (citing SAC ¶¶ 59-60).  Federal Defendants argue that the Forest Service is not a "person discharging" or "proposing to discharge waste" within the Porter-Cologne Act.  Mot. at 17 (quoting SAC ¶ 59).  Federal Defendants contend, therefore, that under the Porter-Cologne Act, the Forest Service is not required to comply with California Water Code ("CWC") provisions governing dischargers.[15]

Federal Defendants argue that the Forest Service does not meet the definition of a "discharging person" under the CWC, which requires that "[a] person discharging waste, or proposing to discharge waste, within any region that could affect the quality of the waters of the state, other than into a community sewer system" must file a report of the discharge with the appropriate regional board.  CWC § 13260(a)(1).  Federal Defendants maintain that the Forest Service "merely issues grazing permits pursuant to its federal mandate" and aver that Plaintiffs have not alleged facts sufficient to show that the Forest Service qualifies as a discharging person.  Mot. at 18.  Neither side cites controlling case law.  Federal Defendants cite a case for the general (and unremarkable) proposition that a person who discharges or proposes to discharge waste must file a permit with the appropriate board, but it offers no

---

[15] The Court agrees with Federal Defendants that to the extent Plaintiffs base their CWA claim on the Forest Service's failure to issue a discharge permit or waiver, any such claim is without support in the law because that role belongs to state entities in the context of nonpoint source pollution.  *Oregon Nat. Res. Council*, 834 F.2d at 849-50.

clarity on whether a landowner who allows others to engage in activities on its land that result in discharges meets that definition. *Id*. at 18 (citing *Tahoe-Sierra Pres. Council v. State Water Res. Control Bd*., 210 Cal. App. 3d 1421, 1433 (Ct. App. 1989), *reh'g denied and opinion modified* (June 28, 1989)). In other words, the fact that direct discharger falls within the definition does not necessarily mean a permitting authority does not. Plaintiffs respond by citing the Ninth Circuit case law for the proposition that "under Section 313 of the Clean Water Act, a federal agency is liable if it authorizes a third party to conduct an activity on federal lands that causes a violation of state water quality standards." Opp. at 22. But the cases Plaintiffs cite do not discuss the scope of CWC § 13260, which is the provision alleged to be violated here.

The CWC creates a duty for any individual that is discharging waste to comply with the requirements of the code. CWC § 13260 requires a party "discharging waste, or proposing to discharge waste," that could affect the water quality in the state to file a report of the discharge. CWC § 13260(a)(1). The Forest Service, an arm of the United States, is a "person" under the CWC. CWC § 13050(c) ("'Person' includes any city, county, district, the state, and the United States, to the extent authorized by federal law."). The State Water Board has in its decisions given broad reach to its definition of "Discharger" under the CWC. In one recent order, for instance, it defined "Discharger" to include "any entity involved in the application of vector control pesticides that results in a discharge of biological and residual pesticides to waters of the U.S." that additionally is either the entity that (1) "has control over the financing for or *the decision to perform* pesticide applications that result in discharges *including the ability to modify those decisions*" or (2) "day-to-day control of pesticide application or performs activities that are necessary to ensure compliance with this Order." Statewide National Pollutant Discharge Elimination System (NPDES) Permit for Biological and Residual Pesticide Discharges to Waters of the United States from Vector Control Applications, 2016 WL 1554261, at *2

(Cal. St. Wat. Res. Bd. Mar. 1, 2016) (emphases added).[16] California courts have held that a company that hired an independent contractor to perform demolition work that resulted in an accidental discharge was nevertheless liable for that discharge under provisions of the CWC covering "[a]ny person who, without regard to intent or negligence, *causes or permits* any hazardous substance to be discharged in or on any of the waters of the state," CWC § 13350(b), and prohibiting any person from "*initiat[ing]* any new discharge of waste" prior to filing a discharge report, CWC § 13264(a). *TWC Storage, LLC v. State Water Res. Control Bd.*, 185 Cal. App. 4th 291, 298 (2010), *as modified* (June 29, 2010) (construing CWC § 13350(b) ("Any person who, without regard to intent or negligence, causes or permits any hazardous substance to be discharged in or on any of the waters of the state, except in accordance with waste discharge requirements or other provisions of this division, shall be strictly liable civilly . . . .") and CWC § 13264(a) ("No person shall initiate any new discharge of waste . . . prior to the filing of the report required by Section 13260 . . . .")). An independent contractor's work does not sever the chain of responsibility from the landowner that hired that third party, such that the landowner can nevertheless be responsible both for "caus[ing] or permit[ting]" a discharge and for "initiat[ing]" a discharge under the California Water Code. *Id.* So too does issuing a permit to a third party to perform grazing on land fall within the Water Code's definition of a discharging person.

Federal Defendants argue that the CWA claim should be dismissed because Plaintiffs have failed to identify anything in the grazing permits that violates the Porter-Cologne Act. Reply at 6. In particular, they contend that the Plaintiffs have failed to allege that the permits alone are sufficient to graze and/or acknowledge that all of the grazing permits for the BEH allotments in fact "specifically require that permittees comply with all applicable state and local requirements."[17] Reply at 6; *see also*

---

[16] The Order was issued to cover both point source discharges under NPDES but also general waste discharges pursuant to the CWC. *Id.* at *5 ("This Order shall serve as a general NPDES permit for point source discharges . . . . This Order also serves as general waste discharge requirements pursuant to article 4, chapter 4, division 7 of the California Water Code (commencing with § 13260).").

[17] The relevant language from the permits is as follows: "It is fully understood and agreed that this permit may be suspended or cancelled, in whole or in part, after written notice, for failure to comply with any of the terms and conditions, specified in

25

Mot. at 18.  The subtext to this argument is that because the Forest Service has issued individual permits that each requires compliance with state and local regulations, any violations of those state and local regulations fall squarely on the shoulders of the permittees.  The SAC does not allege that any individual permittee has acted in violation of state regulations or that the terms of any single permit led to violations of state standards; it instead alleges that the Forest Service has administered the entire grazing program on the BEH allotments in a manner that results in violations of state water quality regulations.  *See* SAC ¶ 18 ("The Forest Service has issued Annual Operating Instructions ('AOIs') to the permittees for the BEH allotments to establish conditions for cattle grazing on the BEH allotments for each year.  The AOIs include conditions such as start date, and stocking levels.  The grazing permits and the AOIs constitute final agency actions subject to judicial review under the APA.").  Federal Defendants have cited no authority for the proposition that Plaintiffs must identify specific provisions of the permits that allegedly violate state and local requirements.  Courts have repeatedly entertained suits claiming that the Forest Service's administration of a grazing program on one or more allotments through the issuance of grazing permits and AOIs allegedly violates state water standards.  *See Ctr. For Native Ecosystems v. Cables,* 509 F.3d 1310, 1333 (10th Cir. 2007) (holding that issuance of AOIs governing cattle grazing on seven allotments was final agency action subject to review under the APA in action claiming that issuance of permits led to violations of Wyoming state standards for fecal-coliform concentrations); *Oregon Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156, 1169-71 (D. Or. 2016) (holding that issuance of AOIs to permit grazing on five allotments did not violate Oregon state water standards for *E. coli* concentration levels).

Parts 1, 2, and 3 hereof, or any of the regulations of the Secretary of Agriculture on which this permit is based, or the instructions of the Forest officers issued thereunder; or for knowledge [of] and willingly making a false statement or representation in the permittees grazing application, and amendments thereto; **or for conviction for failure to comply with Federal laws or regulations or State and local laws relating to livestock control and to protection of air, water, soils and vegetation, fish and wildlife, and other environment values when exercising the grazing use authorized by the permit.**  This permit can also be cancelled, in whole or in part, or otherwise modified, at any time during the term to conform with the needed changes brought about by law, regulation, Executive order, allotment management plans, land management planning, numbers permitted or seasons of use necessary because of resource conditions, or the lands described otherwise being unavailable for grazing.  Any suspension or cancellation action may be appealed pursuant to 36 CFR 251, Subpart C."  ECF No. 41-11, Fed. Defs.' Ex. H, Eagle Meadow grazing permit, ¶ 3 (emphasis supplied).

Federal Defendants make the related argument that Plaintiffs have not sufficiently drawn a causal link between the Forest Service's action and the alleged violations of water standards. Reply at 10. Plaintiffs' allegations that the Forest Service has administered the grazing program on the BEH allotments in a manner leading to violations of state water standards are sufficient to state a claim. The Forest Service's issuance of the permits, along with AOIs – which govern on an annual basis the levels of grazing permitted – form a sufficient causal link between the agency action and the harm alleged. The SAC alleges that between 2011 and 2017, individual and average concentrations of fecal coliform bacteria in surface waters at control sites and at sites within the BEH allotments where grazing would occur were below threshold concentrations prior to the arrival of cattle for grazing. After cattle were released onto the BEH allotments for grazing, according to the SAC, fecal coliform concentrations increased and "in places exceeded the established state standards for recreational contact with water." SAC ¶ 46. This is a clear and direct causal connection, where the injury is "fairly traceable to the challenged action" and not the result of an "independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Finally, Federal Defendants argue that the Plaintiffs have failed to plead a violation of state law because the State Water Board has stated that "[g]enerally, under the Porter-Cologne Act, the [Regional Water Quality Control Boards] cannot take enforcement actions directly against non-discharger third parties." Reply at 7 (quoting State Water Board, "Policy for Implementation and Enforcement of the Nonpoint Source Pollution Control Program" at 15 (May 20, 2004), *available at* https://www.waterboards.ca.gov/water_issues/programs/nps/docs/plans_policies/nps_iepolicy.pdf). The discussion immediately preceding this statement provides important context. The Policy explains that the regional boards typically regulate "individual dischargers, rather than groups of dischargers who are represented by or coordinated through third parties. Individual dischargers, *including both landowners and operators*, continued to bear ultimate responsibility for complying with a RWQCB's water quality requirements and orders." *Id*. (emphasis added). The Policy draws a distinction between parties with

1  decision-making authority and, *e.g.*, lobbying or trade groups that themselves are mere third parties

2  representing or coordinating dischargers.  The Policy also makes clear that "both landowners and

3  operators" are ultimately the responsible parties.  The Forest Service here is akin to a landowner that

4  made the decision to allow grazing and does not occupy the role of a third party merely representing or

5  coordinating other dischargers.

6  **b.    Necessity Of A Permit Pursuant To The Porter-Cologne Act**

7      Defendant-Intervenors argue that Plaintiffs' CWA claim fails because the permits that Plaintiffs

8  allege the Forest Service failed to procure are not required under the Porter-Cologne Act.  They argue

9  that the State Water Board declined to develop a statewide approach to grazing, leaving it to regional

10  water boards to develop their own approaches to the issue, including "cooperative approaches that are

11  based on non-regulatory efforts to implement best management practices."  Intervenor Mot. at 7.  They

12  contend that the Central Valley Regional Water Board, which has jurisdiction over the region that

13  includes the BEH allotments, "has not yet concluded that a formal regulatory permit scheme is needed

14  for grazing" within the region and instead relies on non-regulatory efforts and enforcement options like

15  notices of violation and cease-and-desist orders.  *Id*. at 8.  Plaintiffs respond that the State Water Board

16  has made clear that "all current and proposed [nonpoint source] discharges must be regulated under

17  [waste discharge requirements], waivers of [waste discharge requirements], or a basin plan prohibition,

18  or some combination of these administrative tools."  Opp. at 23 (quoting ECF No. 46-1, Pltfs.' Ex. A

19  (State Water Resources Control Board, Policy for Implementation and Enforcement of the Nonpoint

20  Source Pollution Control Program (May 20, 2004)) at 3).  Moreover, another regional water quality

21  board has adopted a general waiver of waste discharge requirements for nonpoint source pollution,

22  including livestock grazing, an act that would arguably be unnecessary if livestock grazing were not

23  subject to an over-arching permit requirement under the California Water Code.  Opp. at 23 (quoting

24  ECF No. 46-4, Pltfs.' Ex. D (California Regional Water Quality Control Board, North Coast Region,

25  Waiver of Waste Discharge Requirements for Nonpoint Source Discharges Related to Certain Federal

Land Management Activities on National Forest System Lands (Oct. 8, 2015)) at 2).

At bottom, Plaintiffs and Defendant-Intervenors disagree about whether the default state of affairs in California currently requires that nongovernmental actors procure a permit prior to engaging in grazing activities that result in waste discharge. Plaintiffs view grazing as a source of nonpoint discharges that, in the absence of a specific waiver, is subject to general rules bringing the discharge under ordinary regulations. Defendant-Intervenors view the default as the opposite – in the absence of the state or regional board's affirmatively deciding to require permits for grazing activities, none are needed.

CWC § 13260 requires that any "person discharging waste, or proposing to discharge waste, within any region that could affect the quality of the waters of the state, other than into a community sewer system" must file "with the appropriate regional board a report of the discharge, containing the information that may be required by the regional board." CWC § 13260(a)(1). Regional boards are tasked with "prescrib[ing] requirements as to the nature of any proposed discharge, existing discharge, or material change in an existing discharge." CWC § 13263(a). Boards are empowered to prescribe general waste discharge requirements for a category of discharges that meet certain enumerated criteria. *Id*. § 13263(i). The state and regional boards also hold the power to waive the requirements that dischargers file a report of waste discharge pursuant to § 13260 and that they comply with waste discharge requirements pursuant to § 13263 if either board determines that the waiver is "consistent with any applicable state or regional water quality control plan and is in the public interest." CWC § 13269(a)(1).[18]

_____

[18] "On and after January 1, 2000, the provisions of subdivisions (a) and (c) of Section 13260, subdivision (a) of Section 13263, or subdivision (a) of Section 13264 may be waived by the state board or a regional board as to a specific discharge or type of discharge if the state board or a regional board determines, after any necessary state board or regional board meeting, that the waiver is consistent with any applicable state or regional water quality control plan and is in the public interest." CWC § 13269(a)(1). Section 13269 also permits the waiver of compliance with Section 13264(a), which reads, in pertinent part, as follows: "(a) No person shall initiate any new discharge of waste or make any material change in any discharge . . . prior to the filing of the report required by Section 13260 and no person shall take any of these actions after filing the report but before whichever of the following occurs first: (1) The issuance of waste discharge requirements pursuant to Section 13263. (2) The expiration of 120 days after his compliance with Section 13260 . . . . (3) The issuance of a waiver pursuant

29

The SAC alleges that "[t]he Forest Service did not obtain a waste discharge permit or a waiver from the waste discharge permit requirement before issuing permits and AOIs that authorize or allow cattle grazing on the BEH allotments," in violation of the Porter-Cologne Act. SAC ¶ 41. In particular, it alleges that the Forest Service failed to abide by CWC §§ 13260, 13263, and 13269. SAC ¶ 59. As discussed above, those provisions require dischargers to file <u>reports</u> of their discharges, leave it to regional boards to determine the regulatory requirements that dischargers must meet, and provide for waivers by the state or regional boards. The SAC discusses the proposed statewide waiver for certain nonpoint source activities, including grazing, on Forest land. SAC ¶ 42. The failure to enact this statewide waiver left it to the regional boards to regulate these activities. *See* CWC §§ 13263, 13269.

The SAC cites CWC § 13260 but nowhere discusses whether the Forest Service was required to file or did file a report of waste discharge. It also cites CWC § 13263 but nowhere states that the Central Valley Regional Water Quality Board has instituted a regulatory scheme that requires that dischargers apply for discharge permits for livestock grazing. The SAC thus fails to state a claim with respect to its allegation that the Forest Service acted in violation of CWC §§ 13260, 13263, and 13269 when it authorized grazing without first obtaining a permit or a waiver. Accordingly, this claim is **DISMISSED WITH LEAVE TO AMEND**.

### c. Power To Order Requested Relief

As mentioned, in addition to alleging that the Forest Service failed to obtain a state waste discharge permit or waiver, the SAC also alleges that Forest Service permitted grazing on BEH allotments has led to violations of the state water quality standards for fecal coliform concentrations. Therefore, at least one aspect of Plaintiffs' CWA claim is unaffected by the dismissal ordered above. Defendant-Intervenors raise one argument that pertains independently to Plaintiffs' remaining CWA

---

to Section 13269." CWC § 13264(a).

Waivers pursuant to Section 13269 must be temporary, with a renewable maximum duration of five years; conditional; and subject to monitoring requirements. CWC § 13269(a)(2).

claim. Specifically, Defendant-Intervenors argue that this Court is powerless to order the <u>relief</u> that

Plaintiffs seek: an order that livestock grazing permits for the BEH allotments be modified to prevent

violations of state water quality standards. They argue that the CWA does not directly regulate nonpoint

source pollution and that enforcement under the Porter-Cologne Act rests with the California water

boards. Intervenor Mot. at 5. This is true as far as it goes, but, as discussed above, Plaintiffs' nonpoint

source claims arise under the APA and include an APA allegation that approval of the BEH permits in

violation of the CWA is not in accordance with the law. This claim is properly before this Court. *See*

*Idaho Sporting Congress*, 137 F.3d at 1153 ("Under the Clean Water Act, all federal agencies must

comply with state water quality standards . . . . Judicial review of this requirement is available under the

Administrative Procedure Act."). Relatedly, Plaintiffs have included an APA-related declaratory relief

prayer, namely a request that the Court:

> Declare that the Forest Service has violated the Clean Water Act . . .
> because grazing has violated and is likely to continue to violate state water
> quality standards for fecal coliform in waters within the allotments.

SAC at 22 ¶ 1. Defendant-Intervenors fail to explain how the Regional Board's discretion to take a

range of formal and informal actions in connection with nonpoint sources of pollution renders this court

unable to issue declaratory relief under the APA. Intervenor Reply at 5-8. Nor have they explained how

California's refusal to provide private right of action to enforce state water-quality law precludes

jurisdiction under the APA in this case in light of the numerous cases cited above in which CWA claims

involving nonpoint sources of pollution were found to be cognizable under the APA.[19]

---

[19] Defendant-Intervenors make the additional argument that this court has no subject-matter jurisdiction over Plaintiffs' claim that the state water boards have improperly delegated their authority to the Forest Service or have failed to undertake required enforcement actions. Intervenor Mot. at 10-12; Intervenor Reply at 3. In the section on the alleged violation of the CWA, the SAC quotes California's Nonpoint Source Plan: "The SWRCB and RWQCB may not delegate their [nonpoint source] authorities and responsibilities to another agency . . . Another agency's actions pursuant to an MOU or MAA do not fulfill the RWQCB's obligation to use its administrative tools to address the relevant NPS discharges." SAC ¶ 59. The SAC further alleges that the Forest Service's authorization of grazing in the BEH allotments in violation of state law requirements constitutes a violation of the APA for agency action that is arbitrary, capricious, and not in accordance with the law. *Id*. ¶¶ 59-60. Defendant-Intervenors argue that to the extent this portion of the SAC alleges that the state and regional water boards have failed to discharge their statutory duty, this claim is not properly brought in federal court in the first instance. The Court, however, reads the above-quoted portions of the SAC to constitute an effort to show that the state water boards

### 3.     Availability Of Judicial Review Under The APA

Federal Defendants argue that judicial review under the APA is unavailable because judicial review is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. They contend that Plaintiffs do "have an available remedy through established California state processes, including judicial review in the California state courts," to bring their challenge on the ground that grazing is causing violations of California water standards, Mot. at 19, and in reply cite two cases in support. Neither of their cited authorities is on point. They quote *Shell Oil Co. v. Train* for the idea that "[t]he existence of a state judicial forum for the review of the regional board's action forecloses the availability of the federal forum under the terms of the [APA]." Reply at 9 (quoting *Shell Oil Co.*, 585 F.2d 408, 414 (9th Cir. 1978)). The case stands for the proposition that the EPA's informal consultation with a state agency administering an EPA-approved program does not grant federal courts direct review authority under the APA. Shell filed suit in federal district court against the EPA and its administrator to challenge NPDES application decisions made by the California Regional Water Quality Control Board for the San Francisco Bay Region.[20] California's NPDES program was approved by the EPA, which largely relinquished control over the NPDES process to California, though the EPA administrator retained the right to veto particular state-issued permits that do not meet federal requirements, and retained the right to withdraw approval of the entire state NPDES program. *Id*. at 410. Shell's theory in federal court was that "EPA 'coercion' transformed the actions of the state agency into federal agency action reviewable in the federal court." *Id*. at 413. The Ninth Circuit rejected that argument and went on to note that "holding that statutorily sanctioned advice by the EPA to a state agency constitutes final federal agency action reviewable in the federal courts would permit an applicant, dissatisfied with a decision of a state board, to circumvent the [state] appellate process

---

have jurisdiction over nonpoint source pollution and that any violation of state and regional water board regulations is a violation of state law. Nevertheless, the Court agrees that to the extent that the SAC intended to include a claim that the state water boards have improperly delegated their enforcement authority, the Plaintiffs have failed to adequately allege that claim.

[20] In addition to petitioning the state board to set aside or modify the regional board's order, Shell also concurrently filed two federal lawsuits, in federal district court and the Ninth Circuit. *Id*. at 411.

envisioned by the statute and bestow jurisdiction upon a federal court simply by alleging coercion or undue influence." *Id.* at 414. Finally, it held that the agency determination that Shell challenged was not final and that the CWC "specifically conferred on the state['s] courts of general jurisdiction" jurisdiction to review the State Water Board decision. *Id.* Thus, the action belonged in a "state judicial forum for review of the regional board's action," *id.*, and the state agency determination was not reviewable under the APA's provision for review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. 704. Here, by contrast, Plaintiffs do not challenge a regional board's action; they challenge a federal agency action that they allege violates provisions of the CWA requiring compliance with state water regulations.

Also inapposite is *Cook v. Secretary of Air Force*, where a discharged Air Force enlistee brought suit under the APA for money damages and reinstatement to his prior rank and grade. 850 F. Supp. 901, 903-04 (D. Or. 1994). The court dismissed the claim, holding that the request for money damages pushed the claim outside the scope of APA Section 702, which is limited to actions "seeking relief other than money damages." The court further held that "Congress expressly granted jurisdiction to the United States Court of Claims in cases of military discharge," and that because that court had "the authority to award all of the relief that Cook has requested," the claim also fell outside the scope of APA Section 704's requirement that there be "no other adequate remedy in a court." *Id.* at 904 (quoting 5 U.S.C. § 704).

The Supreme Court has explained that the requirement that APA review take place only when there is no other adequate remedy in a court was intended both to "codify the exhaustion requirement" and also to make "clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Where Congress has provided "special and adequate review procedures," as it had constructed through special appeals to Article III judges following Federal Trade Commission and National Labor Relations Board orders, Section 704 was not intended to provide for "additional judicial remedies." In other

words, "[w]hen Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies." *Id*. (quoting Attorney General's Manual on the Administrative Procedure Act 101 (1947)). The Court in *Bowen* rejected an alternative remedy as an inadequate substitute, holding that the Court of Federal Claims lacked authority to grant prospective declaratory relief, rendering it "plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA." *Id*. at 904.

Federal Defendants cite no authority for the proposition that the existence of state enforcement mechanisms for violation of state water regulations serves to divest federal district courts of review of federal agency actions under the APA. The Ninth Circuit has repeatedly held that alleged Section 313 violations are enforceable through the APA, a conclusion inconsistent with the interpretation of APA Section 704 that Federal Defendants advance here. In *Marble Mountain*, for instance, the Ninth Circuit reversed the district court's holding that the California North Coast Water Quality Control Board's failure to object to the Forest Service's draft EIS, which plaintiffs alleged would result in violations of the Board's water quality control plan, barred the plaintiffs' suit in federal court. Independent of any state enforcement decisions, "[t]he judicial review provision of the [APA], 5 U.S.C. §§ 701-706, permits private citizens to sue for alleged state water quality control violations from nonpoint sources." 914 F.2d at 182-83. Federal Defendants argue that the "Porter-Cologne Act provides a comprehensive mechanism for State Board review of any action or failure to act by a Regional Board with respect to waste discharge requirements, including permitting," a process that allows for petitions to the State Board to challenge Regional Board action or inaction, followed by the ability to file a petition for writ of mandate for review by the superior court. Mot. at 19 (citing CWC §§ 13320, 13330; *Voices of the Wetlands v. State Water Resources Control Bd*., 52 Cal. 4th 499, 516 (2011); *Pac. Water Conditioning Assn., Inc. v. City Council*, 73 Cal. App. 3d 546, 551 (Ct. App. 1977)). But judicial review under the APA of alleged violations of CWA § 313 is available regardless of state enforcement action. *Marble*

34

*Mountain*, 914 F.2d at 183 (California regional water quality board's failure to criticize the Forest Service's Draft EIS "does not bar the plaintiff's suit") (citation omitted). Moreover, Plaintiffs seek relief in the form of a declaration that the Forest Service has violated the CWA and an order that the Forest Service modify its livestock grazing permits to comply with the CWA. SAC at 22-23. State administrative proceedings and state superior courts have mechanisms to enforce California water regulations, but those state remedies are unavailable for the relief that Plaintiffs seek.

Federal Defendants next argue that the Plaintiffs fail to allege properly an APA claim, both because they fail to identify a final agency action causally connected to their harm and because they have failed to adequately plead a violation under § 706(2)(A). They argue that Plaintiffs' failure to "connect any permit or AOI provisions to specific alleged water quality violations" from 2000 through the present is too remote a connection between the action challenged and the purported violation of water quality standards, and that without that "specific link, the APA claim fails." Reply at 10. Plaintiffs have alleged that the Forest Service granted permits and issued annual AOIs that allow grazing on BEH allotments that result in violations of state water quality regulations and request that they be modified to ensure compliance with the law. SAC at 23. Specifically, the SAC alleges that fecal coliform levels measured in water within the allotments prior to the arrival of cattle at the grazed sites fell below regulatory thresholds but increased after cattle grazing began on the BEH allotments and in places exceeded the state standards for recreational contact with water. SAC ¶ 46; *see also id*. ¶¶ 47-48.[21] This is a clear causal link between the agency action and the alleged harm. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm."). If the Forest Service did not permit the grazing, or permitted it subject to different conditions in the AOIs, the Forest Service could remedy the alleged water violations.

---

[21] The SAC also alleges that the Central Valley Regional Water Quality Control Board wrote in its March 12, 2014, comment letter on the Draft EIS that "it possessed evidence of water quality violations in streams on the BEH allotments." SAC ¶ 35.

Federal Defendants argue that Plaintiffs have failed to adequately plead a violation under § 706(2)(A), which requires a reviewing court to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This is plainly without merit. Plaintiffs' Complaint contends that the Forest Service has issued permits and AOIs for the grazing program, in violation of CWA § 313 (an action "not in accordance with law").

Federal Defendants make three other minor arguments that may be disposed of in short order. First, they argue that Plaintiffs failed to follow the proper procedures for filing a citizen suit under the CWA. Mot. at 21-22. Plaintiffs are not bringing suit pursuant to the citizen-suit provision, but are instead bringing an APA action pursuant to CWA § 313. Opp. at 13 (citing *Oregon Nat. Res. Council*, 834 F.2d at 842 n.16 (alleged Section 313 violation reviewable under the APA, with federal question jurisdiction provided by 28 U.S.C. § 1331)). Second, Federal Defendants argue in a footnote in reply that while the APA itself contains no statute of limitations, APA challenges carry a six-year civil action statute of limitations, and Plaintiffs claim that they have measured bacterial levels exceeding California water quality standards since 2000. Reply at 10 n.5 (citing *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 942-43 (9th Cir. 2006)). The SAC makes clear that Plaintiffs seek prospective relief concerning ongoing actions, specifically a declaratory judgment that the Forest Service has violated the CWA and an order to modify the livestock grazing program on the BEH allotments to ensure compliance with applicable laws. SAC at 22-23. Finally, Federal Defendants argue that Plaintiffs' suit is a challenge to the Federal Defendants' grazing program generally, improperly seeking broad, programmatic relief. Reply at 10-11. Plaintiffs' challenge is narrowly targeted to discrete final Forest Service actions: the issuance of permits and annual AOIs concerning the grazing program on the BEH allotments, which have allegedly resulted in violations of California water regulations. This is sufficiently narrow and unlike the sort of wide-ranging challenge that the Supreme Court has held to be inappropriate. *See, e.g., Lujan*, 497 U.S. at 890 (holding that the challenged "land renewal program" was a broad term applied to the "continuing (and thus constantly changing) operations

of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans," comprised of over 1250 individual classification terminations and withdrawal revocations, which was thus not a final agency action appropriate for APA review).

In sum, the motion to dismiss the CWA claim is **GRANTED WITH LEAVE TO AMEND** insofar as the SAC fails to state a claim with respect to its allegation that the Forest Service acted in violation of CWC §§ 13260, 13263, and 13269 when it authorized grazing without first obtaining a permit or a waiver. In all other respects, the motion is **DENIED**.

**B.      Second Claim For Relief: National Forest Management Act**

Plaintiffs allege that the Forest Service has authorized livestock grazing in the BEH allotments that violates forest plan management standards, in violation of the NFMA. Courts "set aside an agency's actions 'only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *In re Big Thorne Project*, 857 F.3d 968, 973 (9th Cir. 2017) (quoting *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007)). Federal Defendants make two principal interrelated arguments with respect to the NFMA claim. First, they argue that the NFMA claim is not ripe for review because it is rooted in a withdrawn draft ROD, which carries no obligations and means the Forest Service's ultimate decision and final ROD remain unknown. Mot. at 23-24. Plaintiffs' NFMA claim, however, does not rest on the withdrawn draft ROD; their claim is that the livestock grazing on the BEH allotments "has violated and is likely to continue to violate Forest Plan management standards related to streambank and shoreline protection, livestock impacts to special aquatic features, key grass species utilization and levels of riparian hardwood browse." SAC ¶ 50. It specifically alleges that the grazing has contravened "regional Forest Plan Standard and Guideline No. 50, which requires the Forest Service to 'protect hardwood regeneration in grazing allotments' by allowing 'livestock browse on no more than 20 percent of annual growth of hardwood seedlings and advanced regeneration' and to '[m]odify grazing plans if hardwood regeneration and recruitment needs

are not being met.'" *Id*. It further alleges that the grazing has also contravened "regional Standard and Guideline No. 103, which requires the Forest Service to '[p]revent disturbance to streambanks and natural lake and pond shorelines caused by [livestock] activities . . . from exceeding 20 percent of stream reach or 20 percent of natural lake and pond shorelines.'" *Id*. ¶ 51. Other paragraphs of the SAC allege violations of still other portions of the Forest Plan. *See id*. ¶ 52 (violation of Standard and Guideline 117), ¶ 53 (violation of Standard and Guideline 118), ¶¶ 62-65 (re-alleging violations of Standard and Guidelines 53, 54, 117, and 118). Many of these paragraphs do include discussion of the withdrawn draft ROD, but the core of these allegations are a failure to comply with the Forest Plan; references to the draft ROD are included not because the language of that document committed the Forest Service to any course of action but to provide illustrative examples of how the grazing could be managed in a manner consistent with the Forest Plan.

Federal Defendants next complain that the SAC fails to tie specific language of the permits to alleged violations of the Forest Plan because claims must be linked to "a specific deficiency within the four corners of a permit." Reply at 12. In support they cite *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002), and *Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1132 (9th Cir. 1999). These cases, however, stand for the different proposition that NFMA suits must challenge particular final agency actions, not merely broad practices or policies. Nowhere do these cases require that specific parts of the permits be quoted with specificity. For example, in *Neighbors of Cuddy Mountain*, the Ninth Circuit held that allegations that a timber sale would violate a forest plan's requirement to retain a certain percentage of old growth habitat and species "ma[de] clear the causal connection between alleged mismanagement and the Forest Service's allegedly unlawful approval of old growth sales"[22] and survived a motion to dismiss. 303 F.3d at 1068. It went on to explain that "allegations that the Forest Service's forest-wide failures to protect old growth habitat and species in

---

[22] The opinion quoted the first count of the complaint to specify that "the Supervisor's failure to carry out his mandatory duties under NFMA . . . has . . . rendered any decisions under the [Forest Plan] to harvest old growth arbitrary." *Id*. at 1068.

accordance with NFMA and the Forest Plan render the approval of a specific mature growth timber sale, Grade/Dukes, unlawful."[23]  *Id.*  In *Wilderness Society v. Thomas*, the Ninth Circuit also held that a generalized claim that the Forest Service violated the NFMA by failing to conduct a forest-wide study on the suitability of grazing was not justiciable, but allegations that the Forest Service violated the NFMA "at a site-specific level by approving allotment management plans for [specific] allotments without identifying the lands suitable for grazing on those allotments" was a cognizable claim.  188 F.3d at 1134.  Plaintiffs' claims here are that the permits and AOIs permitting grazing on the BEH allotments violate the forest plan for Stanislaus National Forest.  Grazing permits and AOIs are final agency actions subject to review under the APA.  *O.N.D.A. v. U.S. Forest Serv.*, 465 F.3d at 983 ("[T]he issuance of a grazing permit is an agency action under the APA.") (citing *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 828 (9th Cir. 2002)); *id.* at 985 ("Because the AOI is the only substantive document in the annual application process, it functions to do more than make minor adjustments in the grazing permit . . . ; pragmatically, it functions to start the grazing season.  In short, the AOI is the Forest Service's 'last word' before the permit holders begin grazing their livestock."); *id.* at 990 ("[A]n AOI is a final agency action subject to judicial review under § 706(2)(A) of the APA.").

Federal Defendants argue that the SAC does not explain with specificity what in the grazing permits and AOIs violates the Forest Plan.  Reply at 12.  The SAC alleges that the Forest Service has authorized grazing in violation of Forest Plan Guideline No. 50, which limits "livestock browse [to] no more than 20 percent of annual growth of hardwood seedlings and advanced regeneration" and commands that the Forest Service and to "[m]odify grazing plans if hardwood regeneration and recruitment needs are not being met" in order to "protect hardwood regeneration in grazing allotments."

_____

[23] Challenges to monitoring and management practices, standing alone, are not reviewable without a connection to a particular final agency action.  However, "[w]here the Forest Service generally fails to comply with NFMA and the governing Forest Plan, and where that failure renders an approval of a timber sale unlawful, this Court has power, under the APA, to review the sale and to conclude that its approval was unlawful—even if doing so would, as a practical matter, require us to consider forest-wide management decisions."  *Id.* at 1067; *see also Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1134 (9th Cir. 1999) (holding that claims concerning site-specific injury relating to specific allotments were ripe for review).

SAC ¶ 62.  The draft ROD stated "that necessary adjustments to protect hardwood regeneration and recruitment would be accomplished through an adaptive management program, based on monitoring" but that this program was not adopted, violating the Forest Plan.  SAC ¶ 50.  It alleges that the Forest Service's authorization has violated Forest Plan Guideline No. 103, which seeks to "[p]revent disturbance to streambanks and natural lake and pond shorelines caused by [livestock] activities . . . from exceeding 20 percent of stream reach or 20 percent of natural lake and pond shorelines."  *Id*. ¶ 63. Plaintiffs allege that they have submitted "photo evidence of streambanks and natural lake and pond shorelines, trampled, chiseled, and pocked by livestock hooves" in excess of the 20% limit.  *Id*.; *see also id*. ¶ 30 (describing "photos and field measurements" showing "stream bank degradation and water quality effects associated with livestock being concentrated along streams for prolonged periods" that CSERC provided to the Forest Service in 2012 and 2013); *id*. ¶ 34 (discussing March 2014, submission of "detailed comments, photos providing evidence of degraded resource conditions within the BEH allotments area, [and] extensive field monitoring observations" to the Forest Service).  The SAC further alleges that "special aquatic features on the allotments," such as "springs, fens, and wetlands" are not in "proper functioning condition," in violation of Forest Plan Guideline No. 117.  *Id*. ¶ 64.[24]  It alleges that the Forest Service has not excluded cattle from the substandard special aquatic features "through fencing or alternative methods" in order to protect them.  *Id*.  Finally, the SAC alleges that the grazing program violates Forest Plan Guideline No. 118, which requires that the Forest Service "[p]rohibit or mitigate ground-disturbing activities that adversely affect hydrologic processes that maintain water flow, water quality, or water temperature critical to sustaining bog and fen ecosystems and plant species that depend on these ecosystems."  *Id*. ¶ 65.  Plaintiffs contend that their water-quality monitoring over the last nine years has shown "numerous violations of this standard."  *Id*.

The motion to dismiss the NFMA claim is **DENIED**.

---

[24] The Opposition also cites the statement in the Draft EIS, dated January 2014, that half of the 44 special aquatic features associated with the BEH allotments were not properly functioning.  ECF No. 46-13 at 112.

**C.    Third Claim For Relief: Rescissions Act**

Federal Defendants move to dismiss Plaintiffs' Rescission Act claim on the grounds that Plaintiffs have not made out a claim for unreasonable delay, that Congress has committed the schedule for completion of environmental analyses to agency discretion, and that even if it did not, Plaintiffs fail to marshal any support for their claim that the Forest Supervisor did not properly exercise that discretion.  In their opposition, Plaintiffs argue that the withdrawal of the draft ROD and NEPA Allotment Schedule violates 5 U.S.C. § 706(1) (reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed"), 5 U.S.C. § 706(2)(A) (agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), and 5 U.S.C. § 706(2)(D) (agency action found to be "without observance of procedure required by law").  Opp. at 35.

**1.    Unlawful Failure To Act Or Unreasonable Delay**

Plaintiffs argue that the Forest Service's "failure to implement the completed analysis of grazing on the BEH allotments constitutes a reviewable failure to act, and unreasonable delay under the APA." Opp. at 33 (citing 5 U.S.C. § 706(1); *id*. § 551(13) (APA definition of 'agency action' includes a "failure to act")).  Federal Defendants first argue that the SAC is unclear whether it even contains an allegation that the Forest Service's withdrawal amounted to an agency action "unlawfully withheld or unreasonably delayed" under 706(1), noting that the SAC fails to use the words "withhold" or "delay" and instead frames its allegations as objections about the unilateral alteration of the NEPA schedule and the failure to consider the relevant criteria.  Reply at 13-14 (citing SAC ¶ 68).  The SAC alleges that the Forest Service failed to abide by a schedule for NEPA compliance at a time when the "the Forest Service had no other schedule in place for NEPA compliance for these allotments."  SAC ¶ 68.  While this touches on the issue of unreasonable delay, and the SAC makes no mention of unreasonable delay or 5 U.S.C. § 706(1).  This is insufficient notice, even under *Iqbal's* liberal pleading standard. Nonetheless, because of the liberal amendment standard under Federal Rule of Civil Procedure 15, the Court has evaluated the viability (or futility) of any potential 706(1) claim based upon the facts alleged,

and finds that Plaintiffs cannot state a claim that the Forest Service has engaged in unreasonable delay.

To be granted relief under Section 706(1), a plaintiff must first show that an agency delayed or withheld a discrete action that the agency was legally required to take. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) ("a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*") (emphasis in original). Claims asserting unreasonable delay under the APA are evaluated under the six-factor test outlined in *Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"):

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 n.7 (9th Cir. 1997) (quoting *TRAC*, 750 F.2d at 80). Most important among these factors is the rule of reason. *In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017) (citing *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)). The Ninth Circuit's unreasonable delay mandamus cases have made clear that "[t]he cases in which courts have afforded relief have involved delays of years, not months." *In re California Power Exch. Corp.*, 245 F.3d 1110, 1125 (9th Cir. 2001) (collecting circuit-court cases involving delays of between four and ten years that were held to be unreasonable and comparing with cases involving delays of 14 months to five years where court declined to grant mandamus). In one instance, the Ninth Circuit denied a mandamus petition where the EPA had considered an administrative petition for six years without acting but had a "concrete timeline" for resolving the petition within the next year. *In re Pesticide Action Network N. Am., Nat. Res. Def. Council, Inc.*, 798 F.3d 809, 813-14 (9th Cir. 2015). Only two years later, when the delay was in its eighth year and the agency lacked a meaningful timetable for issuing a final ruling, did

the court find that the EPA had "stretched the 'rule of reason' beyond its limits." *Id*. at 814. *See also In re A Cmty. Voice*, 878 F.3d at 787 (finding unreasonable delay after eight years and "only speculative dates four and six years in the future when [the agency] might take final action" and distinguishing cases "where the delay has been only months or a few years").

Here, the Forest Service withdrew the draft ROD on August 29, 2016, SAC ¶ 37, less than a year and a half ago, which followed years of environmental analyses and other work. *Id*. ¶¶ 26-33, 36-37. The Forest Service has reset the schedule of the NEPA analysis for the BEH allotments for completion in 2019. SAC ¶ 68. This is the sort of a "concrete timeline," *Pesticide Action Network* 798 F.3d at 814, paired with relatively short delay that courts have declined to hold amounts to "unreasonable delay" under the APA. *See Towns of Wellesley, Concord & Norwood, Mass. v. F.E.R.C.*, 829 F.2d 275, 277 (1st Cir. 1987) (14-month delay following issuance of draft decision "is not so egregious as to warrant mandamus") (internal quotation marks omitted); *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (finding "14-month time period" not unreasonable where agency would be addressing "a host of complex scientific and technical issues" and declining to "'punish' [agency] for its past delay by imposing a mandatory, accelerated timetable"). The first factor weighs in favor of Federal Defendants.

The second and fourth factors bear consideration together here, where Congress has granted the Forest Service discretion to determine the priority and timing for performance of the environmental analysis and documentation on thousands of allotments required under NEPA. Congress has provided no "timetable or other indication of the speed with which" Congress expects the Forest Service to proceed. *Indep. Min. Co. v. Babbitt*, 105 F.3d at 507 n.7.

The third, fourth, and fifth factors, whether human health and welfare are at stake, the effect of expediting action on other agency priorities, and the nature and extent of the interests prejudiced by the delay, also bear analysis together. The alleged violations at issue in this suit involve environmental harm, including water-quality violations that could affect human health. Nevertheless, this factor is not

dispositive.  It appears to be the case that the great bulk of the required NEPA analysis for the BEH allotments is completed, but the BEH allotments represent a small part of the thousands of allotments the Forest Service has scheduled for completion, many of which may involve potential harm to human health and the environment.  Whether the public welfare will benefit if action on the BEH allotment is prioritized "depends crucially upon the competing priorities that consume [the Forest Service's] time, since any acceleration here may come at the expense of delay of . . . action elsewhere." *In re Pesticide Action Network N. Am.*, 532 F. App'x 649, 651 (9th Cir. 2013) (internal quotation marks and citation omitted) (holding that six-year delay was not unreasonable where agency had "concrete timeline" for final agency action) (successive petition for writ of mandamus later granted in *In re Pesticide Action Network,* 798 F.3d 809 (9th Cir. 2015)).  These factors do not weigh in favor of a finding of unreasonable delay.

The final *TRAC* factor requires no analysis but instead notes that a court need not find impropriety in an agency's delay in order to find it unreasonable.

Weighing all the factors together, Plaintiffs cannot allege sufficiently a non-futile claim that the Forest Service has acted to unreasonably delay its final decision with respect to the BEH allotment.  Plaintiffs may be frustrated that the environmental analysis on the BEH allotments has stretched across three presidential administrations.  SAC ¶ 26 (the Forest Service first issued an EA in December 2006, and a finding of no significant impact in 2007).  But the statutory framework grants the Forest Service discretion to set the timing of individual allotments within the broader framework of completing thousands of NEPA analyses, and the analysis on the BEH allotments has involved input from various stakeholders and a series of updated iterations.  The Forest Service withdrew the draft ROD less than a year and a half ago and has a concrete timeline for completion by 2019.  Under these circumstances, even viewing the facts alleged by Plaintiffs in a light most favorable to them, Plaintiffs have not made out a case for unreasonable delay in violation of the APA.  *See In re A Cmty. Voice*, 878 F.3d at 787 (collecting cases of unreasonable delay after years, not "weeks or months").

Because a court need not permit an attempt to amend if "it is clear that the complaint could not be saved by an amendment," *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), Plaintiffs' claim for unreasonable delay is **DISMISSED WITHOUT LEAVE TO AMEND**.

### 2. Failure To Proceed In Accordance With Law

Federal Defendants next argue that the language giving the Secretary "sole discretion" to "determine the priority and timing for completing each required environmental analysis," based on the environmental significance and available funding, works to remove the decision from judicial review under the APA by leaving a reviewing court with no law to apply. The "presumption favoring interpretations of statutes to allow judicial review of administrative action is well-settled." *Kucana v. Holder*, 558 U.S. 233, 251–52 (2010) (internal quotation marks and alterations omitted); *see also Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011) ("In general, there is a 'strong presumption that Congress intends judicial review of administrative action.'"); *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 890 (9th Cir. 2004) ("The default rule is that agency actions are reviewable . . . even if no statute specifically authorizes judicial review."). The APA provides that the presumption that agency actions are subject to judicial review is overcome in two "narrow circumstances." *Pinnacle Armor,* 648 F.3d at 719. The first is when Congress has explicitly barred judicial review of agency action. 5 U.S.C. 701(a)(1); *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991) (courts should restrict judicial review only where there is "clear and convincing evidence that Congress intended" to do so). The second, under Section 701(a)(2), applies in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Webster v. Doe*, 486 U.S. 592, 599 (1988). "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

In making the determination whether judicial review is precluded because the action is

committed to agency discretion, the Ninth Circuit considers "the language of the statute and whether the general purposes of the statute would be endangered by judicial review." *Pinnacle Armor,* 648 F.3d at 719 (quoting *Cnty. of Esmeralda v. Dep't of Energy*, 925 F.2d 1216, 1218 (9th Cir. 1991)). "Therefore, 'the mere fact that a statute contains discretionary language does not make agency action unreviewable.'" *Id.* (quoting *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994)); *see also ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th Cir. 2015) (holding that even where agency regulations granted "sole discretion" to the agency, courts will "accord it the proper deference" but that language "does not deprive us of the right to review its actions for an abuse of its discretion or to determine if its actions were otherwise arbitrary and capricious").

Although agency discretion is insulated from review where there is no law to apply, "the APA itself commits final agency action to our review for 'abuse of discretion.'" *Pinnacle Armor,* 648 F.3d at 720 (citing 5 U.S.C. § 706(2)(A)). Where there are adequate standards to permit a court to determine if an agency "is doing what it is supposed to be doing," then an action is subject to review. *Id.* (citing *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) ("The fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds. To concede otherwise would be to disregard entirely the value of political accountability, which itself is the very premise of administrative discretion in all its forms.")). In the "rare instances" in which courts determine that they the lack of a meaningful standard to apply, precluding judicial review, "the case typically involves either an agency's power to manage its own docket, . . . or issues where we have neither standards nor expertise, such [as] when we are asked to review questions of national security . . . or an agency's decision to deny a discretionary federal loan." *Id.*

Federal Defendants argue that the grant of discretion to the Forest Service leaves no meaningful standards against which to measure the exercise of that discretion. In *Great Old Broads For Wilderness v. Kempthorne*, a district court in the District of Columbia held that Section 325 provided no "reference point against which the propriety of the Secretary's timing can be measured" and held that the plaintiffs'

request for, among other things, an order requiring the establishment of a schedule for NEPA compliance was granted to agency discretion under APA Section 701(a)(2). 452 F. Supp. 2d 71, 82 (D.D.C. 2006) (internal quotation marks and citation omitted). Plaintiffs respond that this case was wrongly decided. They argue that the Forest Service has discretion to determine the NEPA schedule, but that discretion must operate within the bounds provided by Congress: it should be based on environmental significance and available funding. The only information the Forest Service provided in connection with the schedule change, Plaintiffs allege, is that the withdrawal of the draft ROD was done to "allow more interactions with stakeholders on the issues." ECF No. 41-3, Fed. Defs.' Ex. A-1, Aug. 29, 2016 letter withdrawing draft ROD. In addition, Plaintiffs argue that neither the decision to withdraw the ROD nor the decision to issue a revised NEPA schedule was supported by the two factors that Congress commanded the Forest Service to consider when exercising its discretion. Opp. at 36.

The bounds on the exercise of discretion are drawn broadly in Section 325, and even if Plaintiffs were to prevail on their Rescissions Act claim, the potential remedies include an order requiring the Forest Service to revise its explanation for why it withdrew the draft ROD or to complete its NEPA analysis by a date earlier than 2019. This is thin relief. Nevertheless, the Court is not persuaded that Section 325 was drawn in a manner that divests district courts of jurisdiction to hear challenges to the exercise of discretion. The Ninth Circuit has emphasized that Section 701(a)(2) is a limited exception and has commanded that "although 5 U.S.C. § 701(a)(2) insulates from judicial review agency discretion where there is no law to apply, the APA itself commits final agency action to our review for 'abuse of discretion.'" *Pinnacle Armor*, 648 F.3d at 720. The Ninth Circuit has only in limited circumstances found an absence of law to apply, and even broad grants of discretion do not ordinarily divest reviewing courts of jurisdiction. *Beno*, 30 F.3d at 1067 (holding agency action reviewable where grant of discretion was not "unlimited" but instead available "only for the period and extent necessary to implement experimental projects which are likely to assist in promoting the objectives" of the program, which objectives were "set forth with some specificity" in the statute) (internal quotation marks and

citation omitted); *ASSE Int'l*, 803 F.3d at 1071; *Newman*, 223 F.3d at 943.[25]

Defendants further argue that even if there are manageable standards to apply, Plaintiffs have failed to state a claim that the Forest Service's actions violated the Rescissions Act. Mot. at 30. Read in the light most favorable to the Plaintiffs, the SAC does allege that the Forest Service did not have reason for delay based on funding availability. The Forest Service had issued a final EIS and draft ROD, meaning that the great bulk of the analysis had already been completed. In addition, Plaintiffs argue that the Forest Service has failed to keep Congress apprised of funding levels needed to ensure timely NEPA review of outstanding allotments, as required under Section 325.[26] But the facts as pled belie Plaintiffs' theory that the Forest Service failed to consider environmental considerations when it altered the NEPA schedule and exercised its discretion in a manner that was arbitrary, capricious, or an abuse of discretion. The withdrawal of the draft ROD occurred after two meetings with objectors between May and July of 2016, where the Forest Service heard objections based on environmental concerns and encouraged the objectors to "strongly consider accepting improved adaptive management and increased monitoring as the management direction for the three allotments" before finally withdrawing the draft ROD. SAC ¶ 37. The only reasonable inference to be drawn from these facts is that the Forest Service's decision to withdraw the draft ROD was based on the environmental concerns[27] that objectors raised and that the Forest Service will continue its analysis and decision-making pursuant to the revised NEPA schedule. Taking into account the many competing priorities and comments on the draft ROD,

---

[25] Plaintiffs make a confusing argument in which they suggest the NEPA process may be bifurcated into two steps: the first involving the environmental review and the second involving the ultimate decision (*e.g.*, issuance of a ROD). This appears to be an attempt to refute Federal Defendants' contention that there is no law to apply here and that the Forest Service has complete discretion over the timing of environmental review in the context of grazing permits. Because the Court finds it has jurisdiction to review Plaintiffs claims, it is unnecessary to delve into the complicated argument.

[26] This portion of Section 325 provides "[t]hat beginning in November 2004, and every year thereafter, the Secretaries of the Interior and Agriculture shall report to Congress the extent to which they are completing analysis required under applicable laws prior to the expiration of grazing permits, and beginning in May 2004, and every two years thereafter, the Secretaries shall provide Congress recommendations for legislative provisions necessary to ensure all permit renewals are completed in a timely manner. The legislative recommendations provided shall be consistent with the funding levels requested in the Secretaries' budget proposals." Pub. L. No. 108–108, November 10, 2003, 117 Stat 1241, § 325.

[27] No party suggests that the environmental concerns at issue here are not of the type intended to be relevant under the Rescissions Act.

48

taking it under advisement, and scheduling the completed analysis for 2019 was a reasonable exercise of "discretion [to] determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available." Pub. L. No. 108–108, November 10, 2003, 117 Stat 1241, § 325.

Plaintiffs have not stated a claim that the withdrawal of the draft ROD and updated NEPA schedule was an agency action that was not in accordance with law, an abuse of discretion, or arbitrary and capricious.[28] This claim is **DISMISSED WITHOUT LEAVE TO AMEND**.

**D.   Fourth Claim For Relief: Endangered Species Act**

In their Opposition to the Motion to Dismiss, Plaintiffs voluntarily dismiss their ESA claims. Pursuant to Federal Rule of Civil Procedure 41(a)(2), Plaintiffs' claim for violation of the ESA is **DISMISSED WITHOUT PREJUDICE**.

**VI. CONCLUSION AND ORDER**

For the foregoing reasons, **IT IS HEREBY ORDERED**:

1. The motions to dismiss the Clean Water Act claims are **GRANTED WITH LEAVE TO AMEND** as to the alleged failure to obtain a waiver or waste discharge permit and **DENIED** as to the alleged violations of state water-quality standards;

2. The motion to dismiss the National Forest Management Act claim is **DENIED**;

3. The motions to dismiss the Rescissions Act claim are **GRANTED WITHOUT LEAVE TO**

---

[28] Defendant-Intervenors additionally argue that Plaintiffs fail to state a claim under the Rescissions Act because "subsequent legislation does not permit the Forest Service to refuse to renew a permit if NEPA analysis is not complete." Intervenor Mot. at 12. This argument rests on the idea that even if Plaintiffs can demonstrate that the Forest Service unreasonably delayed performance of the environmental analysis and documentation required pursuant to NEPA, there is no basis to order any modification to the terms and conditions attached to the permits until the environmental documentation is complete. Intervenor Mot. at 16. Courts do not grant motions under Rule 12(b)(6) "merely because a plaintiff requests a remedy to which he or she is not entitled." *Massey v. Banning Unified Sch. Dist.*, 256 F. Supp. 2d 1090, 1092 (C.D. Cal. 2003) (citation and alteration omitted). "It need not appear that plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Id.* (quoting *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985)). Plaintiffs request, among other things, an order declaring that the Forest Service's withdrawal of the draft ROD and modification of the schedule for NEPA compliance violated the Rescissions Act and subsequent acts, SAC at 23 ¶ 3, relief that is unaffected by the statutory language that Defendant-Intervenors cite concerning the reissuance of permits prior to the performance of NEPA review.

**AMEND**;

4.  The Endangered Species Act claim is **DISMISSED WITHOUT PREJUDICE**.

Plaintiffs shall have forty-five (45) days from electronic service of this Order to file an amended complaint or to give notice that they will stand on the current pleading. This Court's resources are limited due to the enormously high caseload. A large amount of time was invested in this Order. If the Plaintiffs wish to amend, it is expected that every word of this Decision and Order will be read, addressed, corrected, and amended. Counsel should assume that they will not be given another chance to amend.

IT IS SO ORDERED.

Dated:   **February 6, 2018**                    **/s/ Lawrence J. O'Neill**
                                                        UNITED STATES CHIEF DISTRICT JUDGE