1

2

3

4    **UNITED STATES DISTRICT COURT**

5    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

6

| | |
|---|---|
| **CENTRAL SIERRA ENVIRONMENTAL RESOURCE CENTER, *et al.*,** | **1:17-cv-00441-LJO-SAB** |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| **v.** | |
| **STANISLAUS NATIONAL FOREST, *et al.*,** | **(ECF Nos. 80, 85, and 86)** |
| **Defendants.** | |

7

8

9

10

11

12

13                          **I. <u>INTRODUCTION</u>**

14       Plaintiffs Central Sierra Environmental Resource Center ("CSERC") and Sierra Forest Legacy

15  (together, "Plaintiffs") bring this suit against Defendants Stanislaus National Forest, the U.S. Forest

16  Service ("Forest Service" or "USFS"), and Jason Kuiken, in his official capacity as Forest Supervisor

17  for the Stanislaus National Forest[1] (together, "Federal Defendants"), challenging the cattle grazing

18  program for three livestock allotments in Stanislaus National Forest.  ECF No. 57.  Following briefing

19  and a decision on a motion to dismiss, Plaintiffs filed a Third Amended Complaint ("TAC"), bringing

20  claims under the Administrative Procedure Act premised on violations of the Clean Water Act and the

21  National Forest Management Act.  *Id.*  Plaintiffs moved for summary judgment.  ECF No. 75.  Federal

22  Defendants; and Defendant-Intervenors, various permittees and the permittees' trade association filed

23

24  _____

25  [1] The Court is separately issuing an order substituting Jason Kuiken as a party, replacing former Forest Supervisor Jeanne M. Higgins.

1

cross-motions for summary judgment.  ECF Nos. 85, 86.  Plaintiffs opposed both motions and filed a reply in a single filing.  ECF No. 87.  Federal Defendants, ECF No. 88, and Defendant- Intervenors, ECF No. 90, both filed replies.  This matter is now ripe for review and has been deemed suitable for disposition without oral argument.  *See* Local Rule 230(g); ECF No. 91.

## II. <u>STATUTORY BACKGROUND</u>

### A.    <u>Clean Water Act</u>

The purpose of the Clean Water Act ("CWA") is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251.  Accordingly, the CWA prohibits "the discharge of any pollutant by any person" into waters of the United States except when discharged in compliance with a National Pollution Discharge Elimination System ("NPDES") permit.  33 U.S.C. §§ 1311(a), 1342.  The CWA "drew a distinct line between point and nonpoint pollution sources." *Oregon Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 (9th Cir. 1987).  The CWA defines point sources as "discernible, confined and discrete conveyances," including pipes and ditches.  33 U.S.C. § 1362(14).[2]  The CWA does not define nonpoint sources, but they consist of other sources of pollution that do "not result from the 'discharge' or 'addition' of pollutants from a point source."[3] *Oregon Nat. Res. Council*, 834 F.2d at 849 n.9.  Nonpoint sources of pollution include runoff from animal grazing and irrigated agriculture.  *Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1998) ("*O.N.D.A. v. Dombeck*").  The parties do not dispute that "something as inherently mobile as a cow" represents a nonpoint pollution source.  *Id*. at 1099.

The CWA directly regulates pollution from point sources through the issuance of NPDES permits but "provides no direct mechanism to control nonpoint source pollution."  *O.N.D.A. v.*

---

[2] The full definition is as follows:  "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.  This term does not include agricultural stormwater discharges and return flows from irrigated agriculture."  33 U.S.C. § 1362(14).
[3] The CWA defines "discharge of pollutant" to mean, in relevant part, "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).

*Dombeck*, 172 F.3d at 1097.  Instead, the CWA "uses the 'threat and promise' of federal grants to the states to accomplish this task" through federal grants for state wastewater treatment plans, 33 U.S.C. § 1288(b)(2), and a requirement that states prepare nonpoint source management programs, 33 U.S.C. § 1329.  The latter provision, CWA § 319, "does not require states to penalize nonpoint source polluters who fail to adopt best management practices; rather it provides for grants to encourage the adoption of such practices."  *Nat. Res. Def. Council v. E.P.A.*, 915 F.2d 1314, 1318 (9th Cir. 1990).  California's Porter-Cologne Water Quality Control Act ("Porter-Cologne Act" or, simply, "Porter-Cologne") established California's framework for water quality regulation in the state.  Cal. Water Code ("CWC") § 13000 *et seq*.  The Porter-Cologne Act vested California's State Water Resources Control Board ("State Water Board"), CWC § 13100, and nine regional water boards, CWC § 13200, with power to set standards and procedures to protect water quality, such as the creation and adoption of water quality control plans, CWC § 13240, and control over the information that waste dischargers must file with the regional board, CWC § 13260.

Though the CWA does not itself regulate nonpoint pollution sources, it provides that federal agencies are required to comply with state and local water quality requirements to the same extent as nongovernmental actors.  CWA § 313, 33 U.S.C. § 1323.  This requirement applies both to point and nonpoint sources.  *O.N.D.A. v. Dombeck*, 172 F.3d at 1098 ("Section 1323 plainly applies to nonpoint sources of pollution on federal land.").

**B.   National Forest Management Act**

The Forest Service manages the National Forests pursuant to the National Forest Management Act of 1976 ("NFMA").  *See* 16 U.S.C. §§ 1600-1614.  The NFMA and its implementing regulations provide for forest planning and management at the forest level and at the individual project level.  *See id.*; *see also Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996).  At the forest level, the Forest Service is required to develop a Land and Resource Management Plan ("LRMP" or "Forest Plan"), which operates as a long-term planning document for an entire National

1  Forest that considers a range of economic and environmental factors. *See* 16 U.S.C. § 1604(g)(1)-(3).

2  At the individual project level, site-specific actions, such as resource plans, contracts, and grazing

3  permits, are approved or denied by the Forest Service consistent with the governing LRMP. *See Inland*

4  *Empire Pub. Lands Council*, 88 F.3d at 757.

5       "It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan

6  is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir.

7  2005).  NFMA is clear that "[r]esource plans and permits, contracts, and other instruments for the use

8  and occupancy of National Forest System lands shall be consistent with the land management plans."

9  16 U.S.C. § 1604(i); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1062 (9th Cir.

10  2002) ("Specific projects, such as [a specific] timber sale, must be analyzed by the Forest Service and

11  the analysis must show that each project is consistent with the plan."); *Idaho Sporting Cong., Inc. v.*

12  *Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002) ("[A]ll management activities undertaken by the Forest

13  Service must comply with the forest plan, which in turn must comply with the Forest Act."); *Neighbors*

14  *of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377–78 (9th Cir. 1998) (holding that the Forest

15  Service was not in compliance with NFMA where its site-specific project was inconsistent with the

16  forest plan of the entire forest); *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1068 n.4 (9th

17  Cir. 1998) ("16 U.S.C. § 1604(i) plainly imposes a legal obligation on the Forest Service to ensure that

18  timber sales are consistent with the relevant Forest Plan.").

19       The Forest Service authorizes grazing on allotments through three types of site-specific actions,

20  each of which must be consistent with the applicable Forest Plan. *Buckingham v. Sec'y of U.S. Dep't of*

21  *Agr.*, 603 F.3d 1073, 1077 (9th Cir. 2010).  The first type of action is grazing permits, which are

22  "document[s] authorizing livestock to use National Forest System or other lands under Forest Service

23  control for the purpose of livestock production." 36 C.F.R. § 222.1(b)(5); *see also* 43 U.S.C. §§

24  1702(p), 1752(a).  Grazing permits ordinarily specify "(1) the number, (2) kind, (3) and class of

25  livestock, (4) the allotment to be grazed, and (5) the period of use." *Buckingham*, 603 F.3d at 1077

4

1  (quoting *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006) ("*O.N.D.A. v.*

2  *U.S. Forest Serv.*")).  The standard term for grazing permits is ten years.  *Id.* (citing 43 U.S.C. § 1752(b);

3  36 C.F.R. § 222.3(c)(1)).  The Forest Service "'is authorized to cancel, modify, or suspend grazing and

4  livestock use permits in whole or in part' if the permittee fails to comply with the requirements of his or

5  her permit, or with governing regulations."  *Id.* (quoting 36 C.F.R. § 222.4(a)(4)).

6          The second type of site-specific action is an "allotment management plant" ("AMP"), which is

7  "a document that specifies the program of action designated to reach a given set of objectives" as to a

8  specific allotment, including "the manner in and extent to which livestock operations will be conducted

9  in order to meet the multiple-use, sustained yield, economic, and other needs and objectives as

10  determined for the lands, involved."  *Id.* (citing 36 C.F.R. § 222.1(b)(2)).  If no AMP has been

11  completed or if the Forest Service determines that none is necessary, then the grazing permits and leases

12  include "such terms and conditions as [the Forest Service] deems appropriate for management of the

13  permitted or leased lands."  43 U.S.C. § 1752(e).

14          Finally, the third type of site-specific action is the development of annual operating plans

15  ("AOPs") or instructions ("AOIs").  "Whereas the AMP relates the directives of the applicable [F]orest

16  [P]lan to the individual grazing allotment . . . the AOI annually conveys these more long-term directives

17  into instructions to the permittee for annual operations."  *O.N.D.A. v. U.S. Forest Serv.*, 465 F.3d at 980.

18  "Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or

19  may not have anticipated and planned for in the AMP or grazing permit . . . ."  *Id.* at 980-81.  The terms

20  of the AOI are made part of the grazing permit, which then "governs the permit holder's grazing

21  operations for the next year."  *Id.* at 980.

22  **C.**     **National Environmental Policy Act**

23          The National Environmental Policy Act ("NEPA") "is our 'basic national charter for protection

24  of the environment.'"  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d

25  1172, 1185 (9th Cir. 2008) (quoting 40 C.F.R. § 1500.1).  "Although NEPA does not impose any

substantive requirements on federal agencies, it does impose procedural requirements." *N. Idaho Cmty. Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008).  "Through these procedural requirements, NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger public audience." *Id.* (internal citations and quotations omitted).

NEPA requires federal agencies to analyze the potential environmental impacts of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When an agency takes major federal action, the agency must prepare an Environmental Impact Statement ("EIS") "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

An agency may choose to prepare an environmental assessment ("EA") to determine whether an EIS is needed.  40 C.F.R. §§ 1501.4, 1508.9(b).  An EA is meant to be a "concise public document . . . that serves to," among other things, "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9; *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988).  Based on the EA, the agency "may conclude that the action will not significantly affect the environment and issue a 'Finding of No Significant Impact' ('FONSI') in lieu of an EIS." *Bob Marshall*, 852 F.2d at 1225 (citing 40 C.F.R. § 1508.13).

**D.     Administrative Procedure Act**

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions

found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
>
> (D) without observance of procedure required by law[.]

*Id.* § 706.  When assessing claims pursuant to the APA, a court, reviewing only the AR, must determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).  In other words, a court's "review is guided by whether the agency's analysis is reasonable and offers sufficient detail to ensure that environmental consequences have been fairly evaluated." *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) (citations and quotation marks omitted).

A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977).  Although a court's inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity," and a court may not substitute its judgment for that of the agency.  *Id.* at 415-16.

Courts should defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005).  A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  As the Ninth Circuit explained in *River Runners*:

> In conducting an APA review, the court must determine whether the

7

agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*River Runners*, 593 F.3d at 1070. Reviewing courts must be at their "most deferential" when an agency makes predictions, "within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).  In particular, an agency's "scientific methodology is owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004), *superseded on other grounds by regulation as stated in Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017).

But "the deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001).  Deference is not owed if "the agency has completely failed to address some factor consideration of which was essential to making an informed decision," *id.* (internal citation and quotation omitted), and courts are not required to defer to an agency conclusion that runs counter to that of other agencies or other individuals with specialized expertise in a particular technical area.  *See, e.g., Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984) (agency decision under the Marine Mammal Protection Act was not supported by substantial evidence because agency ignored data that was product of "many years' effort by trained research personnel").

Courts must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted).  "The court's task is not to make its own judgment," because "Congress has delegated that responsibility to the [agency]." *River Runners*, 593 F.3d at 1070.  Instead, "[t]he court's responsibility is narrower: to determine whether the [agency's action] comports with the requirements of the APA . . . ." *Id.*  The Ninth Circuit has held that "[t]he [agency's] action . . . need

1   only be a reasonable, not the best or most reasonable, decision." *Id.* (quotation and citations omitted).

2   The APA does not allow a reviewing court to overturn an agency decision because it disagrees with the

3   decision or with the agency's conclusions about environmental impacts. *Id.* This is especially true in

4   the context of management of Forest Service lands, for Congress has consistently acknowledged that the

5   agency must balance competing demands in managing National Forests. *See United States v. New*

6   *Mexico*, 438 U.S. 696, 716 n. 23 (1978).

7   ### III. <u>FACTUAL BACKGROUND</u>

8       Stanislaus National Forest is located between Lake Tahoe and Yosemite National Park on

9   approximately 900,000 acres on the western slope of the Sierra Nevada Mountains.  Among the active

10  grazing allotments within Stanislaus National Forest are the Bell Meadow allotment, Eagle Meadow

11  allotment, and Herring Creek allotment (together, "BEH allotments"), which collectively total

12  approximately 51,200 acres.  AR 8248.[4]  Elevation on the BEH allotments varies from approximately

13  6,600 feet to over 9,000 feet.  *Id.*  Approximately 75% of the land is forested, with the remaining portion

14  consisting of meadows, open ridge, rock outcroppings, and slope areas.  *Id.*  Permitted livestock forage

15  primarily in meadows and riparian areas but also some forested areas.  *Id.*  The BEH allotments also

16  have high recreational use year-round, including scenic viewing, backpacking, hiking, fishing, camping,

17  horseback riding, and skiing.  *Id.*

18      The grazing permit for the Bell Meadow allotment was issued on November 15, 2016, AR 13-19,

19  and modified on September 28, 2017, AR 1-4.  The permit for the Eagle Meadow allotment was issued

20  on March 28, 2012, AR 27- 33, and modified on September 19, 2017, AR 5-8.  The permit for the

21  Herring Creek allotment was issued on June 20, 2016, AR 20-26, and modified on August 24, 2017, AR

22  9- 12.  The most recent AOIs were issued in May and June of 2018. AR 88-95 (Bell), AR 81- 87

23

24  _____

25  [4] All references to the administrative record contain the prefix "AR."

(Eagle), AR 74-80 (Herring).

In February 2016, the Forest Service released an EIS describing a proposal by the Stanislaus National Forest that would reauthorize livestock grazing on the BEH allotments on the Summit Ranger District.  AR 8188.  A Draft Record of Decision, issued at the same time, proposed to adopt the alternative described in the EIS that would have reauthorized grazing while implementing an adaptive management strategy[5] to ensure compliance with the governing Forest Plan.  AR 8150.  Approximately six and a half months later, after receiving public comment, the Forest Supervisor withdrew the Draft Record of Decision on August 29, 2016, "[i]n order to allow more interactions with stakeholders on the issues."  AR 7780.  That letter also withdrew the proposed plan to reauthorize grazing subject to an adaptive management policy.  *Id.*

Livestock grazing on the lands on the BEH allotments stretches back to the 1850s, AR 8248-49, and "[t]he BEH meadows have had a history of grazing and overgrazing going back to the 1890s."  AR 8344.  *See also* AR 362 (1965 Management Plan for Bell Meadow, stating "Many of the present and past conflicts between grazing and other renewable resources are in evidence on this allotment," including "the lack of primary plants in meadow types[] and the serious erosion along Bell Creek.  All of these conditions are chronologically successive and can be attributed to overgrazing."); AR 8829 ("Range inspection notes from 1953 indicated active erosion along creeks in Hammill Canyon and that Castle, Coyote, and Wire Corral have been 'fed to the bone. Absolutely nothing remains.'").

## IV. STANDARD OF DECISION

Under the APA, the district court's review of an agency's decision is usually limited to the administrative record.  5 U.S.C. § 706; *see also County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (when reviewing final agency action, the district court is not managing a "garden

---

[5] The Draft Record of Decision explains that "[a]daptive management uses monitoring to determine if actions prescribed were followed, and adjusts management if changes are needed.  An adaptive strategy is particularly suited for dealing with problems involving high levels of uncertainty, limited knowledge, and unpredictability.  This approach lends itself to learning and continual improvement while allowing for flexibility."  AR 8163.

1   variety civil suit," but rather "sits as an appellate tribunal").  Therefore, the usual "genuine dispute of

2   material fact" standard for summary judgment normally does not apply in an APA case.  *San Joaquin*

3   *River Group Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011).

4   When reviewing an administrative decision under the APA, there are normally no "disputed facts that

5   the district court must resolve."  *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

6   Instead, "the function of the district court is to determine whether or not as a matter of law the evidence

7   in the administrative record permitted the agency to make the decision it did*." Id.; see also City & Cnty.*

8   *of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).  "[S]ummary judgment is an

9   appropriate mechanism for deciding the legal question of whether the agency could reasonably have

10  found the facts as it did."  *Occidental*, 753 F.2d at 770.

11                                          **V. <u>ANALYSIS</u>**

12  **A.      <u>First Claim for Relief: Clean Water Act</u>**

13          Plaintiffs' APA claims relating to the CWA are in three parts.  First, Plaintiffs contend that the

14  Forest Service's authorization of grazing on the BEH allotments has caused violations of water-quality

15  standards for fecal coliform bacteria, in violation of the Central Valley Regional Water Quality Control

16  Board Basin Plan.  Second, they allege that the Forest Service has failed to file a report with the

17  appropriate state board concerning the discharges of waste from livestock grazing on the BEH

18  allotments.  Finally, Plaintiffs allege that the Forest Service has initiated new discharges of waste or

19  made material changes in the discharges on the BEH allotments before filing a report and before

20  obtaining a permit or waiver from the permit requirement.

21          Defendants' arguments do not necessarily track the claims in a neat fashion but are generally

22  summarized as follows. Federal Defendants argue that the Forest Service had no duty to seek a permit

23  prior to authorizing grazing on the BEH allotments and that the decision to authorize grazing on the

24  allotments was neither arbitrary and capricious nor in violation of law.  Defendant-Intervenors join in

25  Federal Defendants' arguments that the Forest Service has complied with the CWA.  Defendant-

1   Intervenors focus their briefing on their alternative argument that the CWA claim should either be

2   dismissed because "Plaintiffs cannot enforce a grazing regulatory framework that is in the process of

3   being developed" or stayed "pending completion of that process by the Regional Board."  ECF No. 86-1

4   at 5.

5          **1.**      **Background Relevant to CWA Claims**

6          Evaluating the CWA claims requires an understanding of the complex regulatory framework and

7   factual information from the record.  The Porter-Cologne Act is "the principal law governing water

8   quality control in California."  AR 5664.  Passed in 1969, "[i]ts goal is 'to attain the highest water

9   quality which is reasonable, considering all demands being made and to be made on those waters and the

10  total values involved, beneficial and detrimental, economic and social, tangible and intangible.'"  *City of*

11  *Burbank v. State Water Res. Control Bd.*, 35 Cal. 4th 613, 619 (2005) (quoting California Water Code

12  ("CWC") § 13000).  Porter-Cologne "established the State Water [Board], along with nine regional

13  water quality control boards [], and gave those agencies 'primary responsibility for the coordination and

14  control of water quality.'" *Dep't of Fin. v. Comm'n on State Mandates*, 1 Cal. 5th 749, 755 (2016)

15  (quoting CWC § 13001), *as modified on denial of reh'g* (Nov. 16, 2016).  "The [State Water Board]

16  adopts State policy for water quality control and statewide water quality control plans in addition to

17  regulations that are binding on the [regional water quality control boards, which] each govern one of the

18  nine hydrologic regions into which California is divided, adopting regional water quality control plans

19  (basin plans) for their respective regions."  AR 5665 (citing CWC §§ 13200, 13201).

20         Porter-Cologne requires the preparation and adoption of basin plans and requires that those plans

21  "consist[] of a designation or establishment of the waters within a specified area," the beneficial uses to

22  be protected, the water-quality objectives, and an implementation program to achieve the water quality

23  objectives.  CWC § 13050(j).  Regional Water Boards adopt and amend basin plans "under a structured

24  process involving full public participation and state environmental review," and the plans are not

25  effective until they receive State Water Board approval.  AR 5087.

"Planning authority under the Porter-Cologne Act extends to any activity or factor that may affect water quality." AR 5665 (citing CWC §§ 3000, 13050(i), 13140, 13142, 13241). "The Porter-Cologne Act provides that 'All discharges of waste into the waters of the State are privileges, not rights.'" *Id.* (quoting CWC § 13263). Both point and non-point source discharges are subject to regulation under Porter-Cologne. *Id.*

The Central Valley Water Board ("Regional Board") has jurisdiction over the streams that flow through the BEH allotments. AR 8361 (EIS statement that the document used the Central Valley Regional Water Board's Basin Plan as a regulatory benchmark to assess the effect of the proposed action and its alternatives on water quality). The Regional Board approved the governing Basin Plan in 1998. AR 5076. That Basin Plan states that beneficial uses "are critical to water quality management in California" and are "primary goals of water quality planning." AR 5092. The Basin Plan includes Water Contact Recreation (termed "REC-1"), which includes "[u]ses of water for recreational activities involving body contact with water, where ingestion of water is reasonably possible," such as swimming, wading, and fishing, among other activities. *Id.* The water quality standards for bacteria for REC-1 in the Basin Plan state that "[i]n waters designated for contact recreation (REC-1), the fecal coliform concentration based on a minimum of not less than five samples for any 30-day period shall not exceed a geometric mean of 200/100 ml, nor shall more than ten percent of the total number of samples taken during any 30-day period exceed 400/100 ml." AR 5104.

Section 303(d) of the CWA requires that each state compile a list of waters (known as a § 303(d) list) within the state that do not meet applicable water quality standards. 33 U.S.C. § 1313(d). *See also* AR 7388 (State Water Resources Control Board document explaining development of Section 303(d) list (citing 40 C.F.R. § 130.7(c), (d))). Section 305(b) of the CWA requires that each state prepare a biennial water quality assessment report concerning all navigable waters in that state. 33 U.S.C. § 1315(b)(1). "Along with the § 303(d) list, the state must submit, inter alia: (1) '[a] description of the methodology used to develop the list'; (2) '[a] description of the data and information used to identify

13

1  waters'; (3) '[a] rationale for any decision not to use any existing and readily available data and

2  information' for certain categories of water; and (4) '[a]ny other reasonable information requested by the

3  Regional Administrator.'" *Thomas v. Jackson*, 581 F.3d 658, 662 (8th Cir. 2009) (quoting 40 C.F.R. §

4  130.7(b)(6)).  The Section 303(d) list applies to waters impaired by both point sources and nonpoint

5  sources of pollution.  AR 6659.

6       The Regional Water Boards propose recommendations for water bodies to be included on the

7  Section 303(d) list to the State Water Board, which in turn may receive public comments concerning the

8  recommendations and make changes to the recommendations list.  AR 7413.  The State Water Board

9  then evaluates the data to determine whether standards have been exceeded.  AR 7411.  States

10  developing their Section 303(d) list are "required to assemble and evaluate all existing and readily

11  available water quality-related data and information, including, at a minimum: (1) waters identified as

12  partially meeting or not meeting designated uses or as threatened in the state's most recent CWA Section

13  305(b) report; (2) waters for which dilution calculations or predictive modeling indicate nonattainment

14  of applicable standards; (3) waters for which water quality problems have been reported by

15  governmental agencies, members of the public, or academic institutions; and (4) waters identified as

16  impaired or threatened in any CWA Section 319 nonpoint source assessment submitted to the EPA."

17  AR 6659-60 (citing 40 C.F.R. § 130.7(b)(5)).  States must regulate water body segments placed on the

18  Section 303(d) list through development of total maximum daily loads ("TMDLs")[6] or another

19  regulatory step "reasonably expected to result in the attainment of water quality standards within a

20  specified timeframe."  AR 7095.

21       The California State and Regional Water Boards prepare a single integrated report that meets the

22  reporting requirements set forth in Sections 303(d) and 305(b) of the CWA.  AR 7095.  In 2004, the

23

24  _____

25  [6] "A TMDL is the sum of the individual waste load allocations for point sources, load allocations for nonpoint sources, and natural background."  AR 7097 (citing 40 C.F.R. § 130.2(j)).

1    State Water Board adopted a listing policy establishing a standardized approach to development of the

2    Section 303(d) list for California, including "requirements for data quality, data quantity, and

3    administration of the listing process."  *Id.*  This policy includes factors to be considered for listing and

4    delisting decisions with respect to various pollutants, including bacterial water quality standards, among

5    others.  AR 7097.  California's listing policy also requires that assessments of water quality and listing

6    decisions be documented in water body "fact sheets" that include "lines of data" summarizing the

7    available data for a water body segment relative to the applicable standard.  AR 7097-98.  After

8    reviewing the fact sheets, staff members make listing recommendations.

9            Nonpoint source discharges in California are normally managed through permits or waivers of

10   the permit requirement granted by regional water boards.  *See* AR 5665.  The State Water Board's Water

11   Quality Enforcement Policy has a "progressive enforcement" format that consists of an "escalating

12   series of actions that allows for the efficient and effective use of enforcement resources to: (1) assist

13   cooperative dischargers in achieving compliance; (2) compel compliance for repeat violations and

14   recalcitrant violators; and (3) provide a disincentive for noncompliance."  AR 5063.  Progressive

15   enforcement is not a universal starting point, including in situations involving "violations by dischargers

16   with a history of noncompliance," but it is a standard starting point before "escalat[ing] to increasingly

17   more formal, forceful, and serious actions until compliance is achieved."  *Id.*  The operative Basin Plan

18   acknowledges that "the Regional Water Board recognizes that immediate compliance with water quality

19   objectives adopted by the Regional Water Board or the State Water Board, or with water quality criteria

20   adopted by the USEPA, may not be feasible in all circumstances."  AR 5103.  Moreover, in

21   circumstances where the Regional Board "determines it is infeasible for a discharger to comply

22   immediately with such objectives or criteria, compliance shall be achieved in the shortest practicable

23   period of time (determined by the Regional Water Board), not to exceed ten years after the adoption of

24   applicable objectives or criteria."  *Id*.

25           As discussed more fully below, in 1981, the State Board and the Forest Service signed a

15

Management Agency Agreement ("MAA") exempting the Forest Service from the requirement to file a discharge report or procure a permit.  AR 5913.  The MAA also obligates the Forest Service to incorporate best management practices ("BMPs") for protection of water quality.  AR 5840.

The state legislature amended Porter-Cologne in 1999 to "require the [State Board] to enforce the state's NPS pollution control program."  AR 5659.  The State Board responded in 2004 through its adoption of the Policy for Implementation and Enforcement of the Nonpoint Source Control Program. AR 5661.  That policy provides that "all current and proposed NPS discharges must be regulated under [waste discharge requirements], waivers of [waste discharge requirements], or a basin plan prohibition, or some combination of these administrative tools."  AR 5665.  In 2009, the State Board determined that the water quality management plan under the MAA should be revised and initiated a process to update the program.  AR 3206, 3268, 3478.  In 2009, the State Board adopted a resolution directing State Board staff to propose a statewide approach to address activities on National Forest system lands, including grazing.  AR 3268.  That effort produced a draft statewide waiver that would have waived waste discharge requirements for nonpoint source discharges for certain activities on National Forest system lands in California.  AR 3478.  That draft statewide waiver was later withdrawn.  In 2015, the State Board discontinued the effort at a statewide level and adopted a resolution directing the regional boards to develop their own systems, taking regional differences into account.  AR 2930.  Since 2016, the Central Valley Regional Board has been working with the Forest Service to develop a discharge permit that would cover forest-management activities in the region, including grazing.  *Id.*  The Regional Board anticipates that a permit could be adopted this year or in 2020.  The proposed permits would require only the Forest Service and United States Bureau of Land Management to apply for permit coverage, not individuals or grazing permit holders.   AR 3406-08.

## 2. First CWA Claim: Violation of REC-1 Standard

Plaintiffs' first CWA claim is that the Forest Service has authorized grazing on the BEH allotments that has resulted in violations of the Basing Plan's REC-1 standard, an action that was

1  arbitrary, capricious, or contrary to law under the APA. ECF No. 57 at ¶¶ 51-52.

2          a.      **CSERC Testing**

3          In 2009, CSERC staff prepared a quality assurance project plan ("QAPP") to establish

4  methodologies to sample, gather, and report on water quality in streams in Stanislaus National Forest.

5  AR 6501-43. That QAPP addressed protocols such as training and lab certification, methodology for

6  collecting water samples, chain of custody for the samples, equipment calibration, and analytical

7  methods.  AR 6504-05.  A senior environmental scientist from the State Water Board served as a

8  technical advisor to CSERC in the preparation of the QAPP.  AR 6504, 7193.[7]  The State Water Board

9  stated that data collected under a QAPP "pursuant to the requirements of 40 CFR 31.45 are acceptable

10  for use in developing the [CWA] section 303(d) list."  AR 7407.[8]

11          Between May and August of 2009, CSERC tested streams on each of the BEH allotments, one

12  stream on another allotment within Stanislaus National Forest that authorizes cattle grazing, and a

13  control site (Bourland Creek) where no cattle grazing is authorized.  AR 6297-99.  Following the QAPP,

14  CSERC took multiple samples within the streams it tested and conducted testing both before and after

15

16  _____

17  [7] The Regional Board stated in response to comments to the Final 2014 Integrated Report that the scientist "is a Senior
   Environmental Scientist and Coordinator for the Clean Water Team (CWT)."  It further explained that:

18          The CWT is the citizen monitoring program of the State Water Resources Control Board and is part of the
          Surface Water Ambient Monitoring Program (SWAMP). Mr. Burres's role as Coordinator is to work
          statewide to provide technical assistance and guidance documents, training, and QA/QC support to citizen
19          monitoring programs, non-profit groups, Farm Bureaus, Resource Conservation Districts, Coordinated
          Resource Management and Planning groups, government agencies including the U.S. Forest Service,
20          Tribes, and colleges. Mr. Burres provided telephone consultation to the Central Sierra Environmental
          Resource Center regarding how to design a monitoring plan and QAPP, and how to select and follow the
          SWAMP methods and procedures for data collection and analysis, to enable SWAMP-level quality and
21          comparability so that resulting data can be used in Water Board assessments. For more information about
          the Clean Water Team, please refer to this Water Board website:
22          http://www.waterboards.ca.gov/water_issues/programs/swamp/cwt_volunteer.shtml.

23  AR 7193.

24  [8] 40 C.F.R. § 31.45 provides: "If the grantee's project involves environmentally related measurements or data generation, the
   grantee shall develop and implement quality assurance practices consisting of policies, procedures, specifications, standards,
   and documentation sufficient to produce data of quality adequate to meet project objectives and to minimize loss of data due
25  to out-of-control conditions or malfunctions."

1    the cattle arrived for grazing.  AR 6297-98.  CSERC sent the samples to AquaLab in Twain Harte,

2    California, a state-certified analytical laboratory.  AR 6299.  AquaLab tested the samples for *E. coli*,

3    total coliform, and fecal coliform bacteria.[9]  *Id.*  CSERC's testing reported 17 violations of REC-1

4    bacteria standards in streams on Lower Round Meadow in the Bell Meadow Allotment, AR 6307-12;

5    seven violations of REC-1 bacteria standards in streams on Barn Meadow[10] in the Eagle Meadow

6    Allotment, AR 6301-02; and 11 violations of REC-1 bacteria standards in streams on Bull Run Meadow

7    and Upper Fiddler's Green Meadow in the Herring Creek Allotment, AR 6304-07.  CSERC documented

8    no REC-1 violations in samples taken from the headwaters of Bourland Creek below Bourland Meadow,

9    a control site with no livestock grazing.  "In comparison to the significant increase in fecal coliform

10   colonies quantified at the streams with grazing once livestock were present," the fecal coliform

11   concentration from Bourland Meadow "remained consistently low and within standard limits throughout

12   the same time period that the grazed samples were being collected."  AR 6320.

13        Between May and August of 2010, CSERC tested streams in non-BEH allotments within

14   Stanislaus National Forest, finding 100 REC-1 violations on eight allotments sampled and zero REC-1

15   violations on the two control sites where no grazing was authorized.  AR 6232.  Like the 2009 report,

16   this study found that fecal coliform bacteria in surface waters were below the REC-1 standard before

17   grazing but increased substantially after grazing began "and in places exceeded state standards" during

18   the summer grazing period.  AR 6201.

19              **b.      CSERC Water Data Incorporated into State Water Board and EPA**
                         **Processes**

20

21        The Regional Board solicited data for use in development of the Section 303(d) lists from mid-

22   January to August 30, 2010.  AR 7184.  CSERC submitted the data it collected during the summers of

23   _____

24   [9] Although fecal coliform and *E. coli* are "generally not harmful themselves," they are indicator species that signal that fecal contamination may have occurred.  AR 8364.

25   [10] "Barn Meadow lies along the headwaters of Niagara Creek, with segments in contact with the stream."  AR 8371.

2009 and 2010 for streams in Stanislaus National Forest.  AR 7187.  The Regional Board issued a draft

integrated report for 2014-2016 for public comment beginning in September of 2016.[11]  AR 7086.  The

draft report proposed inclusion of six creeks that CSERC recommended, including Bell Creek on the

Bell Meadow allotment and Niagara Creek on the Eagle Meadow allotment.[12]  AR 7204, 7158, 7165.

On October 20, 2016, the Forest Service submitted comments to the Regional Board concerning the

water bodies proposed to be included on the 303(d) listings.  AR 7281-85.  The Regional Board also

received comments from 11 other commenters.  AR 7183.

In December 2016, the Regional Board issued its final integrated report that included responses

to the comments received during the comment period concerning the water-quality assessments for

creeks on or near grazing allotments on Stanislaus National Forest.[13]  AR 7183-7207.  In response to

comments questioning the use of CSERC data, the Regional board stated that the CSERC data complied

with "minimum requirements for quality control and assurance, temporal and spatial characteristics, and

minimum samples sizes established by the Listing Policy and are therefore appropriate for use in the

listing process."  AR 7187.  The report also stated that the data "were collected during the critical season

for the pollutant and applicable water quality standard (spring/summer for recreational beneficial uses)"

and that, according to the QAPP, sampling only took place when the water bodies had adequate flow

[11] The process appears to be a lengthy one.  The State Water Board adopted the statewide 2012 report in 2015, and the most recent information in that report for the Central Valley was from the 2010 Central Valley Integrated Report.  AR 7099.  The 2014-2016 draft integrated report noted that "the timeline for completing TMDLs for water bodies listed for the first time as part of the 2014 Integrated Report is estimated to be no longer than thirteen years, which equates to an estimated completion date of 2027."  AR 7116.

[12] CSERC also recommended inclusion of Bull Meadow Creek, Jawbone Creek, an unnamed tributary to Jawbone Creek, and Rose Creek in Tuolumne County.  After its review of the data, the Regional Board did not recommend including Jawbone Creek.  AR 7176, 7204.

[13] The responses to the comments are grouped by frequency of appearance in the comment letters.  Ten of the comments appeared in multiple comment letters, which included the comments that grazing was not the only source of the bacteria; that the data was collected prior to August, 2010, and should be updated before a listing decision was made; that the assessments incorporated only data from one source, CSERC; that there was potential bias in the collection of samples; and that the samples are not representative of overall water-quality conditions.  The final report also responded to comments raised only in the USFS's comments.  AR 7196-7200.

conditions.  AR 7188-89.  The Regional Board rejected the argument that the REC-1 should not apply

because "the water bodies are small ephemeral creeks with limited swimming areas," reiterating instead

that the beneficial uses of the Tuolumne and Stanislaus Rivers apply to their upstream tributaries that do

not have separately listed beneficial uses in the basin plan.  AR 7190-91.  The Regional Board also

rejected the argument that the water-quality standards should be assessed under the EPA's new 2012

standards, making two primary points.  First, the Regional Board used the water-quality objective for

fecal coliform bacteria under the governing basin plan, and indicated that "[d]etermining the

appropriateness of water quality objectives and revising the Basin Plan" was "outside the scope of this

listing process."[14]  AR 7192.  Second, using the EPA's 2012 standards (which were in draft form at the

time the project began) "would likely increase the number of exceedances identified in the lines of

evidence" because the standard in the 2012 criteria is "more stringent" than the criteria in the EPA's

1986 criteria.  AR 7191.  The Regional Board agreed with the comment raised by all but three of the

commenters that "grazing should not be considered the sole source of bacteria to these streams since

there are wildlife species and other potential sources," but concluded that "since the available data and

information indicate that grazing animals are a likely potential source of indicator bacteria to these

streams," the proposed 303(d) listings for the creeks would continue to identify them as "grazing related

source."[15]  AR 7185.  The final integrated report continued to propose to add to the 303(d) list five of the

six streams listed in the draft report, including Bell Creek on the Bell Meadow allotment and Niagara

Creek on the Eagle Meadow allotment.  AR 7158, 7165; *see also* AR 8355 (stating that 6.6 miles of Bell

Creek is on the Bell Meadow allotment); AR 8366 (listing Niagara Creek on the Eagle Meadow

---

[14] Although the EPA in 2012 began recommending that *E. coli* rather than fecal coliform be used "as the best indicator of health risk from water contact in recreational waters," the Regional Board has not changed the basin plan's REC-1 standard and continues to use fecal coliform as the standard indicator.  AR 8364.

[15] The Regional Board modified the listings to add on the list of potential sources "natural sources" and "source unknown" even as it continued to identify grazing as a potential source as well.  *Id.*

1    allotment).

2          The State Water Board solicited public comments on the proposed list beginning in June 2017

3    and held a public hearing on the list on October 3, 2017, approving the list that same day.  AR 6662.

4    The approved 303(d) list included both Bell Creek and Niagara Creek.[16]  AR 6730.  On April 6, 2018,

5    EPA approved the State Water Board's list of impaired waters, "including all water quality limited

6    segments (WQLSs) and associated pollutants identified by the State Water Resources Control Board

7    (State Board) as requiring a total maximum daily load under CWA section 303(d)."  AR 6658.

8          **c.     Recent CSERC Monitoring**

9          CSERC has continued to test water quality in streams on Stanislaus National Forest land in the

10   years since 2009-10, including streams on the BEH allotments, using the same methodology that the

11   Regional and State Boards relied on to include Bell Creek and Niagara Creek on the 303(d) list.

12   - Between June and August 2011, CSERC tested streams in Stanislaus National Forest.  Because
     of heavy snowpack, no livestock grazed on the Eagle Meadow or Herring Creek allotments that
13     grazing season.  AR 6191.  The CSERC report did not calculate the number of violations found
       on the Lower Round Meadow on the Bell Meadow allotment but noted "a rapid rise" in the fecal
14     coliform and *E. coli* concentrations after cattle arrived to graze.  AR 6192.
15   - Between June and August 2012, CSERC documented 21 bacterial violations[17] on the Lower
       Round Meadow on the Bell Meadow allotment.  AR 6174-79.
16   - Between June and August 2013, CSERC documented 12 bacterial violations on two wilderness
       sites not on the BEH allotments that had some livestock grazing.  AR 6170, 6183-86.
17   - Between June and September 2014, CSERC documented 27 bacterial violations on Bell Creek
       on the Bell Meadow allotment, zero violations on Niagara Creek on the Eagle Meadow
18     allotment, and zero violations on a major tributary of Cow Creek on the Herring Creek allotment.
       AR 6155, 6156, 6161-6166.
19   - Between May and September 2015, CSERC documented 49 bacterial violations on Bell Creek
       on the Bell Meadow allotment, the only site tested on the BEH allotments.[18]  AR 6118-18, 6141-
20     52.
     - Between June and October 2016, CSERC documented 20 bacterial violations on Bell Creek on
21     the Bell Meadow allotment, seven bacterial violations on Cow Creek on the Herring Creek

---

22   [16] The State Water Board's supporting information for each creek listed the expected TMDL completion date as 2027.  AR
23   6731, 6739.

     [17] Unless otherwise noted, "bacterial violations" here refers only to fecal coliform measurements, though the CSERC reports
24   also frequently sample for *E. coli*.

25   [18] CSERC also documented 85 violations on four streams in other allotments not at issue in this case where livestock grazing
     took place.  AR 6125-40.

allotment, and three violations on Niagara Creek on the Eagle Meadow allotment.  AR 6099-6106.  CSERC documented no bacterial violations at the tributary of Bell Creek that it tested.  AR 6104.

- Between May and November 2017, CSERC documented two bacterial violations on Bell Creek on the Bell Meadow allotment, zero bacterial violations on Cow Creek on the Herring Creek allotment, five bacterial violations on Herring Creek in Hammill Canyon Meadow on the Herring Creek allotment, and two violations on Niagara Creek on the Eagle Meadow allotment.  AR 6067-68, 6070-72, 6080-81.

Plaintiffs summarize the reports to mean that between 2009 and 2017, CSERC data demonstrate 136 violations of the REC-1 standard for fecal coliform on the Bell Creek allotment, 12 on the Eagle Meadow allotment, and 23 on the Herring Creek allotment.  ECF No. 87 at 11.

Plaintiffs argue that the same testing that CSERC conducted in 2009-2010 that the Regional Board, State Board, and EPA relied on for purposes of a 303(d) listing has been continued in the years since and have continued to show that the Forest Service is authorizing grazing on its land that results in violations of the REC-1 standard in the Basin Plan, in violation of the APA.  *See id*. at 10-11.

### d.    Programmatic Challenge and Attenuated Causal Chain

Federal Defendants first contest whether Plaintiffs can bring this sort of claim at all, arguing that the general nature of the challenge is inadequately tied to specific agency action and that the alleged violation occurs too far down the causal chain for Federal Defendants to be responsible.

Federal Defendants argue that Plaintiffs have not identified a specific "final agency action," as they must when bringing a challenge under the APA, and that by lumping the grazing permits and AOIs together, this suit is an impermissible "programmatic challenge," rather than a specific agency action that has "an actual or immediately threatened effect."  ECF No. 85-1 at 9 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892-94 (1990)).  The Court agrees that the TAC does seek relief in broad terms, but the violations identified in the various CSERC reports that form the basis of the CWA claim focus mostly on Bell Creek on the Bell Meadow allotment.  The other water violations likewise took place on a handful of allotments, making the challenge more discrete than it appears at first blush.  In any case, the three dozen allotments on Stanislaus National Forest land is not so broad and unwieldy that

1  it is a programmatic challenge unsuited to resolution in court.

2         Federal Defendants also take another gentle pass at the argument that this action is barred by

3  sovereign immunity, an argument the Court rejected in its order on Federal Defendants' motion to

4  dismiss.  ECF No. 55 at 22.  Federal Defendants now argue more forcefully that even if the CWA claim

5  is not barred by sovereign immunity, the causality alleged in the TAC is too attenuated to survive.

6  Federal Defendants maintain that the Forest Service had no duty to seek a permit because an agency

7  authorizing legal activity does not incur APA liability for that action when the alleged violation is at the

8  long end of a causal chain. They cite *Protect Our Communities Foundation v. Jewell*, 825 F.3d 571 (9th

9  Cir. 2016) ("*POCF*"), in support of their argument that the causal chain between the Forest Service

10  action and the violation alleged in the TAC is too attenuated to be actionable under the APA.  The

11  plaintiffs in *POCF* challenged the Bureau of Land Management's ("BLM") decision to grant a right-of-

12  way on federal land that would permit a company to build and operate a wind energy facility on 12,360

13  acres.  BLM issued the right-of-way only after adopting a final EIS modifying the plan to reduce the risk

14  of birds colliding with wind turbines blades and further provided that the grant was conditioned on the

15  adoption of certain "mitigation measures and monitoring programs." *Id*. at 577.  Relatedly, certain of

16  the bird species at risk were protected by the Migratory Bird Treaty Act ("MBTA"), and the Bald and

17  Golden Eagle Protection Act ("BGEPA").  The U.S. Fish and Wildlife Service ("FWS") —the agency

18  charged with implementing relevant aspects of the MBTA and BGEPA—advised BLM that the

19  collection of mitigation measures BLM adopted were not the equivalent of a "take permit" that would

20  have authorized harming birds under the MBTA and/or BGEPA.  Yet FWS acknowledged that the

21  mitigation measures "could serve as the basis for a future permit application with the FWS." *Id*. at 578.

22  A group of plaintiffs brought an APA challenge to the right-of-way grant as unlawful under NEPA,

23  MBTA, and BGEPA.  Plaintiffs put forward two theories of liability.  First, they argued that BLM,

24  "acting in its regulatory capacity," was directly liable for unlawful "take" of birds under the Acts

25  without a permit from Fish and WS. *Id*. at 585.  Second, plaintiffs argued that the authorization was

1   "not in accordance with law" because BLM did not condition its right-of-way grant on the company's

2   "securing the appropriate permits from the FWS." *Id*.

3       The Ninth Circuit affirmed the grant of summary judgment to the federal defendants on both

4   counts.  The court first held that the MBTA "does not contemplate attenuated secondary liability on

5   agencies like the BLM that act in a purely regulatory capacity, and whose regulatory acts do not directly

6   or proximately cause the 'take' of migratory birds" within the definition set forth in that statute. *Id*. at

7   585.[19]  More directly relevant to this case, the court held that the APA claim failed because "the BLM's

8   regulatory role in this case is too far removed from the ultimate legal violation to be independently

9   unlawful under the APA." *Id*. at 586.  Federal Defendants argue that the same result should issue here,

10  where there is the risk of "unbounded agency vicarious liability" if the Forest Service is found liable.  *Id*.

11      The agency action in *POCF* was "far too removed from the ultimate legal violation to be

12  independently unlawful under the APA." *Id*.  The court held the BLM merely granted a permit "to

13  engage in otherwise lawful activities that would incidentally lead to migratory-bird deaths" and that the

14  challengers' argument "hinge[d] on the assumption" that the third-party permittee will operate wind

15  turbines in an unlawful manner. *Id*.  With BLM having done nothing more than authorize the

16  development of a wind-energy facility, and "[w]ithout further indication of its involvement in the

17  putative violation," the court declined to "hold the BLM complicit in future unlawful activity, separately

18  committed by a grantee, through a mere failure to intervene at the permitting stage." *Id*. at 587.

19  Moreover, the BLM approval was contingent on the permittee's compliance with the law, including the

20  securing of necessary permits, and the terms of the right-of-way permitted the BLM to withdraw

21  approval if it determined that the permittee was not complying with those provisions. *Id*.

22

---

23  [19] The court distinguished the case of the National Marine Fisheries Service's decision to apply for a permit from the FWS to
24  cover incidental take of migratory seabirds by a Hawaii fishery.  The court surmised that the agency there was functioning in
    a "managerial capacity over the activities of the fishery," meaning that it "occup[ied] a more directly supervisorial position
    over a regulated third party than that of a typical agency" or, alternatively, was playing it safe by deciding to shield itself
25  from potential liability by applying for a permit it likely was not compelled to secure. *Id*. at 586.  If the former, the closeness
    of the supervision distinguished the matter from the project at issue in *POCF*, the court held.

1       Here, by contrast, the connection between the agency action and the alleged violations is much

2   closer and more active.  As explained above, the Forest Service issues permits and AOIs that determine

3   the type of species, the number, the areas of permissible grazing, and dates during which grazing may

4   occur.  As discussed more fully below in the context of the NFMA claims, the Forest Service engages in

5   monitoring of the allotments to ensure compliance with the operative Forest Plan.  It has adopted an

6   adaptive management framework to monitor compliance with the plan and to modify the grazing on the

7   BEH allotments to ensure movement toward achievement of the Forest Plan's objectives.  The Forest

8   Service is empowered to and does modify the permits and AOIs that exerts a level of control over the

9   permittees that was absent in *POFC*.  The Forest Service has, for example, recently modified grazing

10  permits to include maps with special aquatic features on the permittees' allotments that should be

11  protected, AR 3, 7; has modified AOIs to include mitigation measures like installing an electric fence,

12  installing a water trough on a specific meadow, minimizing use of another specific meadow, and herding

13  livestock away from yet another meadow, AR 121, 133; and has installed an electric fence to prevent

14  overgrazing of young aspen, AR 607-08.  This is a granular level of control that was absent in *POFC* but

15  is substantially similar to the "directly supervisorial position" an agency could occupy that would

16  distinguish it from the attenuated role at issue in *POFC*.  825 F.3d at 586.

17      The *POCF* court distinguished a case involving an agency's compliance with the Endangered

18  Species Act because there was no statutory duty in *POCF* that created any "affirmative duty on the part

19  of the BLM to guarantee a grantee's compliance." *Id*. at 587.  In contrast, the alleged CWA violations

20  here do involve just that sort of *agency* duty that was absent in *POCF*.  CWA § 313 requires that federal

21  agencies like the Forest Service comply with state water standards to the same extent as nongovernment

22  agencies.  Under the 1981 MAA between the State Board and the Forest Service, the Forest Service

23  agreed to be the designated water-quality management agency for national forest lands in California.

24  AR 6029.  The MAA obligated it to incorporate BMPs for protection of water quality and to monitor the

25  program's effectiveness.  AR 5840-41.  More recently, the Regional Board is in the process of crafting a

1   regulatory framework for nonpoint source discharges on Forest Service land that would require a

2   discharge permit that would cover forest-management activities in the region, including grazing, AR

3   2930, and would require *only* the Forest Service and United States Bureau of Land Management to

4   apply, not individuals or grazing permit holders. AR 3406-08.  The level of control that the Forest

5   Service has over grazing activities and its role as the more directly regulated party with respect to state

6   water regulators brings this case far outside the attenuated speculative causal chain at issue in *POFC*.

7          The Court agrees that an agency acting in a mere regulatory role "far removed from the ultimate

8   legal violation" can be too attenuated to violate the APA.  But, the violations alleged here are closely

9   tied to agency action and the agency itself is the entity whose conduct is regulated.

10         **e.**      <u>**Forest Service's Close Contact with State Regulators**</u>

11         Federal Defendants next argue that Forest Service permitting of grazing on the BEH allotments

12  has not violated the APA.  Focusing on the forgiving standard of review, Federal Defendants argue that

13  the Forest Service's action taken in close engagement with state water agencies prevents a finding that

14  the agency acted arbitrarily, capriciously, or in violation of law, even where there were exceedances of

15  bacteria levels.

16         In *Center for Native Ecosystems v. Cables*, 509 F.3d 1310 (10th Cir. 2007), like here, the

17  plaintiffs challenged the issuance of AOIs as arbitrary and capricious under the APA and in violation of

18  CWA § 313(a), 33 U.S.C. § 1323(a), because nonpoint-source pollution had resulted in levels of fecal-

19  coliform bacteria in violation of Wyoming regulations.  The bacterial violations led the state of

20  Wyoming to list the waters as impaired under the CWA.  The court concluded that under Wyoming's

21  water-quality standards, nonpoint-source pollution was "not under 'control'" and accordingly subject to

22  state enforcement action only if BMPs had not been implemented.  *Id.* at 1332.  The court held that "so

23  long as BMPs have been implemented, the state agency has no authority to take enforcement action, and

24  the Forest Service cannot be said to have failed to comply with state requirements 'in the same manner,

25  and to the same extent as any nongovernmental entity.'"  *Id.* at 1333 (quoting 33 U.S.C. § 1323(a)).

1   Under those circumstances, with ongoing implementation of BMPs and a memorandum of

2   understanding with local conservation districts, the court determined that the Forest Service

3   demonstrated no "clear error of judgment" in issuing the AOIs.  *Id.*

4           In *Center for Biological Diversity v. Wagner*, No. CIV. 08-302-CL, 2009 WL 2176049, at *16

5   (D. Or. June 29, 2009), *report and recommendation adopted*, No. CIV. 08-302-CL, 2009 WL 2208023

6   (D. Or. July 22, 2009), the court held that in an APA challenge brought pursuant to CWA § 313, Oregon

7   law had a safe-harbor provision for designated management agencies that had implemented best

8   management practices, such that even evidence of elevated *E. coli* levels did not mean that the Forest

9   Service had acted arbitrarily or capriciously.  *Id.* at *18.  The *Wagner* plaintiffs pointed to *Northwest*

10  *Indian Cemetery Protective Association v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986), *rev'd on other*

11  *grounds sub nom. Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), a

12  Ninth Circuit case involving the Forest Service's alleged failure to comply with water-quality standards

13  in a California regional water board's basin plan.  In *Peterson*, the Ninth Circuit rejected the argument

14  that implementation of BMPs gave the Forest Service a safe harbor, because the BMPs "are merely a

15  means to achieve the appropriate state Plan water quality standards," finding "no indication in the Plan

16  or in the agreements between the Forest Service and the Water Quality Control Board that the BMPs

17  were to be considered standards in and of themselves," and concluding "[a]dherence to the BMPs does

18  not automatically ensure that the applicable state standards are being met."  *Id.*  The *Wagner* court

19  distinguished *Northwest Indian Cemetery Protective Association*, noting that unlike the basin plan at

20  issue there, the Oregon regulations in *Wagner* did contain a safe-harbor provision providing that a

21  management agency's adoption of BMPs satisfied state water-quality standards.  The court granted

22  summary judgment to the Forest Service because it had implemented those BMPs and accordingly did

23  not violate the APA.

24          Oregon later removed the provision permitting BMPs to serve as compliance with state water-

25  quality standards, and the Forest Service again faced a CWA § 313 challenge for failing to comply with

state water standards. *Oregon Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156 (D. Or. 2016).  The Forest Service and state regulators had entered into a memorandum of understanding, and the Forest Service had developed a water quality restoration plan that state regulators found adequately addressed its obligations. *Id.* at 1169-70.  Under these circumstances, even without the BMP safe-harbor, the court found that because the Forest Service "designed and implemented multiple measures to ensure achievement of temperature standards" and state regulators had "approved of those efforts and certified their compliance with state regulations," the Forest Service did not act in an arbitrary and capricious manner.  *Id.* at 1171.  The court concluded that "[e]xceedances are expected and do not render the Forest Service's efforts invalid.  The Forest Service rationally issued the challenged AOIs on this basis."  *Id.*

The lesson of these cases is even when an agency might be shown to otherwise technically violate a state water quality standard, compliance can be achieved in a number of indirect ways, including through the implementation of BMPs serving as an acknowledged alternative to direct compliance;[20] or through the existence of other mechanisms, including a combination of BMPs, memoranda of understanding with the state regulators, and other efforts designed to achieve compliance with water quality standards

Two elements of *Oregon Wild* and *Cables* are instructive.  In *Oregon Wild*, the state regulators acknowledged that "violations may occur while the Forest Service works to achieve long-term goals," but certified that the Forest Service's efforts as outlined in a water-quality plan and in memoranda of understanding would serve to satisfy their obligations to comply with state water-quality standards. *Oregon Wild*, 193 F. Supp. 3d at 1170.  Similarly, in *Cables*, the Tenth Circuit rejected the claim that evidence of continued bacterial violations even after implementation of BMPs violated the law, because "that is not the standard dictated by state regulations *and the CWA*."  *Cables*, 509 F.3d at 1333

---

[20] No Defendant here has identified a best management practices provision that excuses violations of the applicable water standards in this case.

(emphasis added).  The state regulations at issue provided that even where BMPs were ineffective, the state agency would work with polluters to identify modifications to the best management practices.  *Id*. Because the state regulators lacked authority to take enforcement action so long as the BMPs were being implemented, the Forest Service was complying with state water law to the same extent as a nongovernmental actor and was accordingly not acting arbitrarily or capriciously.  *Id*.  This was so even though the alleged water-quality violations led to a listing of the water bodies as impaired under the CWA.  *See id*. at 1319.

Unlike in *Oregon Wild*, state regulators here have not "certified" that the Forest Service's efforts comply with state regulations, and unlike in *Cables*, the state agency here does have authority to take enforcement action despite implementation of best management practices.  Yet, Federal Defendants emphasize that the regulatory process stretching back to the 1981 signing of the MAA has kept the Forest Service in close engagement with the State and Regional Boards concerning water quality on Forest Service land.  *See* ECF No. 85-1 at 14-20.  The MAA obligated the Forest Service to implement BMPs for water quality and to monitor the effectiveness of those efforts and exempted the Forest Service from filing notices of discharge and applying for a permit or waiver from the permit requirement.  AR 6028-34.  Since the State Board determined in 2009 that the water quality management plan under the MAA should be revised, there has been a lengthy effort to work with stakeholders to update the regulatory scheme for nonpoint source activities on National Forest land.  *See* AR 3206, 3268, 3478 The close relationship between the Forest Service and the State and Regional Boards weighs against a finding that the Forest Service has acted in violation of the APA, especially in light of the State Board's progressive enforcement structure and the Basin Plan's acknowledgement that "that immediate compliance . . . may not be feasible in all circumstances."  AR 5103.  Viewing the circumstances as a whole, where the MAA has required the implementation and monitoring of water quality, state regulators have for the past decade worked to craft an updated regulatory framework for nonpoint source discharges on Forest Service land, and Plaintiffs have not identified any formal or

29

1  informal enforcement actions brought by the state agencies charged with enforcing the Basin Plan

2  regulations alleged to have been violated, the Forest Service's action do not appear to have been

3  arbitrary, capricious, or contrary to law, in violation of the APA.[21]

4  **f.      Forest Service's Steps to Address Water Quality In Grazing**

5  The conclusion that the Forest Service's decision to issue grazing permits and AOIs did not

6  violate the APA is bolstered by the actions the Forest Service has taken to address water quality.

7  Federal Defendants argue that the Forest Service has not acted arbitrarily, capriciously, or in violation of

8  law because it rationally addressed water quality in its grazing authorizations, pointing to steps it has

9  taken to modify the permits and AOIs.  ECF No. 85-1 at 21-21.

10  First, in May 2017, the Forest Service incorporated provisions relating to water quality into the

11  grazing permits.  *See* AR 3, 7, 11.  The language the Forest Service identifies states, in a section labeled

12  "Water Quality" in a grazing permit modification:

> One of the Forest Goals described in the Forest Plan Direction is to "Maintain or improve water quality and watershed conditions to meet applicable state and federal requirements," including water quality standards established by the state and regional water boards.  Forest Plan Direction p. 5.  Meeting riparian S&Gs for forage use and streambank disturbance on the Bell Meadow and Upper Hull allotments will facilitate this goal, as will herding, salting and other management practices that reduce cattle concentration in riparian areas and increase upland distribution.

17  AR 3 ((grazing permit modification dated September 2017).  The Forest Service also points to language

18  included in the 2017 and 2018 AOIs that is identical but for the identification of specific allotments

19  identified in the last sentence.  AR 78, 85, 92, 100, 108, 115.

20  Second, the Forest Service points to its efforts to improve water-quality infrastructure.  The

21  Forest Service purchased three livestock water troughs in 2017 with plans to install them on the Herring

22  Creek allotment in 2018.  AR 5782.  The purpose of the troughs is to provide water to the livestock

---

24  [21] The Regional Board did comment on the EIS and register its disagreement with the Forest Service's comments concerning

25  the Basin Plan.  *See* AR 9111 (letter dated Mar. 12, 2014, commenting on draft EIS and objecting to statement in draft EIS that high bacterial concentrations were "discounted" because they occurred in areas where ingestion of water was unlikely, noting that the Basin Plan applied to those areas).

1  away from riparian areas to reduce the potential impact to water quality. *Id.* Federal Defendants also

2  point to language included in the 2018 AOIs for Bell Meadow and Eagle Meadow allotments

3  acknowledging that the EPA approved the State Board's inclusion of Bell Creek and Niagara Creek on

4  the 303(d) list of impaired waters, repeating the recommendations included in the permit modifications

5  about using herding and salting to reduce cattle distribution in riparian areas.  AR 85, 92.  The 2018 Bell

6  Meadow AOI also mentions as a priority the installation of a solar pump and watering trough at Middle

7  Bell Meadow to reduce livestock presence near the stream.  AR 92; *see also* AR 5782 (discussing the

8  stream's water gap creating concentration of livestock near Bell Creek on Middle Bell Meadow and why

9  water trough will help to reduce this concentration).

10  Third, Federal Defendants point to the Forest Service's partnership with the University of

11  California, Davis ("UC Davis"), which began in 2010.  AR 6009.  This partnership formed to sample

12  water quality to examine how grazing was affecting water quality on the BEH allotments.  AR 8363-64.

13  The UC Davis researchers published their findings in a peer-reviewed article in June 2013, presenting

14  their findings from the 2011 water quality sampling in Stanislaus National Forest.  AR 5986.  In August

15  2016, UC Davis scientists indicated that the Regional Board had expressed interest in forming a

16  partnership to develop a strategy to protect water quality and compliance with regulatory standards on

17  grazing land.  AR 5972-73, 5978.  UC Davis also began weekly sampling on Stanislaus National Forest

18  in July of 2016 and planned to continue through September of that year.  AR 5972.

19  Finally, Federal Defendants cite the Forest Service's own monitoring, which began in earnest in

20  2011.  AR 525.

21  Together, the Forest Service contends that these actions demonstrate that the Forest Service has

22  considered water quality on the BEH allotments and modified its livestock grazing program in response.

23  ECF No. 85-1 at 22.  In light of the close regulatory scheme, the Forest Service's efforts to monitor

24  bacteria levels and limit the likelihood of cow waste ending up in water bodies near the BEH allotments

25  bolsters the conclusion that the Forest Service has not acted in violation of the APA by authorizing

1  grazing on the BEH allotments.[22]

2     In light of the authorities discussed above and given the ongoing, working regulatory relationship

3  between the Forest Service and the Regional and State Boards and the Forest Service's efforts to reduce

4  potential water quality violations, issuing the challenged grazing permits and AOIs was not arbitrary,

5  capricious, or contrary to law. *Cables*, 509 F.3d at 1333 (10th Cir. 2007) (holding that Forest Service

6  efforts to modify livestock grazing to limit fecal-coliform bacteria violations, along with "[t]he Forest

7  Service's ongoing implementation of BMPs and its entry into a Memorandum of Understanding with

8  local conservation districts reflect a reasoned approach to elevated fecal-coliform levels" that did not

9  violate the APA).

10    **3.**  **Second and Third CWA Claims: Failure to File a Discharge Report or To Procure a Permit or Waiver**

11

12     The second component of Plaintiffs' claim in the TAC that the Forest Service has violated the

13  APA has two related parts.  First, Plaintiffs contend that the Forest Service has unlawfully failed to file a

14  report with the Regional Board.  Second, Plaintiffs argue that the Forest Service has unlawfully initiated

15  new discharges of waste or made material changes in such discharges on the BEH allotments before

16  filing a report and before obtaining a permit or waiver from the permit requirement.

17     The Porter-Cologne Act provides that any person "discharging waste, or proposing to discharge

18  waste, within any region that could affect the quality of the waters of the state" is required to file a

19  report with the appropriate regional water board.  CWC § 13260.  "The regional board then 'shall

20  prescribe requirements as to the nature' of the discharge, implementing any applicable water quality

21

22  _____

[22] The Forest Service also contests the quality of the CSERC data.  Sone of the arguments, such as the fact that EPA now
23  recommends use of *E. coli* rather than fecal coliform bacteria for water-quality testing, were specifically rejected by the
Regional Board.  Others, such as the fact that a 303(d) listing does not mean that livestock grazing was the sole cause of any
24  bacterial violations (especially in warm-weather months, when bacteria sources apart from cattle can and do contribute to
bacteria levels), are well-taken and were acknowledged by the Regional Board.  The Court need not resolve this dispute,
because, as discussed herein, even assuming the validity of the CSERC data, the Forest Service has not acted arbitrarily,
25  capriciously, or in violation of law.

1  control plans." *Dep't of Fin. v. Comm'n on State Mandates*, 1 Cal. 5th 749 at 756 (2016) (quoting CWC

2  § 13263(a)), *as modified on denial of reh'g* (Nov. 16, 2016).

3       Plaintiffs argue that under the plain language of Porter-Cologne, the Forest Service is required to

4  file a discharge report and that the Forest Service admitted as much in response to a comment to the EIS.

5  In response to a comment stating that the Forest Service was not complying with the Clean Water Act or

6  the Porter-Cologne Act in its administration of livestock grazing on the BEH allotments, the EIS stated,

7  "The Forest will continue working with the regional water quality control board to obtain a permit or

8  waiver for nonpoint source pollution in order to ensure compliance with all applicable water quality

9  regulations." AR 8492. Plaintiffs also assert that the Forest Service has violated CWC § 13264, which

10 provides

11     No person shall initiate any new discharge of waste or make any material changes in any
       discharge, or initiate a discharge to, make any material changes in a discharge to, or
12     construct, an injection well, prior to the filing of the report required by Section 13260 and
       no person shall take any of these actions after filing the report but before whichever of the
13     following occurs first:

14     (1) The issuance of waste discharge requirements pursuant to Section 13263.

15     (2) The expiration of 140 days after compliance with Section 13260 if the waste to be
       discharged does not create or threaten to create a condition of pollution or nuisance and
16     any of [a list of enumerated conditions applies.]

17     . . .

18     (3) The issuance of a waiver pursuant to Section 13269.

19 CWC § 13264. Plaintiffs argue that because the Forest Service has not filed a discharge report and has

20 continued to authorize grazing on the BEH allotments, it has violated CWC §§ 13260 and 13264.

21       The Forest Service and Defendant-Intervenors argue that the Forest Service is under no such

22 obligation because it is operating under the 1981 MAA with the State Water Board. In 1979, the State

23 Board designated the Forest Service as the management agency "for all activities on NFS lands effective

24 upon execution of a management agency agreement." AR 6029. In the 1981 MAA, the Forest Service

25 agreed that it would be designated the water-quality management agency for national forest lands in

1   California.  AR 6029.  The State Board agreed

2
3
4   That Section 313 of the Federal Water Pollution Control Act mandates federal agency compliance with the substantive and procedural requirements of state and local water pollution control law.  It is contemplated by this agreement that Forest Service reasonable implementation of those practices and procedures and of this agreement will constitute compliance with Section 13260, subdivision (a) of Section 13263, and subdivision (b) of Section 13264, Water Code.  It is further contemplated that these provisions requiring a report of proposed discharge and issuance of waste discharge requirements for nonpoint source discharges will be waived by the Regional Board pursuant to Section 13269, Water Code, provided that the Forest Service reasonably implements those practices and procedures and the provisions of this agreement.  However, waste discharges from land management activities resulting in point source discharges, as defined by the Federal Water Pollution Act, will be subject to NPDES permit requirements, since neither the State Board nor the Regional Board has authority to waive such permits.
5
6
7
8

9   AR 6029-30.[23]  <u>The MAA thus specifically exempts the Forest Service from having to file reports of</u>

10  <u>waste discharge or from obtaining a permit or waiver</u>.  The State Board also certified a plan titled

11  "Water Quality Management for National Forest System Lands in California," AR 3268, which

12  "obligated the USFS to incorporate Best Management Practices (BMPs) for protection of water quality

13  into land and resource management activities and to monitor their implementation and effectiveness,

14  which has been accomplished since 1992 using the BMP Evaluation Program."  AR 5840-41.

15       Plaintiffs contend that the provisions of the 1981 MAA have been "superseded by legislative

16  amendments and binding State Board nonpoint source pollution policies."  ECF No. 87 at 23.  The state

17  legislature amended Porter-Cologne in 1999 to "require the [State Board] to enforce the state's NPS

18  pollution control program."  AR 5659.  The State Board responded in 2004 through its adoption of the

19  Policy for Implementation and Enforcement of the Nonpoint Source Control Program.  AR 5661.  That

20  policy provides that "all current and proposed NPS discharges must be regulated under [waste discharge

21  requirements], waivers of [waste discharge requirements], or a basin plan prohibition, or some combination

22  of these administrative tools."  AR 5665.

23

24  _____

25  [23] The MAA also included a provision stating that "nothing herein will be construed in any way as limiting the authority of the State Board, or the Regional Boards in carrying out their legal responsibilities for management, or regulation of water quality."  AR 6030.

1    Plaintiffs argue that this change made regulation of nonpoint source discharges mandatory.  The

2    Lahontan Regional Water Quality Control Board recognized the change, stating that "[b]ased on these

3    changes, the MAA designating the [Forest Service] as a [Water Quality Management Agency] was no

4    longer sufficient to comply with the newly adopted [Nonpoint Source] Policy."  AR 3478.  The North

5    Coast Regional Board has adopted a waiver for nonpoint source discharges resulting from activities that

6    the Forest Service authorizes on its land.  AR 2895, 2914-15.  The State Board's draft statewide waiver

7    that would have waived waste discharge requirements for nonpoint source discharges for certain

8    activities on National Forest system lands in California and the effort to develop a regional permitting

9    scheme would be unnecessary if the MAA still controlled, Plaintiffs contend, meaning that the Forest

10   Service is under a current obligation to file a discharge report and obtain a permit or waiver.  ECF No.

11   87 at 27.

12    Regional or state efforts to evolve with the changing regulatory framework do not mean that the

13   MAA has ceased to have any legal significance.  Plaintiffs have identified nothing indicating that the

14   MAA has been withdrawn or invalidated.  That regional boards are in the process of developing waivers

15   or permits for activities on National Forest land is not evidence that the MAA has been withdrawn; it is

16   consistent with the MAA being in effect until superseded by a permit or waiver.[24]  As a result, as plainly

17   stated in the MAA, the Forest Service is not required to obtain a permit or file notices of discharge.

18    Accordingly, Plaintiffs' motion for summary judgment on the CWA claim is **DENIED**, and

19   Federal Defendants and Defendant-Intervenors' cross-motions for summary judgment are **GRANTED**.

20   **B.**    **Second Claim for Relief: National Forest Management Act**

21    "A forest plan establishes goals and objectives for management of forest resources."  *Earth*

22   *Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1014 (9th Cir. 2012) (citing 16 U.S.C. § 1604(g)(1)–

23

24   _____

25   [24] The purpose of filing a notice of discharge with a regional board is to put the board on notice of a discharge so that it can
     determine how best to regulate that discharge.  The Regional Board is aware of the activities on the Forest Service land.

35

1   (3)).  "Failing to comply with the provisions of a forest plan is a violation of NFMA." *All. for the Wild*

2   *Rockies v. Savage*, 897 F.3d 1025, 1032 (9th Cir. 2018).  "Agency decisions that allegedly violated

3   NFMA . . . are reviewed under the APA." *All. for the Wild Rockies v. United States Forest Serv.*, 907

4   F.3d 1105, 1112 (9th Cir. 2018).  *See also* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts,

5   and other instruments for the use and occupancy of National Forest System lands shall be consistent

6   with the land management plans.").

7       The Forest Service completed the Stanislaus National Forest Land and Resource Management

8   Plan ("Forest Plan") in 1991.  AR 1388.  The currently operative March 2017 Forest Plan Direction is

9   based on the 1991 Forest Plan, as modified by approximately two dozen Forest Plan Amendments.  AR

10  1388-89.  The Forest Plan contains goals that "set the standards for the future condition of the Forest.

11  Objectives and subsequent levels of direction are aimed at accomplishing these goals."  AR 1390.  The

12  Forest Plan defines objectives as "planned, measurable results that respond to the general goals of the

13  Forest Plan," and management practices as "management actions that achieve the goals and objectives

14  of the Plan."  AR 1390.

15      The Forest Goal for range is to "[m]anage livestock to utilize available forage while avoiding

16  adverse impacts on soil, vegetation, water quality, wildlife, fisheries and riparian zones."  AR 1392.  The

17  Forest Goal for riparian areas is broadly to "maintain the physical, chemical and biological integrity of

18  the region's waters" and to support the goal "to provide habitat for riparian and aquatic-dependent

19  species" under various federal laws.  AR 14189-90.[25]

20      Forestwide standards and guidelines ("Forest Plan S&Gs") "provide specific direction for

21  implementing the management practices throughout the Forest."  AR 1391.  They apply at the project

22  level and are "an integral part of interdisciplinary planning for all projects and activities."  AR 1420.  In

23

24  _____

25  [25] This Forest Goal is taken from the 2004 Sierra Nevada Forest Plan Amendment Record of Decision, which superseded the original Goal and is incorporated into the Forest Plan.  AR 1393.

1    the grazing context, S&Gs provide short-term indicators of grazing impacts that are "designed keep

2    short term impacts at levels which, over the long term, will facilitate meeting Forest Plan Goals and

3    Objectives."[26]  AR 396.  Site-specific projects, such as permits, can be challenged and must be

4    consistent with the applicable Forest Plan.  *Inland Empire*, 88 F.3d at 757; 16 U.S.C. § 1604(i)

5    ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National

6    Forest System lands shall be consistent with the land management plans.").

7       Plaintiffs allege that the Forest Service's actions have failed to comply with three Forest Plan

8    S&Gs: 50, 117, and 118.[27]  Forest Plan S&G 50 applies to range resources and provides that "[t]o

9    protect hardwood regeneration in grazing allotments, allow livestock browse on no more than 20 percent

10   of annual growth of hardwood seedlings and advanced regeneration.  Modify grazing plans if hardwood

11   regeneration and recruitment needs are not being met."  AR 1439.

12       Forest Plan S&Gs 117 and 118 relate to Riparian Conservation Objective 5, which is to

13   "[p]reserve, restore, or enhance special aquatic features, such as meadows, lakes, ponds, bogs, fens, and

14   wetlands, to provide the ecological conditions and processes needed to recover or enhance the viability

15   of species that rely on these areas."  AR 1580.  Forest Plan S&G 117 provides

16
17
18
> Assess the hydrologic function of meadow habitats and other special aquatic features
> during range management analysis.  Ensure that characteristics of special features are, at a
> minimum, at Proper Functioning Condition, as defined in the appropriate Technical
> Reports (or their successor publications): (1) "Process for Assessing PFC" TR 1737-9
> (1993), "PFC for Lotic Areas" USDI TR 1737-15 (1998) or (2) "PFC for Lentic Riparian-
> Wetland Areas" USDI TR 1737-11 (1994).

19
20   *Id*.  Forest Plan S&G 118 provides

21
> Prohibit or mitigate ground-disturbing activities that adversely affect hydrologic processes
> that maintain water flow, water quality, or water temperature critical to sustaining bog and
> fen ecosystems and plant species that depend on these ecosystems.  [Footnote 66: ground

22

---

23   [26] This statement comes from a Forest Service document titled "Stanislaus National Forest's Evaluation of Central Sierra

24   Environmental Resource Center's 2017 Meadow Condition and Grazing Utilization Report" that evaluates the data, methodology, and conclusions in CSERC's observations of the grazing allotments.

25   [27] The TAC also alleges that the grazing on the BEH allotments has violated S&G 103, though Plaintiffs have abandoned this claim.  Pls.' Mot. at 18 n.10.

1

disturbing activities: activities that result in detrimental soil compaction or loss of organic
matter beyond the thresholds identified by soil quality standards. (SNFPA ROD, p. 71;
USDA 2004).] During project analysis, survey, map, and develop measures to protect bogs
and fens from such activities as trampling by livestock, pack stock, humans, and wheeled
vehicles. Criteria for defining bogs and fens include, but are not limited to, presence of:
(1) sphagnum moss (Spagnum spp.), (2) mosses belonging to the genus Meessia, and (3)
sundew (Drosera spp.)[.] Complete initial plant inventories of bogs and fens within active
grazing allotments prior to re-issuing permits.

2

3

4

5

*Id.* Plaintiffs cite data from both the EIS and their own monitoring reports in support of their claims that

6

the Forest Plan S&Gs are not being met. Defendants emphasize that the Forest Service is entitled to

7

deference in the interpretation of the Forest Plan S&Gs and the actions taken in connection with their

8

implementation. Defendants also argue that the Forest Plan S&Gs further long-term goals and do not

9

serve to halt any agency action when there is any minor failure to comply. Finally, Defendants

10

challenge the data that Plaintiffs cite in support of their claims and point to recent remedial measures

11

that the Forest Service has undertaken.

12

### 1.    The Forest Service's Interpretation of Its Forest Plan Is Entitled to Deference

13

The parties first dispute the strength of the requirement that Forest Service actions must comply

14

with the forest plan. The core of the dispute is whether the S&Gs are firm requirements requiring strict

15

compliance or broader goals toward which short-term actions should move. In other words, the parties

16

dispute how mandatory the S&Gs really are. "While NFMA requires that the proposed site-specific

17

actions be consistent with the governing Forest Plan, the Forest Service's interpretation and

18

implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v.*

19

*Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

20

Plaintiffs point to 2012 regulations (which Federal Defendants call the "2012 Planning Rule")

21

providing criteria for determining whether a project or activity is consistent with the applicable forest

22

plan, stating that a project or activity is consistent with the governing forest plan when it "complies with

23

applicable standards." 36 C.F.R. § 219.15(d)(2). These standards also provide that consistency with the

24

governing forest plan with respect to guidelines is met when the project or activity "[c]omplies with

25

applicable guidelines set out in the plan" or "[i]s designed in a way that is as effective in achieving the

purpose of the applicable guidelines." *Id.* § 219.15(d)(3).  The 2012 Planning Rule provides that "[a]

standard is a *mandatory constraint* on project and activity decisionmaking, established to help achieve

or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet

applicable legal requirements."  36 C.F.R. § 219.7(e)(1)(3) (emphasis supplied).

The 2012 Planning Rule provides that forest plans that were developed, amended, or revised

under a prior planning regulation would be unaffected, stating that "[e]xisting plans will remain in effect

until revised."  36 C.F.R. § 219.17(c).  It further provides that "[n]one of the requirements of this part

apply to projects or activities on units with plans developed or revised under a prior planning rule until

the plan is revised under this part, except that projects or activities on such units must comply with the

consistency requirement of § 219.15 with respect to any amendments that are developed and approved

pursuant to this part."  *Id.*

Only one amendment to the Stanislaus Forest Plan, not at issue here, post-dates the 2012

Planning Rule, AR 1389 (amending SNFP for Horse Gulch Campground site, adopted Jan. 26, 2016),

leaving the rest of the SNFP subject to the planning rule in effect at the time adopted.  *See Alliance for

the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018) ("Our original

opinion cited to 36 C.F.R. § 219.15.  However, because the Payette National Forest Plan was adopted

pursuant to the 1982 regulations, the newer regulations, promulgated in 2012, are inapplicable. 36

C.F.R. § 219.17(c) ("None of the requirements of this part apply to projects or activities on units with

plans developed or revised under a prior planning rule until the plan is revised under this part.")"); *In re

Big Thorne Project*, 857 F.3d 968, 974 (9th Cir. 2017) (applying "NFMA's regulations at the time of the

Forest Plan").  Accordingly, the Court agrees with Federal Defendants that the governing provisions

here are in the 1982 Planning Rule.  AR 17266 (1991 Forest Plan citing 1982 regulations); AR 14177

(2004 SNFPA Record of Decision, stating, "My decision conforms with the 1982 planning regulations

1    (36 CFR 219) that implement the National Forest Management Act.").[28]  The 1982 Planning Rule

2    consistency provisions provide that "the Forest Supervisor shall ensure that, subject to valid existing

3    rights, all outstanding and future permits, contracts, cooperative agreements, and other instruments for

4    occupancy and use of affected lands are consistent with the plan." 36 C.F.R. § 219.10(e) (1998);

5    *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998) (quoting 36 C.F.R.

6    § 219.10(e)).

7          The Forest Service's interpretation of its own 1982 Planning Rule is entitled to "substantial

8    deference," and "judicial review of an agency's interpretation of its own regulations is limited to

9    ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation."

10   *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003).  The Forest Service views

11   the S&Gs as short-term indicators of grazing impacts that "are designed [to] keep short term impacts at

12   levels which, over the long term, will facilitate meeting Forest Plan Goals and Objectives."  AR 396.

13   "The Forest range monitoring program is geared towards assessing whether S&Gs are met across a

14   particular area over a particular time, or whether adjustments to the grazing program might be necessary

15   to effectively move towards meeting the broader Forest Goals outlined in the Forest Plan."  AR 395.

16   "[T]he focus of the Forest's range program, which is informed by monitoring, is on meeting or moving

17   toward the broad Goals laid out in the Forest Plan, including through application of S&Gs (e.g.,

18   incorporation of applicable S&Gs in Term Grazing Permits and addressing the S&Gs in Annual

19   Operating Instructions)."  *Id*.  In other words, according to the Forest Service, general compliance with

20   short-term S&G goals will generally advance broader goals of the Forest Plan.  *See id*.  This approach is

21   consistent with the 1982 Planning Rule's general requirement that grazing "permits . . . cooperative

22   agreements, and other instruments for occupancy and use of affected lands are consistent with the

23   _____

24   [28] Where a regulation, like the consistency provision, has been superseded, the superseded regulation applies "'only to the
     extent' it was incorporated into the relevant Forest Plan." *In re Big Thorne Project*, 857 F.3d at 974 n.1 (quoting *Ecology
25   Ctr. v. Castaneda*, 574 F.3d 652, 657 (9th Cir. 2009)).  As described in text, the 1991 Forest Plan and the 2004 Forest Plan
     amendments each cite the 1982 regulations, which are accordingly incorporated into the relevant forest plan here.

[Forest] [P]lan." 36 C.F.R. § 219.10(e) (1998).

The Forest Service ensures general compliance with short-term S&G goals through two types of monitoring on the BEH allotments: implementation monitoring and effectiveness monitoring. AR 8314. Implementation monitoring is "short-term monitoring that is conducted to evaluate whether activities are meeting Forest Plan Standards and Guidelines." *Id*. It is conducted annually at "select locations on the Forest." AR 397. The USFS has limited resources—a single full-time rangeland management specialist conducts most of the monitoring—and does not conduct monitoring for each parameter on each of the 36 grazing allotments in Stanislaus National Forest every year. *Id*. Instead, Forest Service employees follow the Region 5 Forest Handbook to determine priority for allotment administration, using measures like compliance history, resource problems, and new or emerging resource issues. *Id*. (citing Region 5 Forest Service Handbook 2209.13, section 19.1 (USDA 2011a)).

Effectiveness monitoring is "long-term monitoring that is conducted to determine whether the Standards and Guidelines are sustaining or moving rangeland conditions toward desired conditions and to establish baseline information for future planning." AR 8314. The purpose is to "evaluate the degree and rate at which prescribed management practices are meeting management objectives." AR 399. It is generally conducted every three to ten years. *Id*.

Considered as a whole, the Forest Service's monitoring program, designed to use S&Gs as stepping stones toward "desired conditions" is a reasonable interpretation of both the applicable Forest Plan and the 1982 Planning Rule. With this in mind, the Court examines the Forest Service's actions in connection with each of the three challenged S&Gs.

**2.   S&G 50**

As discussed above, S&G 50 provides "[t]o protect hardwood regeneration in grazing allotments, allow livestock browse on no more than 20 percent of annual growth of hardwood seedlings and advanced regeneration. Modify grazing plans if hardwood regeneration and recruitment needs are not being met." AR 1439. Plaintiffs contend that the Forest Service has violated this S&G, pointing to the

1  Forest Service's own reports, the EIS, and CSERC's monitoring.

2        **a.**    **Aspen Browse**

3        The Forest Service last conducted aspen browse monitoring on the BEH allotments in 2010.  AR

4  399 ("Due to limited staff and resources, aspen browse is not monitored on every allotment every year.

5  Rather, Forest Service specialists may monitor aspen browse if a resource concern has been identified or

6  for upcoming project planning needs. For example, aspen browse was measured on the [BEH]

7  allotments . . . in 2010 to determine whether aspen browse standards are typically met on these

8  allotments.").  That monitoring, conducted in August and September of 2010, found that a significant

9  number of the sampled sites on the BEH allotments had aspen browse rates at or in excess of the 20%

10  threshold.  AR 526-656.[29]  Many of the sites with total browse above 20% noted evidence of livestock.

11  AR 541 (Round Meadow, 67.8% browsed; noting signs of livestock: "fresh [hoof] prints & cow

12  patties").  Plaintiffs argue that 15 of the 28 sampled sites met or exceeded 20% browse.

13        Plaintiffs also cite CSERC's monitoring data.  The AR includes CSERC's annual "Meadow

14  Condition and Grazing Utilization Report" for each year since 2011. *See* AR 657-1381.  Plaintiffs assert

15  that these reports demonstrate further incidents of aspen browse exceeding 20%, and that none of this

16  has "been recorded or addressed through mitigation by the Forest Service."  ECF No. 80 at 30.  The EIS

17  proposed that implementation monitoring "be conducted annually, if needed, as indicated below to

18  determine whether the Allotments are being managed in accordance with the Terms and Conditions of

19  the Grazing permits, AMPs and Annual Operating Instructions (AOIs)."  AR 8499.  For aspen browse

20

21  _____

22  [29] *See* AR 545-46 (Holding Pasture, 40% and 91.1% browsed); AR 550 (Crab Meadow, 67.8% browsed, noting that "fresh
cow patties present"); AR 554 (Kerrick Corral, 34.4% browsed); AR 571 (Eagle Meadow Horse Camp, 28.9% browsed); AR
23  583 (Eagle Meadow, 25.6% browsed); AR 603 (Herring – Pavement End, 23.3% browsed, noting that "recent cow sign
([hoof] prints & cow patties) present"); AR 612 (Fiddler's Green, 72.2% browsed, noting "fresh cow patties present"); AR
616 (Bull Run, 35.6% browsed, noting "[r]ecent cow patties present"); AR 624 (Snow Cabin, 23.3% browsed, noting "recent
24  cow patties present"); AR 633 (Hammis West, 26.7% browsed); AR 637 (Herring Creek, 31.1% browsed); AR 645 (Cow
Creek, 47.8% browsed, noting "recent cow patties present"); AR 649 (Punch Bowl, 28.9% browsed, noting presence of
25  "recent cow patties"); AR 653 (Cow Creek, 43.3% browsed, noting "recent cow patties present").

standards, the proposed implementation monitoring would take place "[p]rior to livestock turnout and end of season." *Id*. Because the Forest Service withdrew the Draft Record of Decision, the Forest Service did not adopt this plan.[30] Plaintiffs argue that the resulting failure to impose implementation monitoring means that the acknowledged violations of the 20% browse limit remain unremedied.

Federal Defendants read the numbers in the EIS to show that 23 of the 36 sites exceeded 20% browse but that "at least 10 of these locations had not been grazed by cattle." ECF No. 85-1 at 29. Half of the locations exceeding 20% browse did not even have cattle present, Federal Defendants argue, and the Forest Service could not determine whether livestock browsing alone accounted for the exceedances or whether other wildlife also contributed.[31] The EIS referenced these exceedances, stating that site visits to the meadows in 2004-05 and 2010-11 "indicated aspen regeneration in several areas is periodically being affected by over-browsing during the late-growing season" but that "it is unknown whether the majority of browse is attributable to livestock, packstock, or wildlife or a combination of all browsers."[32] AR 8318. *See also id*. ("Aspen browsing in the project area has been noted to exceed standards and guidelines in scattered locations."). In addition, as discussed more fully below, the Forest Service prepared a report assessing the data from CSERC's monitoring and concluded that CSERC failed to describe the methods used to measure aspen browse. AR 404-05. The Forest Service's own

---

[30] As mentioned above, in 2016, along with issuing an EIS to reauthorize grazing in the Stanislaus National Forest, the Forest Service issued a Draft Record of Decision that would have implemented an adaptive management strategy to ensure compliance with the governing Forest Plan. AR 8150. But the Draft Record of Decision was withdrawn on August 29, 2016, "[i]n order to allow more interactions with stakeholders on the issues." AR 7780.

[31] It may be overreading the data to conclude, as Federal Defendants do, that a blank entry on the data sheets for "number of animals" implies that there were no livestock present. *See* ECF No. 85-1 at 29 (citing instances in the data sheets where the "number of animals" field stated "none," "non-use," or was blank). This field is empty on every sheet other than the four instances that note that the site had no animals or was in non-use, including on sheets that also note the evidence of recent cow presence. Other than the instances where this field affirmatively notes the absence of cattle, it is not clear that it offers any meaningful information. Nevertheless, there are instance of sites that exceed 20% browse that note that the area in question did not have cattle present. AR 562 (Barn Meadow Proper, 23.3% browsed (in non-use that year)); AR 566 (Barn Meadow North, 20% browsed (in non-use that year)); AR 567 (Barn Meadow North, one month later, 23.3% browsed (in non-use that year)); AR 575 (Eagle Meadow Road, 23.3% browsed (no animals present)).

[32] The EIS discussed eighteen site visits, which found six sites with aspen browsing levels exceeding 20%, though three of the six included no cattle browsing. AR 8318.

43

monitoring data from 2017 differed from CSERC's, a result it attributes to differing methodology. AR

407. The Forest Service is conducting its own monitoring, has noted that overbrowse of aspen may not

be solely attributable to livestock graze, and, as discussed more fully below, is modifying grazing plans

where the S&G is not being met, just as S&G 50 requires. For instance, the Forest Service represents

that it has set up an electric fence to limit aspen browse where overbrowsing was occurring. ECF No

85-1 at 40 (citing AR 607-08). Given that the Forest Service has interpreted the S&Gs to require long-

term rather than immediate compliance, a reasonable interpretation entitled to deference, the Court

cannot say that the Forest Service has acted in violation of the APA with respect to aspen browse under

S&G 50. *See Weldon*, 697 F.3d at 1056 ("In determining whether [an agency decision challenged under

the NFMA] is arbitrary or capricious, we 'must consider whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment.'" (quoting

*Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 573 (9th Cir.1998))).

### b.  Woody Riparian Browse

Plaintiffs also point to CSERC's monitoring data in support of their claim that there has been

considerable overbrowsing of willow and other riparian species in streambanks in the allotments.

Federal Defendants cite Forest Service monitoring data, which does not show that woody

riparian browse has exceeded 20% on the BEH allotments. ECF No. 85-1 at 29, 29 n.19 (citing AR 410,

431, 434, 494-95, 524, 525 and noting that the two locations with browse levels exceeding 20% at AR

8504 are not on the BEH allotments). Plaintiffs view this data as inadequate, because it views the Forest

Service's method for collecting this data as inadequate. Federal Defendants describe Plaintiffs'

argument as a disagreement about the Forest Service's choice of scientific methodology, the sort of

disagreement that goes to agency expertise. The NMFA grants the Forest Service flexibility in

balancing its goals and deference in achieving its objectives. In reviewing the Forest Service's actions

with respect to NMFA regulations, "courts may not require a particular type of proof" but need only

provide "a rational connection between the facts found and the conclusions made." *In re Big Thorne*

1   *Project*, 857 F.3d 968, 975 (9th Cir. 2017) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 997

2   (9th Cir. 2008) (en banc), and *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1131 (9th Cir.

3   2007)).  "This rational connection can be supplied with studies or models or experts—or really any

4   legitimate evidence, so long as the agency describes a reasonable fit between its means and ends."  *Id.*

5       It is precisely the reasonable fit that Plaintiffs challenge.  They argue that the Forest Service's

6   use of Multiple Indictor Monitoring ("MIM") for browse of riparian shrubs is a method ill-suited for the

7   task.  ECF No. 87 at 45.  The method examines a marked segment of stream selected for monitoring

8   (referred to as a designated monitoring area, or "DMA") that extends at least 110 meters along the

9   stream.  AR 1930.  Examining a representative plot approximately two meters wide, the MIM method

10  involves making a visual estimate of the percentage level of browse for each woody species in a

11  particular plot.  AR 1821-22.  Plaintiffs contend that because the method focuses on the percentage level

12  of browse for each woody species within a plot, without regard for the *number* of such species within

13  the plot, thinly populated plots with unbrowsed willows would be treated with equal weight as a highly

14  populated plot with highly browsed willows.  In other words, focusing on plots rather than trees could

15  result in a deeply flawed calculation, leaving the Forest Service without a way to explain adequately

16  how it is meeting the 20% standard.  This is in contrast to the Forest Service protocol for aspen browse,

17  which Plaintiffs deem to be adequate because it "focuses not on an average of plots that may vary

18  considerably in measurable hardwood abundance, but rather the overall amount of browsing that has

19  occurred within a particular area."  ECF No. 80 at 32 (citing AR 399, explaining that the method counts

20  individual young aspen plants).[33]

21      This is nothing more than a disagreement about the Forest Service's methodology to measure

22

23

---

24  [33] Plaintiffs further point out that the technique for measuring stream alteration also uses a DMA, AR 1812-19, but register no objection to its use there, because one streambank DMA is measuring the same resource as the next streambank DMA – streambank land.  Plaintiffs argue that DMAs selected to measure hardwood trees, by contrast, may vary wildly in the

25  number of trees that are located on them, rendering the method unsupportable for measuring riparian hardwood browse.

browse.  The Forest Service is entitled to follow the peer-reviewed procedure published in the MIM

method, selected based on its agency expertise, even if the court might, in the first instance, find a

contrary method to be a better one.  *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)

("When specialists express conflicting views, an agency must have discretion to rely on the reasonable

opinions of its own qualified experts even if, as an original matter, a court might find contrary views

more persuasive.").  The MIM technical reference document explains that the method for measuring

riparian woody species use was adapted from a 1996 BLM "appearance method"[34] that was considered

along with other methods.  AR 1819-20.  One of the other methods considered that is closer in substance

to the one that Plaintiffs advocate is the "Cole browse method," which measures the percent of

individual twigs used on available shrubs, was one possibility that the Forest Service considered but

ultimately determined were not suitable for riparian woody species use.  AR 1820 (explaining that it was

developed for upland shrubs, has never been used extensively on riparian shrubs, and suffered from

specific measurement difficulties, including an inability to differentiate use by birds from use by large

herbivores).  The Forest Service recognizes that the MIM procedure is not a perfect one, noting that

there are often low numbers of woody plants and resulting small sample sizes.  AR 1820-21.  It also

cautions that the method "should not be used as a grazing use standard" but should instead "be an

indication of the browsing impacts within a use class range," AR 1821, which is how the Forest Service

used it here.  *See, e.g.,* AR 404 (explaining that Forest Service monitoring for willow browse on (Upper)

Round Meadow in 2017 was 14.8%).  The MIM method provides that the average use "is calculated as

the arithmetic average of woody species use values recorded for each plot, based upon the use category

or class for each species." AR 1823.  The method provides for reporting based on "class," which is

broken into categories of usage: Slight (0-20%), Light (21-40%), Moderate (41-60%), Heavy (61-80%),

---

[34] USDI, Bureau of Land Management. 1996b. Utilization studies and residual measurements. Interagency Technical Reference 1734-3. BLM/RS/ST-96/004+1730.  *See* AR 1939.

and Severe (81-100%).

The Court agrees that a measurement protocol focusing on an average of plots rather than plants has the potential for unrepresentative conclusions and that the perfect method, all else being equal, would focus on plants themselves. Nevertheless, the Forest Service weighed the strengths and shortcomings of the MIM method, as well as of other methods, and made the decision that the MIM method was appropriate for the task. Having considered the proper factors and relied on its scientific expertise to reach a reasoned conclusion, that is not a choice that the Court will second-guess.

### 3. S&G 117

Plaintiffs argue that the Forest Service also has violated S&G 117, which provides

> Assess the hydrologic function of meadow habitats and other special aquatic features during range management analysis. Ensure that characteristics of special features are, at a minimum, at Proper Functioning Condition, as defined in the appropriate Technical Reports (or their successor publications): (1) "Process for Assessing PFC" TR 1737-9 (1993), "PFC for Lotic Areas" USDI TR 1737-15 (1998) or (2) "PFC for Lentic Riparian-Wetland Areas" USDI TR 1737-11 (1994).

AR 1580.

Plaintiffs cite various statements in the EIS acknowledging some impact from grazing on special aquatic features. For instance, in a summary table near the beginning of the 374-page EIS, identifying existing conditions and needs for change, the EIS notes about the existing conditions that "[m]any special aquatic features are functioning at risk. Livestock use may be causing trailing and trampling in special aquatic features, which in some cases has resulted in hydrologic alteration, bare soil/peat and/or loss of wetland vegetation." AR 8213. The "need for change" is to "[r]educe impacts of livestock to special aquatic features by improving livestock distribution and minimizing time spent near special aquatic features. Update [Allotment Management Plans] to incorporate and implement an adaptive strategy to improve the condition of special aquatic features that are Functioning At-Risk." *Id.*

1    The EIS later states that the Forest Service conducted Proper Functioning Condition (PFC)[35]

2    monitoring on "all known special aquatic features ([f]ens, seeps, and springs) that were identified in

3    Allotment surveys" and geographical mapping.  AR 8319.  That PFC monitoring found that

4    approximately half of the 44 special aquatic features assessed were properly functioning, while the other

5    half were all "Functional – At Risk."  *Id.*   The EIS states that the "trend was not apparent" and that

6    further monitoring would be needed to determine if they were trending in an upward or downward

7    manner.  *Id.*; *id.* at 8344.

8    Summarizing a 2010 assessment conducted on 16 springs, fens, and shorelines in the Bell

9    Meadow Allotment, the EIS noted that half of the special aquatic features were determined to be

10   functional – at risk, and that "the primary hydrologic issue" at those sites was "[h]oof action altering

11   flow patterns."  AR 8367.  The other two allotments had similar assessments.  *See* AR 8372 (seven of 13

12   special aquatic features surveyed in 2010 in the Eagle Meadow Allotment were functional – at risk, with

13   "[h]oof action altering flow patterns" as "the primary hydrologic issue"); AR 8377 (six of 17 special

14   aquatic features surveyed in 2010 in the Herring Creek Allotment were functional – at risk, with "[h]oof

15   action altering flow patterns" as "the primary hydrologic issue").

16   Federal Defendants assert that more recent data since 2010 demonstrate stable conditions and

17   identify three sites that saw improved conditions between 2010 and 2015, noting that none of the

18   meadow areas on the BEH allotments examined showing deteriorating conditions.  ECF No. 85-1 (citing

19   AR 433 and identifying Crab Meadow, Round Meadow, Wire Corral, and Red Rock Meadow as sites

20   with conditions that improved during the five years).

21   Part of the dispute over S&G 117 rests on what exactly the S&G requires.  Federal Defendants

22   argue that the plain language of S&G 117 applies only "during range management analysis."  ECF No.

23   _____

24   [35] "PFC is a qualitative method for assessing the condition of riparian wetland areas."  AR 400.  It is "a consistent approach
     for considering hydrology, vegetation, and soils attributes and processes to assess the condition of riparian wetland areas"

25   that "is intended to be conducted by a trained and experienced interdisciplinary team and evaluates how well the physical
     processes are functioning through use of a checklist."  *Id.*

85-1 at 33.  Plaintiffs contend that while the language does state that "the hydrologic function of meadow habitats and other special aquatic features" should be assessed "during range management analysis," the second component of the S&G is unbounded by a temporal limitation and requires that the Forest Service "[e]nsure that characteristics of special features" are at least in PFC.  ECF No. 87 at 36.

As mentioned above, approximately half of the special aquatic features assessed in 2010 were below PFC, either "functional – at risk" or "non-functional."  Plaintiffs view this as a problem in need of more serious resolution; Federal Defendants point to modest improvement on a handful of meadows and argue that the special aquatic features are trending in the right direction.  Exactly what the S&G means when it commands the Forest Service to ensure that the characteristics of special features in PFC or better is not perfectly clear, and the Forest Service asserts that the trend is in the right direction.  The Forest Service's interpretation that this Forest Plan S&G is satisfied if there is an improving trend is entitled to deference.  The improvement may be gradual, but that does not make the Forest Service's action arbitrary or capricious.

### 4.     S&G 118

Finally, Plaintiffs argue that the Forest Service has violated S&G 118, which provides in pertinent part "[p]rohibit or mitigate ground-disturbing activities that adversely affect hydrologic processes that maintain water flow, water quality, or water temperature critical to sustaining bog and fen ecosystems and plant species that depend on these ecosystems."  AR 1580.  It goes on to provide "[d]uring project analysis, survey, map, and develop measures to protect bogs and fens from such activities as trampling by livestock, pack stock, humans, and wheeled vehicles."  *Id.*  It concludes, "[c]omplete initial plant inventories of bogs and fens within active grazing allotments prior to re-issuing permits."  *Id*.

Plaintiffs argue that the Forest Service has failed to comply with S&G 118 by allowing continued grazing in bog and fen ecosystems that result in damage from hoofs and trampling.  They cite much of the same data as they do in support of their claim for S&G 117.  *See* AR 8367 (eight of 16

special aquatic features surveyed in 2010 on the Bell Meadow Allotment were functional – at risk, with "the primary hydrologic issue" at those sites being "[h]oof action altering flow patterns'); AR 8372 (seven of 13 special aquatic features surveyed in 2010 in the Eagle Meadow Allotment were functional – at risk, with "[h]oof action altering flow patterns" as "the primary hydrologic issue"); AR 8377 (six of 17 special aquatic features surveyed in 2010 in the Herring Creek Allotment were functional – at risk, with "[h]oof action altering flow patterns" as "the primary hydrologic issue").  CSERC annual monitoring also found "cattle trampling altering the hydrologic functioning of seeps and fens."  ECF No. 75 at 28.

Federal Defendants state that the Forest Service has surveyed, mapped, and developed measures to protect fens and bogs, such as conducting botany surveys within special aquatic features during project analysis of the BEH Rangeland Allotments project, AR 8600-01, in satisfaction of the S&G's requirements.  *See* AR 1580 ("During project analysis, survey, map, and develop measures to protect bogs and fens from such activities as trampling by livestock, pack stock, humans, and wheeled vehicles. . . . Complete initial plant inventories of bogs and fens within active grazing allotments prior to re-issuing permits.").  It also mapped special aquatic features within the BEH project area and assessed the hydrologic function of these features.  AR 10499-510.  Federal Defendants argue that they have added mitigation features, pointing to modifications made to the grazing permits in 2017 to include a "detailed map" and reference to S&G 118, with the command that permittees protect specific identified special aquatic features within the allotments.  ECF No. 88 at 22 (citing AR 3, 7, 8, 11, 12).  The Forest Service has complied with the plain language of S&G 118, surveying and mapping during project analysis as required, and mitigating ground-disturbing activities that inhibit hydrologic processes by amending AOIs to identify locations of special aquatic features on the allotment, though this latter component is both vaguer in the S&G and, as discussed in the discussion of S&G 117, improving at a slow rate.  Nevertheless, both the interpretation of the S&G and the scientific judgment driving its execution are matters within the Forest Service's discretion, and it does not appear that the Forest

1   Service has acted arbitrarily or capriciously.  Language in the Forest Plan granting the Forest Service

2   discretion to mitigate harm when possible means that "the USFS's alleged failure to apply these

3   provisions as [a complaining party] wishes is not a violation of the NFMA."  *Conservation Cong. v.*

4   *United States Forest Serv.*, No. 18-17165, 2019 WL 2172782, at *2 (9th Cir. May 20, 2019).

5           **5.       Forest Service's Disagreement with CSERC's Data**

6           The Forest Service is entitled to make its own reasonable scientific judgments so long as it has

7   considered a reasoned evaluation of the relevant factors when reaching that conclusion.  *Marsh*, 490

8   U.S. at 378.  The Forest Service has done so here in part by reviewing and analyzing CSERC's data that

9   CSERC believes shows failure to comply with the Forest Plan S&Gs.

10          The Forest Service prepared a report evaluating CSERC's 2017 Meadow Condition and Grazing

11   Utilization Report.  AR 393 (report dated May 18, 2018); AR 657 (2017 CSERC report).  The Forest

12   Service report faults the CSERC report for failing to identify the methods used to measure riparian

13   alteration and notes the Forest Service's use of the MIM method, resulting in divergent results between

14   the CSERC report and the Forest Service monitoring data, including data taken at the same meadow just

15   a day apart.  AR 404.  The Forest Service report similarly faults the CSERC report for its failure to

16   describe the methods used to measure willow and aspen browse, further noting that aspen health has

17   declined in the region independent of cattle grazing.  AR 404-05.  The Forest Service also criticizes the

18   CSERC report for failing to describe the criteria or monitoring methods employed in determining

19   whether special aquatic features were in proper functioning condition, contrasting it with the Forest

20   Service's use of an interdisciplinary team's use of technical references[36] to make the determinations.

21   AR 406.  The Forest Service report acknowledges that it has used CSERC data to inform management

22   practices in the past and will continue to do so, but ultimately discounts CSERC's report for using faulty

23

24   _____

25   [36] The Forest Service uses "A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lentic Areas."  USDI TR 1737-16 (1999, revised 2003).  AR 400.

1  methodology or failing to report the methodology it used, concluding that the divergent data that is

2  largely inconsistent with the Forest Service's own monitoring data for 2017 "is most likely attributable

3  to the difference in methodology employed." AR 407. The Forest Service is entitled to rely on its own

4  expertise when it has properly considered the relevant factors. *Marsh*, 490 U.S. at 378 ("When

5  specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions

6  of its own qualified experts even if, as an original matter, a court might find contrary views more

7  persuasive."); *Lands Council*, 537 F.3d at 993 ("[O]ur law . . . requires us to defer to an agency's

8  determination in an area involving a 'high level of technical expertise,'" and "we are to conduct a

9  'particularly deferential review' of an 'agency's predictive judgments about areas that are within the

10  agency's field of discretion and expertise . . . as long as they are reasonable.'" (citations omitted)),

11  *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

12       **6.       Forest Service's Corrective Measures**

13       Federal Defendants highlight that the Forest Service has undertaken corrective measures to try to

14  nudge the S&Gs toward compliance where appropriate. ECF No. 85-1 at 30-32, 37-38. Plaintiffs

15  repeatedly identify statements in the EIS stating that adaptive management plans should be implemented

16  to allow the Forest Service to adjust the grazing program to comply with the Forest Plan.[37] For instance,

17  they point to the statement in the EIS that "[r]ecent assessments indicate that, while desired conditions

18  are being met throughout a large portion of the project area, specific locations within the project area

19  may not be meeting or moving toward desired conditions in a manner that is timely and consistent with

20  Forest Plan objectives, standards and guidelines. Gaps between existing resource conditions and desired

21  conditions indicate a need to change grazing management by updating AMPs." AR 8199. Plaintiffs

22  also highlight language in the EIS noting that action was needed, along with the Forest Supervisor's

23

24  _____

25  [37] The EIS explains that adaptive management "uses monitoring to determine if actions prescribed were followed, and adjusts management if changes are needed. An adaptive strategy is particularly suited for dealing with management issues involving high levels of uncertainty, limited knowledge, and unpredictability." AR 8198.

1   statement in the later-withdrawn Draft Record of Decision stating that "[r]ecent assessments indicate

2   that specific locations within the project area may not be meeting or moving toward desired conditions

3   in a manner that is timely and consistent with the Forest Plan.  There is a need to change grazing

4   management by implementing an adaptive management system and resource conservation measures that

5   more effectively move resource conditions toward desired conditions in a manner that is timely and

6   consistent with the Forest Plan."[38]  AR 8165.

7         Plaintiffs view the current monitoring framework as too infrequent to ensure compliance and

8   argue that the failure to adopt the adaptive management plan in the EIS leaves the Forest Service on the

9   same path that has resulted in "*decades* of non-compliance with these standards."  ECF No. 87 at 41

10   (citing AR 8210).  More importantly, Plaintiffs contend that failure to complete the NEPA process

11   leaves the Forest Service without the authority to impose meaningful adaptive-management-triggered

12   restrictions like adding recommendations or instructions in an AOI, because such actions require the

13   completion of the NEPA process.  *Id.* (citing AR 18392 (FSH Section 96.2: "Adaptive management

14   options that would be activated if the authorized activity is not achieving the anticipated objectives must

15   be specified in the project-level decision."); AR 18385 (FSH Section 92.23b(3): "As circumstances

16   where changes in conditions warrant implementation of a management option that has not been provided

17   for in the NEPA analysis, or when the predicted effects of implementation are determined to be greater

18   than the effects originally predicted, a supplemental or new NEPA analysis and NEPA-based decision is

19   needed."); AR 8239 (EIS statement that under current management, adoptive management options are

20   limited to the terms of the grazing permit)).  In Plaintiffs' view, the adaptive management options that

21   the Forest Service retains in the absence of the completion of the NEPA process is too toothless to

22   comply with the S&Gs.  ECF No. 87 at 37-42.

23   ————————————————

24   [38] The Draft Record of Decision also proposed an action that included "[a]uthorization of continued livestock grazing within the permitted grazing area will occur the year following this decision with updates to AMPs and term grazing permits that

25   would establish the specified livestock numbers, season of use, utilization standards, allotment infrastructure and management (grazing system)."  AR 8161.

Federal Defendants disagree, pointing to permits modifications that the Forest Service made in 2017 to provide additional information, including a "detailed map" of special aquatic features on the allotment and reference to S&G 118 with the command that permittees protect specific identified special aquatic features within the allotments.  ECF No. 88 at 22 (citing AR 3, 7, 8, 11, 12).  The 2017 modifications also specify which S&Gs apply to ground-disturbing activities and which special aquatic features are on the allotments.  *Id.*  The Forest Service has also recently modified AOIs.  AOIs since 2016 have included a new section entitled "Other Management Recommendations/Instructions" or "Other Management Considerations."  AR 78, 85, 92 100, 108, 115, 118, 121, 133.  These new sections include mitigation measures, such as installing an electric fence, herding away from Wire Corral, minimizing use on Coyote Meadow, and installing a water trough on Bluff Meadow.  AR 121, 133.  The Forest Service also represents that the Forest Service set up an electric fence to protect aspen where excessive aspen browse was an issue.  ECF No. 85-1 at 40 (citing AR 607-08 (aspen browse data sheets noting that "clump is surrounded by electric fencing")).  The Forest Service characterizes these steps as improvements to the range management process since 2016.  They argue that the Forest Service was already complying with the Forest Plan and that these more recent efforts have only improved the range monitoring program.  ECF No. 88 at 24.  Though the Forest Service did not adopt the Draft Record of Decision, it did incorporate adaptive management principles into its administration of grazing on the BEH allotments.

Plaintiffs dismiss these "[r]andom mitigation measures" as an inadequate substitute for "a coherent strategy and regulatory commitment to limit grazing when adverse impacts occur."  ECF No. 87 at 42.  An adaptive management system can come in many varieties and need not follow the exact contours of the adaptive management proposed in the Draft Record of Decision.  The Forest Service is entitled to craft the adaptive management program that it deems appropriate.  The Forest Service's actions may not represent Plaintiffs' preferred course, but as long as it has reasonably interpreted its Forest Plan and used its scientific judgment while considering the proper factors, the decision belongs to

54

1   the Forest Service.

2          The alternatives outlined in the EIS are not the measuring stick against which all adaptive

3   management activities must be compared.  Even in the absence of a completed NEPA process, the

4   Forest Service retains the power to impose directions and limitations on grazing in the BEH allotments.

5   The corrective measures outlined in the EIS may be swifter and more forceful than the measures the

6   Forest Service has undertaken so far.  But if the Forest Service has determined in its expertise that its

7   Forest Plan requires movement toward long-term goals in the S&Gs and that it is on the path to

8   achieving those goals, that judgment is entitled to deference.  Plaintiffs have not demonstrated that the

9   Forest Service's judgment should be disturbed.  *Forest Guardians,* 329 F.3d at 1097-98  (holding that in

10  light of the deferential standard of review of the Forest Service's interpretation of its forest plan and in

11  light of the federal requirement to consider the use of National Forest lands for grazing of livestock and

12  to develop AMPs in consultation with permittees, lessees, and landowners, a Forest Service decision to

13  reduce grazing over three-year period rather than doing so immediately was not arbitrary, capricious, or

14  a violation of law); *id*. at 1099-1100 ("An agency's actions need not be perfect; we may only set aside

15  decisions that have no basis in fact, and not those with which we disagree. . . . Thus, even if we were to

16  conclude that the Service could develop a better system of predicting wild ungulate use, or even

17  preventing overgrazing, we are not permitted to substitute our judgment for the agency's."); *Theodore*

18  *Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010) (holding in a NEPA

19  challenge that "[a]llowing adaptable mitigation measures is a responsible decision in light of the

20  inherent uncertainty of environmental impacts" that "is certainly not arbitrary or capricious").

21          In sum, Federal Defendants argue that the Forest Service's range monitoring program reasonably

22  assesses compliance with the S&Gs, that the Forest Service has in fact complied with S&Gs 50, 117,

23  and 118, and that these methods and conclusions are entitled to deference because a court's "highest

24  deference is owed to the Forest Service's technical analyses and judgments within its area of expertise."

25  *League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1131 (9th Cir.

1    2010) (citing *Lands Council*, 537 F.3d at 993, *overruled on other grounds by Winter v. Nat. Res. Def.*

2    *Council, Inc.,* 555 U.S. 7 (2008)).  The Court agrees.

3       Accordingly, Plaintiffs' motion for summary judgment on the NMFA claim is **DENIED**, and

4    Federal Defendants and Defendant-Intervenors' cross-motions for summary judgment are **GRANTED**.

5               **VI. <u>CONCLUSION AND ORDER</u>**

6       The Court is sympathetic to the concerns that sparked this lawsuit.  Technical violations of water

7    quality standards persist, and the process in place to address them is moving at a glacial pace.  Yet, the

8    structure of the regulatory regimes at issue in this case grants state water quality regulators great

9    flexibility in their dealings with the Forest Service, which is, in turn, working cooperatively with

10    regulators to address water quality issues. Likewise, the Forest Service is entitled to deference in its

11    achievement of compliance with the various goals set forth in the Forest Plan. Accordingly, and for the

12    reasons set forth above Plaintiffs' motion for summary judgment is **DENIED** and Defendants' cross

13    motions are **GRANTED**.

14       Within ten days of electronic service of this Memorandum Decision and Order, Federal

15    Defendants shall submit a proposed form of judgment consistent with the rulings herein.

16    **IT IS SO ORDERED.**

17    **Dated:   <u>August 6, 2019</u>**          <u>**/s/ Lawrence J. O'Neill**</u>

18                            **UNITED STATES CHIEF DISTRICT JUDGE**

19

20

21

22

23

24

25